2001 WL 1491183
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.

Carl MOSS, Plaintiff,
v.
Jason MORMON, et al., Defendant.

No. 99 C 3571. | Nov. 26, 2001.

Opinion

**MEMORANDUM, OPINION AND ORDER**

ANDERSEN, District J.

**\*1** The Plaintiff, currently an inmate at Menard
Correctional Center, has brought this pro se civil rights
action pursuant to 42 U.S.C. § 1983 against officers and
officials at the Joliet Correctional Center where he was
previously housed, alleging violations of constitutional
rights arising from an incident when another inmate
assaulted him, breaking his jaw. He raises claims of
failure to protect from harm and failure to provide
adequate medical care. He claims that the defendant Dr.
Craig violated his constitutional rights by failing to
provide him with adequate dental care. This matter is
before the Court for consideration of the defendant Dr.
Craig's motion for summary judgment. For the reasons
stated in this order, the motion is granted.

**STANDARD OF LAW**

Summary judgment will be granted when there is no
genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. Fed.R.Civ.P.
56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);
O'Connor v. DePaul Univ., 123 F.3d 665, 669 (7th
Cir.1997). In weighing a motion for summary judgment,
the court must take the facts in the light most favorable to
the party opposing the motion and draw all reasonable
inferences in that party's favor. Bahl v. Royal Indemnity
Co., 115 F.3d 1283, 1289 (7th Cir.1997); Condo v. Sysco
Corp., 1 F.3d 599, 601 (7th Cir.1993), cert. denied, 114
S.Ct. 1051 (1994). The party opposing the motion must

present evidence of a triable issue of material fact. See
Vance v. Peters, 97 F.3d 987, 990 (7th Cir.1996), cert.
denied, 117 S.Ct. 1822 (1997). The non-moving party is
required to go beyond the pleadings and designate
specific facts showing a genuine issue for trial.
Bank-Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236
(7th Cir.1991). A fact is material when it would determine
the outcome under the governing law. Whetstine v. Gate
Rubber Co., 895 F.2d 388, 392 (7th Cir.1990). A material
fact is genuinely in dispute when "the evidence is such
that a reasonable jury could return a verdict for the
non-moving party." Anderson v.. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986).

**FACTS**

The Plaintiff, Carl Moss, is currently an inmate at Menard
Correctional Center. In 1998, however, he was an inmate
at Joliet Correctional Center. On May 6, 1998, Plaintiff
alleges that another inmate assaulted him in the shower,
breaking Plaintiff's jaw.

Plaintiff outlines the facts relevant to Dr. Craig in his
sworn statement, entitled "History of Broken Jaw," as
follows: Dr. Craig installed a bracket on both his upper
and lower jaws. These brackets contained numerous razor
sharp points that are intended to hold small rubber bands
that would lock the top and bottom jaws together. These
bands broke on the way back to the prison. His tongue
was wired to the floor of his mouth. By placing his finger
into his mouth, Plaintiff managed to get his tongue out
from under the wire. He states no injury to his tongue
from this procedure. Upon return to prison, Plaintiff
requested more bands from Joliet Correctional Center
personnel. He was told that Dr. Craig sent them to
Stateville Prison by mistake.

**\*2** When he next saw Dr. Craig, the doctor gave him
dental wax which helped protect his mouth from the sharp
metal brackets. (Dep. pp. 100-102, stating that the wax
was "very effective"). He complained to Joliet
Correctional staff almost daily for more wax. One month
after the surgery, he was given 23 bands by Dr. Ward.
Plaintiff complains that Dr. Craig tightened the wires
holding the brackets to his teeth, inflicting needless pain.
He would not give Plaintiff more bands and would not
remove the device from his mouth.

Defendant Craig summarizes the facts as follows: On
May 11, 1998, Plaintiff was taken to a hospital in Joliet
where Dr. Craig installed metal brackets to his upper and



EXHIBIT
D

1

lower jaws to immobilize the broken jaw. The stainless steel wires and the rubber bands were used to lock the brackets together. Plaintiff alleges that the rubber bands he was given broke due to the sharpness of the dental appliance that Dr. Craig installed. For the next two months he was treated almost daily. He sought additional rubber bands from both Dr. Mitchell and Dr. Craig. However, as Plaintiff states in his deposition, Dr. Craig was on vacation from May until early June; further, Dr. Craig sent replacement rubber bands to Stateville Correctional Center instead of to Joliet Correctional Center by mistake. In addition to the rubber bands, Plaintiff received dental wax and pain medication while he was under the care of Dr. Craig. Finally, defendant Craig asserts that Plaintiff received rubber bands on June 11, 17 and July 6, 10, and 13. Craig attaches the medical records from Joliet Correctional Center, including nurses and doctors progress notes, to support these claims.

Plaintiff asserts in his second response to defendant Craig's motion for summary judgment (Plaintiff has filed four separate responses) that all of the medical records and progress notes from the prison are false. He provides no support for this claim. Regarding one important fact, however, he does agree with defendant's statement of facts, # 30, that Dr. Craig sent ligature bands to the wrong prison by mistake. (Dep. p 99-100; 8/30/01 response to motion for summary judgment).

## DISCUSSION

Since this motion is brought only by Dr. Craig, the Court reviews the facts relating to him without commenting on any allegations against any other defendant. There are three different episodes related to Dr. Craig's care of plaintiff: the surgery itself, the month after surgery when rubber bands were allegedly not delivered, and one visit with Dr. Craig when Plaintiff alleges the doctor tightened the brackets on his teeth in a manner that inflicted needless pain. Since the serious nature of Plaintiff's medical needs is not in dispute, the Court will review the applicable law related to deliberate indifference and then examine each of these situations in turn and determine the applicability of the deliberate indifference standard to each instance.

## DELIBERATE INDIFFERENCE

*3 The Supreme Court has limited recovery under the Eighth Amendment to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 291 (1976). A prison official violates the Eighth Amendment when (1) the deprivation alleged is objectively sufficiently serious and (2) the prison official acts with "deliberate indifference." *See Wilson v. Seiter*, 501 U.S. 294, 297-302 (1991). Deliberate indifference exists when an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In order for this Court to find that Plaintiff's claims of inadequate medical care amount to punishment, he must demonstrate that Dr. Craig exhibited deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 104; *Holmes v. Sheahan*, 930 F.2d 1196, 1199 (7th Cir.1991). Plaintiff must show acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

A state has an affirmative obligation under the Eighth Amendment to provide persons in its custody with a medical care system that meets minimal standards of adequacy. *Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir.1987). However, not every claim by a prisoner alleging inadequate medical care states a constitutional violation. *Id.* Mere negligence on the part of a physician in diagnosing or treating a medical condition will not state a valid claim of medical mistreatment under the Eighth Amendment. *See Estelle*, 97 S.Ct. at 292; *see also Williams v. Cook County Jail Medical Staff*, 1991 WL 181072, at *1 (N.D.Ill. Sep. 11.1991).

Dental care is one of the most important medical needs of inmates. *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir.1980). Plaintiff's allegations are sufficient to demonstrate that he had a serious medical need to restore his broken jaw. The parties agree that Plaintiff has sufficiently stated a serious medical need for treatment for a broken jaw. This treatment includes the operation and the requisite post-operative care.

## WAS DR. CRAIG DELIBERATELY INDIFFERENT TO PLAINTIFF'S MEDICAL NEEDS?

To determine whether Plaintiff has shown that defendant Dr. Craig was deliberately indifferent to his medical needs, it is necessary to evaluate the undisputed facts presented in the summary judgment motion. Inadequate treatment due to negligence, inadvertence or differences

in judgment between an inmate and medical personnel do not rise to the level of a constitutional violation. *Estelle,* 429 U.S. at 106; *Del Raine v. Williford,* 32 F.3d 1024, 1031-32 (7th Cir.1994). Failure to treat a known serious medical need is not alone sufficient to show a constitutional violation; the failure to treat must cause serious injury. *See Langston v. Peters,* 100 F.3d 1235, 1240-41 (7th Cir.1996). The Court reviews all contacts between Plaintiff and Dr. Craig to determine if Plaintiff met the *Farmer* test: namely, Dr. Craig must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference.

### The Surgery

**\*4** Applying this law to the facts in Plaintiff's case, the only issue related to the surgery is the Plaintiff's claims that his tongue was underneath a wire after the surgery. Although Plaintiff alleges that his tongue was wired to his teeth, he later asserts that he was able to free his tongue with his finger, belying his earlier allegation. He makes no further mention of any wrongdoing regarding the actual surgery. He never complained to Dr. Craig about this tongue problem, and it does not seem to have injured him. He now states in his response that this was a "botched operation." However, he has introduced no evidence of this. To the extent that he claims that the operation was not successful, Plaintiff's claim appears to be one of negligence. As the case law makes clear, negligence, or even gross negligence, does not state a claim for deliberate indifference. Therefore, the Court finds as a matter of law that defendant Craig was not deliberately indifferent to Plaintiff in performing the surgery to repair his broken jaw.

### The Post-Operative Care: Rubber Band Replacement

The gravamen of Plaintiff's complaint is that the defendant failed to act appropriately following the surgery in that Dr. Craig neglected to provide Plaintiff with post-operative rubber bands and other treatment. The key aspect of the necessary post-operative care was the delivery of rubber bands during the first month after the surgery. It is now undisputed that Dr. Craig mistakenly ordered that the rubber bands be sent to the wrong prison, and that he was on vacation and not available during the first month after the surgery. Nevertheless, there is no circumstance present in the Plaintiff's complaint which rises to the level of deliberate indifference with regard to the bands. Although there was delay in Plaintiff's receipt of dental rubber bands due to Dr. Craig's mistake, the record does not support an assertion that he was either

aware of a risk or that he drew the inference that there was any risk to Plaintiff regarding delivery of the rubber bands. Therefore, as a matter of law, Dr. Craig did not deliberately delay Plaintiff's access to medical attention. *See Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992); *Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir.1990) ("In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligent or isolated occurrences of neglect"). While it was unfortunate that Dr. Craig did not send the rubber bands to the correct institution, there is no evidence that he did so deliberately. *See Rapier v. Harris,* 172 F.3d 999, 1006 (7th Cir.1999).

### The Post-Operative Care: Tightening The Brackets

Plaintiff's affidavit reiterates his allegations in his complaint that the procedure to tighten his brackets caused him needless pain. His bald allegation that this was done intentionally to cause him needless pain, without any supporting evidence, must fail. As the Seventh Circuit has held, a plaintiff cannot overcome a motion for summary judgment by simply restating the allegations contained in his complaint without any additional evidence. *See Bank-Leumi Le-Israel,* 928 F.2d at 236. Plaintiff does not state that the procedure was not medically required, only that it hurt. While we have no doubt that the Plaintiff experienced some discomfort, that is a normal side effect of any surgery. Nevertheless, if Plaintiff's constant complaining is any indication, it appears that some adjustment may have indeed been necessary. However, without any evidence to indicate that this bracket tightening procedure was not medically required, Plaintiff has failed to allege deliberate indifference. Indeed, the medical notes, which Plaintiff asserts are fabricated, show that his jaw was healing, albeit slowly. (Plaintiff disputes the Defendant's statement of facts regarding these notes by saying that they are "all lies." However, he provides no substantive evidence to support these allegations.) Plaintiff cannot succeed in this case merely by challenging the validity of his medical records. This is so because the Court does not rely on medical records alone, which themselves are hearsay evidence and not supported by affidavits from any defendants, but rather on the undisputed facts regarding this procedure, particularly the statements Plaintiff makes in his own deposition. Plaintiff's assertion that this procedure caused him needless pain, without more, fails to state a claim.

### CONCLUSION

**Moss v. Mormon, Not Reported in F.Supp.2d (2001)**

**\*5** For the foregoing reasons, the defendant's motion for summary judgment is granted. Judgment is entered on behalf of Dr. Craig and he is dismissed from this suit. All other parties remain. Any other pending motions are denied as moot.

It is so ordered.

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22232830
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Ronald MYERS, # N-30973, Plaintiff,
v.
Dr. James McAULEY, et al., Defendants.

No. 02 C 1590. | Sept. 16, 2003.

**Attorneys and Law Firms**

Ronald Myers, pro se, Vienna, IL, for plaintiff.

John A. Ouska, John Michael Allegretti, Ashley Caroline Esbrook, Cook County State's Attorney, Chicago, IL, for defendants.

**Opinion**

### *MEMORANDUM OPINION AND ORDER*

COAR, J.

**\*1** The plaintiff, currently a state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff claims that the defendants, health care providers at the Cook County Jail, violated the plaintiff's constitutional rights by acting with deliberate indifference to his serious medical needs. More specifically, the plaintiff alleges that the defendants refused to provide proper maintenance and medical care for his tracheotomy/breathing tube. This matter is before the court for consideration of the defendants' motion for summary judgment. For the reasons stated in this order, the motion will be granted.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Prime Northgate Plaza Ltd. Partnership v. Lifecare Acquisitions Corp., 985 F.Supp. 815, 817 (N.D.Ill.1997). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Walker v. Northeast Regional Commuter Railroad Corp., 225 F.3d 895, 897 (7th Cir.2000).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 393 (7th Cir.1997), cert. denied, 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998).

### *FACTS*

The defendants have filed a statement of uncontested material facts pursuant to Local Rule 56.1. Together with their motion, the defendants served on the plaintiff the required notice under Local Rule 56.2, advising him what he needed to do to contest the motion, and specifically what he needed to do to dispute their statement of uncontested facts. In addition, the court's Minuto Order of July 10, 2003, struck the plaintiff's original statement of contested facts and instructed him how to respond, reminding him that every assertion of fact he made had to be supported by a citation to the record. Despite this, many of the plaintiff's denials are unsupported by the evidence to which he points. Unsupported statements in a brief are not evidence and cannot be given any weight. See, e.g., Johnson v. Spiegel, Inc., No. 02 C 0680, 2002 WL 1880137, at *4 (N.D.Ill. Aug.15, 2002) (Pallmeyer, J.), citing In the Matter of Morris Paint and Varnish Co., 773 F.2d 130, 134 (7th Cir.1985). Furthermore, the plaintiff has failed to provide his own statement of additional facts he wishes the court to consider.

**\*2** The plaintiff's failure to properly respond to the defendants' statements of material facts as directed warrants disregard of any contrary assertions he makes in his briefs. See Smith v. Lamz, 321 F.3d 680, 683 (7th Cir.2003). The court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." Id., citing Bordelon v. Chicago School Reform Bd. of Trustees, 233 F.3d 524, 529 (7th Cir.2000). And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. Edward E. Gillen Co. v. City

*of Lake Forest,* 3 F.3d 192, 196 (7th Cir.1993).

Nevertheless, because the plaintiff is proceeding *pro se,* the court has considered the factual assertions he makes in his brief and affidavit, but only to the extent that the plaintiff could properly testify about the matters asserted at trial. Affidavits must concern facts about which the affiant is competent to testify, must be based on personal knowledge, and must set forth such facts as would be admissible in evidence. Fed.R.Civ.P. 56(e). A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed.R.Evid. 602. It should additionally be noted that the validity of medical records and entries in the medical records cannot be disputed in the absence of any contrary evidence. *Moss v.. Morman,* No. 99 C 3571, 2001 WL 1491183, at *4 (N.D.Ill. Nov.26, 2001) (Andersen, J.)

The court therefore finds that the following facts are undisputed for purposes of this motion [or there is no genuine issue as to these facts]: The plaintiff, Ronald Myers, is a state prisoner. (Defendants' Exhibit A, Deposition of Plaintiff Ronald Myers, at p. 6.) At the time of the events giving rise to this action, the plaintiff was an inmate at the Cook County Jail. (Amended Complaint, p. 2, Part I, "Plaintiff(s)" section.)

The defendant James McAuley is the jail's Medical Director. (*Id .,* Part II, "Defendant(s)" section, pp. 2-2A.) The defendants Andrew Ting and Mohammed Mansour are staff physicians at the jail. (*Id.*) The defendant Carlos Altez is a physician's assistant at the jail. (Defendants' Answer, ¶ 10.)

In September 1999, the plaintiff had a tracheotomy or tracheostomy because of breathing problems and because one of his vocal cords was not working properly. (Plaintiff's Deposition, pp. 10, 13.) The surgery left the plaintiff with a stoma[1] in his neck. (*Id.,* p. 10.) A device consisting of a permanent tracheotomy tube attached by "fangs" was placed in the plaintiff's neck during the surgery. (*Id.,* pp. 10-12.) To keep the tracheotomy tube clean and free of fluid and other obstructions, the plaintiff regularly used a suctioning device as well as a "trach kit" (brush, wires, pipe cleaners, cotton swabs, and gauze). (*Id.,* pp. 14-15.)

**\*3** On July 28, 2001, almost two years after the tracheotomy tube was implanted, the plaintiff was arrested for residential burglary and held at the Cook County Jail pending trial. (Amended Complaint, p. 6; Plaintiff's Deposition, p. 8.) The plaintiff was incarcerated at the jail from July 28, 2001, to May 20, 2002. (*Id.*)

Upon the plaintiff's arrival at the jail, a physician performed an initial medical screening in the receiving unit. (*Id.,* pp. 8-9; Defendants' Exhibit B, Medical Records, pp. 1-4, "Medical Intake Record and assessment forms.) Following the medical screening, the plaintiff was placed in Division 10, the segregation unit, overnight. (Plaintiff's Deposition, p. 16.)

The next day, the plaintiff was seen at Cermak Health Services Emergency room by Dr. Enoch Anaglate (not a defendant). (Plaintiff's Deposition, p. 18; Medical Records, pp. 5-7.) Anaglate noted that the plaintiff had a tracheotomy tube and complained of shortness of breath. (Medical Records, p. 6.) Anaglate prescribed three medications: Compazine [a medication used to control nausea and vomiting, according to the *Physician's Desk Reference,* 57th cd. (2003), at p. 1489], Imodium [a medication aimed at diarrhea and gastro-intestinal problems], and Raitin [which does not appear in the *PDR* ], along with daily stoma care. (*Id.,* pp. 7-8, 53.) Although the doctor's notes are only semi-legible, the court can discern that he wrote, "ø SOB" (no shortness of breath). (*Id.,* p. 5.)

After seeing the doctor, the plaintiff was transferred from Division 10 to the Residential Treatment Unit, or "Medical Dormitory." (Plaintiff's Deposition, pp. 18-19; Medical Records, pp. 6, 7.) On the plaintiff's medical dormitory admission form, Anaglate listed the plaintiff's medications and noted that he needed dressing changes for his tracheotomy tube. (Medical Records, p. 7.) The plaintiff remained in the medical dormitory until May 13, 2002, a week before he left the jail. (Plaintiff's Deposition, p. 18.)

When the plaintiff arrived at the jail, his throat was unclogged and he initially experienced "no problems" with the tracheotomy tube. (Plaintiff's Deposition, p. 21; Medical Records, p. 7.)

Although the plaintiff claims that the jail did not have a functioning mechanical suction pump (Plaintiff's Deposition, pp. 23-25), the health care staff did provide him with tracheotomy care kits like the ones he would obtain from the hospital prior to his incarceration. (*Id.,* pp. 24-26.) The plaintiff's medical records reflect that he received tracheotomy care daily, or nearly daily. (Defendants' Exhibit B, Treatment Dressing Records, pp. 41-47.) However, the plaintiff maintains that on certain occasions, he went up to ten days without a kit. (*Id.,* pp. 22, 24; Plaintiff's Exhibit D, Affidavit of Ronald Myers, ¶ 2.)[2] The nursing staff generally watched the plaintiff clean his tracheotomy to make sure that he did it correctly. (Plaintiff's Deposition, pp. 20, 23, 26.)

**\*4** On August 9, 2001, the plaintiff filled out a Detainee Health Service Request form stating that he needed to see a doctor because his tracheotomy tube did not "feel right." (Defendants' Exhibit B, p. 9.) The plaintiff was referred to "sick call" the same day. (*Id.*)

The plaintiff saw Dr. Ting for the first time on August 14, 2001. (Defendants' Exhibit B, Medical Records, p. 10.) At that visit, the plaintiff complained of a weak suction machine. (*Id.,* p. 11.) The plaintiff told Ting that he did not wish to change from his implanted tracheotomy tube to a removable one that was attached as a "cuff with ties" because he feared risk of injury from other inmates. (*Id.*) Ting prescribed the plaintiff Amoxicillin (an antibiotic), Tylenol and Motrin. (*Id.,* p. 53.) Ting also referred the plaintiff to an ENT (ear, nose and throat) specialist. (*Id.,* p. 10.)

The plaintiff saw an ENT specialist ten days later, on August 24, 2001. (Plaintiff's Deposition, p. 27.) At the time of his first visit to the ENT specialist, the plaintiff was not experiencing any throat problems. (*Id.,* p. 28.) Either the ENT doctor or the defendant Ting wrote the plaintiff prescriptions for tracheotomy care (saline irrigation) and a bedside humidifier. (Medical Records, p. 56.) The specialist recommended that the plaintiff return to Cermak in four weeks.

The plaintiff maintains that he began to experience problems swallowing and eating around the end of August 2001. (Plaintiff's Deposition, pp. 28-29.) On August 29, 2001, the plaintiff submitted a Detainee Health Service Request form indicating that he found a small amount of bright red blood when he cleaned out his tracheotomy tube. (Medical Records, p. 12.) The request slip did not mention any problems breathing or eating. (*Id.*) A nurse who spoke to the plaintiff noted that he had no breathing problems, that he was just concerned by the sight of blood. (*Id.*)

On September 17, 2001, the plaintiff was treated in the Cermak Emergency Room for a scalp laceration after he fell in the shower. (Medical Records, pp. 13-14.) The Ambulance Report Sheet attributed the fall to "no lights." (*Id.,* p. 13.) The medical records do not reflect any statement by the plaintiff to health care providers that he fell because he had lost consciousness due to an inability to breathe. (*Id.,* pp. 13-15.) The plaintiff received staples or sutures. (*Id.,* pp. 14-15.) The staples were removed on September 24, 2001, upon the plaintiff's request. (*Id.,* p. 16.)

On October 3, 2001, the plaintiff saw the defendant Altez at Cermak. (*Id.,* p. 17.) Altez wrote a prescription for the plaintiff to continue receiving routine tracheotomy care

with suction for six weeks. (*Id.,* pp. 17, 56.) Carlos also referred the plaintiff to an ENT to evaluate the plaintiff's request for closure of his tracheotomy tube. (*Id.,* pp. 17-18.)

On October 21, 2001, the plaintiff filled out a health service request form complaining that he had not yet seen the ENT. (*Id.,* p. 19.) An appointment was scheduled for November 10, 2001. (*Id.,* p. 20.)

**\*5** At the November 10, 2001, appointment, the ENT physician noted that the plaintiff's neck was "clean, no messes," that the tracheotomy tube was capped and in place, and that there were "no ulcers or messes." (*Id.,* p. 20.) The doctor additionally noted that the plaintiff "denied" shortness of breath. (*Id.*). The doctor directed that routine tracheotomy care be continued, and that he return to the ENT in four to six weeks. (*Id.*)

On November 13, 2001, the plaintiff saw the defendants Ting and Altez about his tracheotomy. (*Id.,* p. 21.) At that appointment, the plaintiff denied acute complaints, according to the medical progress notes. (*Id.,*) The plaintiff was directed to continue with the routine tracheotomy care and return to Cermak in two to three weeks. (*Id.*)

Ten days later, on November 23, 2001, the plaintiff saw an ENT doctor again.[3] At that time, the plaintiff reiterated that he wanted his tracheotomy tube removed. The physician recommended Ocean Nasal Spray for the plaintiff, directed him to continue the maintenance plan previously put in place, and scheduled an appointment for twelve weeks later. Ting wrote a prescription for nasal spray on the same day. (*Id.,* p. 57.)

Twelve days later, on December 4, 2001, the plaintiff returned to Cermak for a follow-up visit. (*Id.,* p. 22.) The defendant Mansour examined the plaintiff and charted that his stoma (tracheotomy tube) was clean, that there was no evidence of infection, and that the plaintiff's lungs were clear. (*Id.*) Mansour renewed the nasal spray prescription, recommended that the plaintiff continue with routine tracheotomy care, and scheduled a return appointment on January 29, 2002. (*Id.,* pp. 22, 57.)

On January 4, 2002, the plaintiff saw an ENT specialist again. (*Id.,* p. 25.) At that appointment, the plaintiff requested an appointment at the Cook County Hospital for routine cleaning. (*Id.*) The doctor indicated that he would refer the plaintiff to the hospital and scheduled a return appointment in eight weeks. (*Id.*)

On January 27, 2002, the plaintiff filled out a health service request form insisting that he needed to go to the

hospital. (*Id.,* p. 23.) The plaintiff complained that he could not breathe, that his tracheotomy tube hurt when he cleaned it, and that the tube was blocked. (*Id.*) An appointment was scheduled for two days later. (*Id.*)

Dr. Mansour examined the plaintiff again on January 29, 2002. (*Id.,* p. 24.) Mansour noted the plaintiff's subjective complaints, but his objective observations were that the plaintiff's throat was clear and without lesions, that he demonstrated no shortness of breath, that he said he was not having problems breathing or talking, that the tube was in place, that there was no drainage, that the tube looked clear of mucus, and that there was "very good air exchange." (*Id.*) Mansour scheduled a follow-up appointment the following week and gave the plaintiff another prescription for Ocean Nasal Spray. (*Id.*)

**\*6** At a doctor's visit on February 4, 2002, Mansour noted that the plaintiff had "ø complaints @ present" and that he was scheduled at Cook County Hospital's Fantus Clinic four days later for a possible tube change. (*Id.,* p. 26.) Mansour ordered another prescription for nasal spray. (*Id.*)

On February 10, 2002, the plaintiff submitted another detainee health service request form. (*Id.,* p. 27.) The plaintiff stated, "I need to see the Doctor about my trach tube being cloggy & bleeding." (*Id.*) The defendant Altez noted on the form that an ENT had referred the plaintiff to Fantus Clinic and that the plaintiff was "waiting to go," but that the appointment had been postponed twice. (*Id.*) Altez further noted that the plaintiff nevertheless showed no signs of infection. (*Id.*)

The plaintiff was seen at Cermak's "sick call" on February 14, 2002, four days later. (*Id.,* pp. 28, 29.) Ting referred the plaintiff back to an ENT specialist. (*Id.*)

The next day, February 15, 2002, the plaintiff saw an ENT at the Cook County Hospital. (Plaintiff's Deposition, p. 61.) At that visit, the ENT replaced the plaintiff's tracheotomy tube. (*Id.*) Later that day, the plaintiff returned to Cermak Health Services and saw another ENT. (*Id.,* p. 63; Plaintiff's Medical Records, p. 28 .) The Cermak ENT examined the plaintiff and recommended that he return in sixteen weeks. (Medical Records, p. 28.) Unspecified health care personnel also wrote the plaintiff a prescription for pain medication, although the plaintiff states that he never received it. (Plaintiff's Deposition, p. 63.)

Two or three days after his tube was replaced, the plaintiff saw the defendant Ting. (*Id.,* p. 65.) The plaintiff told the doctor he was still in pain. (*Id.*) Ting prescribed the plaintiff new medication. (*Id.*)

On February 20, 2002, the plaintiff filled out another detainee health service request form asking for pain medication. (Medical Records, p. 30.) A health care provider named Brown noted on the form the next day, "Detainee stated difficult to swallow, swollen, & painful. -A new trach put in [illegible]. B [lood] p[ressure] 132/76. Tylenol Suspension Liq. 30 cc." (*Id.*) A "sick call" appointment was scheduled for March 12, 2002. (*Id.*) In addition, Dr. Ting prescribed Amoxicillin and Motrin to combat pain and infection. (Medical Records, p. 61.)

On February 24, 2002, the plaintiff filled out another detainee health service request form, complaining of persisting pain. (*Id.,* p. 31.) A licensed practical nurse who spoke to the plaintiff noted on the form that the plaintiff was claiming throat and neck pain and insisting that the pain was not relieved by Tylenol. (*Id.*)

On March 4, 2002, the plaintiff filled out another request form asking to see a doctor. (*Id.,* p. 32.) The plaintiff wrote, "You put me on pain medicine and now it stop[ped]. I need to see you doctor about this and the other medicine stop." (*Id.*) The plaintiff was referred to sick call the same day. (*Id.*)

**\*7** On March 12, 2002, the plaintiff had an appointment with the defendant Mansour. (*Id.,* p. 33.) Mansour's notes concerning the examination indicated that the plaintiff "feels much better," that his breathing was better, that his vital signs were "OK," that his tracheotomy bore no evidence of infection, that the tracheotomy tube was in place, and that his lungs were clear. (*Id.*) Mansour prescribed the plaintiff Tylenol and Disalcid [a non-steroid anti-inflammatory drug also used for pain]. (*Id.,* p. 63.)

On March 20, 2002, the plaintiff saw Dr. Ting again. (*Id.,* p. 34.) Ting noted on the plaintiff's medical progress notes that he complained of difficulty swallowing for about a month, but that there were no objective signs of a problem. (*Id.*) The plaintiff had no difficulty talking or breathing, his neck was supple, and the tracheotomy tube was clean and without blockage or obstructions. (*Id.*) Because the plaintiff complained that the Amoxicillin caused gastro-intestinal problems, Ting prescribed three new medications: Motrin, Naprosyn (another non-steroidal anti-inflammatory pain medication), and Taguire. (*Id.,* p. 63.) [Neither party explains what Taguire is used for and the drug is not listed in the *Physician's Desk Reference.*] Ting referred the plaintiff to an ENT two days later and directed that he return to Cermak in four to six weeks. (*Id.,* p. 34.)

On March 22, 2002, an ENT specialist examined the plaintiff. (*Id.,* p. 35.) The ENT noted that the plaintiff's

mouth was pink and moist and without lesions, and that his neck was soft and supple. (*Id.*) The ENT directed that the plaintiff return in two weeks. (*Id.*)

On March 27, 2002, the plaintiff was prescribed Ibuprofen and Prevacid (a medication used to relieve heartburn, acid reflux and ulcers). (*Id.,* p. 62.)

On April 19, 2002, an unnamed physician referred the plaintiff back to an ENT specialist for a follow-up appointment. (*Id.,* p. 36.) The plaintiff saw the ENT the next day, April 20, 2002. (*Id.*) Although the ENT's notes are illegible, the consultation form shows that the plaintiff was to return in six weeks. (*Id.*)

On April 30, 2002, the plaintiff saw the defendant Ting at "sick call." (*Id.,* p. 37.) Among other [mostly illegible] notes, Ting charted that the plaintiff's neck was supple, that he demonstrated no trouble breathing and no shortness of breath, and that the tracheotomy tube looked clean. (*Id.*) At the same appointment, Ting prescribed the plaintiff Motrin, Prevacid, and Elavil (a drug used to treat depression and migraine headaches, as well as to manage chronic pain). (*Id.,* p. 63.) Ting prescribed Elavil because the plaintiff told him that Naprosyn was not casing his pain. (Plaintiff's deposition, pp. 39, 41.) Each time the plaintiff saw Dr. Ting and complained that the current pain medication was not alleviating his pain, Ting would prescribe a different drug. (*Id.,* p. 48.)

**\*8** On May 8, 2002, the plaintiff was evaluated for a transfer to 3 North (a hospital unit). (Medical Records, p. 39.) The doctor noted:

> Patient states doing well, not having problems č tracheostomy tube; getting tracheostomy care when needed; states he's very comfortable and happy č TRACHEOSTOMY care in RU Medical Area. States his tube has been changed and he's [illegible]. Denies shortness of breath, clogging of tube or problems breathing, also denies GERD symptoms. Pt has been seen by ENT doctors = 7x at Cermak being the last visit on 5/3/02. Also seen by ENT doctors at Cook County hospital about 4 or 5 times; and seen in sick call visits several times without any complaints of life threatening situations. Pt stable without any acute complaints and refuses to be transferred to 3 North hospital area. Refusal form signed by patient after patient was clearly explained about refusal implications. Pt also is a worker

and has been working for over 4 months in RU Medical Area in the Clothing Department. Continue with tracheostomy care. Follow-up with ENT as advised. RTC as advised by Dr. Ting. (*Id.*)

At a second visit to the health care unit that day, the doctor noted on the plaintiff's medical progress chart:

> No complaints; said he feels fine.... He said he is happy with the tracheostomy care he is [illegible]. He said he is getting suction, [illegible], clean of tracheotomy hole daily. He said the nurse always gives him the cleaning kit and suction. When ever he wants. He said he has no problem with his tracheotomy care [illegible]. ø shortness of breath ø fever ø>>> obstruction. He feel (sic) fine. Alert [illegible], neck supple, [illegible] tracheotomy tube. [Illegible] clean. No obstructions.... (*Id.,* p. 40.)

The plaintiff signed a form confirming that he had refused placement on 3N/3W hospital wing for routine tracheotomy care.4 (*Id.,* p. 41.) Five days later, the plaintiff was transferred to another unit. (Defendants' Exhibit C, Housing History, p. 2.) The plaintiff left the jail on May 20, 2002, a week later. (Plaintiff's Deposition, p. 8.)

### DISCUSSION

Even viewing the record in the light most favorable to the plaintiff, no reasonable person could find that the defendants acted with deliberate to the plaintiff's serious medical needs. The record establishes that the plaintiff received comprehensive medical care, even if he was unsatisfied with it. The plaintiff's evidence, consisting of unsupported statements and contradictory sworn testimony, is insufficient to create a triable issue of fact. The plaintiff has failed to meet his burden under Fed.R.Civ.P. 56 for the case to survive summary judgment.

The court recognizes that, in ruling on a motion for summary judgment, the court cannot weigh the affidavits or the credibility of the parties. *Castillo v. United States,* 34 F.3d 443, 445 (7th Cir.1994). Nevertheless, "there is no issue for trial unless there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). The inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In this case, the evidence almost entirely refutes the plaintiff's allegations.

**\*9** It is well established that the Due Process Clause prohibits deliberate indifference to the serious medical needs of a pretrial detainee. *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir.1999); *Salazar v. City of Chicago,* 940 F.2d 233, 237-38 (7th Cir.1991). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the health care provider must be subjectively aware of and consciously disregard a risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v.. Gamble,* 429 U.S. 97, 103-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Sherrod v. Lingle,* 223 F.3d 605, 610 (7th Cir.2000). In this case, the court will assume for purposes of this motion that tracheotomy maintenance is a "serious" medical need; however, the plaintiff has failed to make a triable showing that the defendants acted with deliberate indifference.

In denying the defendants' motion to dismiss, the court noted that the fact that a prisoner received some medical attention does not necessarily defeat his Section 1983 claim; deliberate indifference to a serious medical need can be manifested by "woefully inadequate action" as well as by no action at all. *Reed v. McBride,* 178 F.3d 849, 854 (7th Cir.1999). But the more fully developed record demonstrates that the plaintiff received constitutionally adequate medical treatment. At best, the plaintiff has greatly exaggerated both his medical complaints and any deficiencies in the care he received; at worst, this is an entirely trumped-up lawsuit.

### No Serious Health Complication

Even though the plaintiff's tracheotomy or tracheostomy pro-dated his incarceration by almost two years, the court finds that he had a "serious" medical condition. Under the Seventh Circuit's standard,

> A "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so

obvious that even a lay person would easily recognize the necessity for a doctor's attention.... [Indications of a serious medical need include] the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

*See* *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Even though the plaintiff's medical records repeatedly refer to "routine maintenance," the importance of a breathing tube is obvious; its proper functioning would constitute an objectively serious medical need. In fact, the medical staff deemed monitoring of the plaintiff's condition sufficiently important to house him in the residential treatment unit. The court therefore finds that the plaintiff's medical needs were "serious."

Nevertheless, the record fails to support the plaintiff's claim that he had serious complications during his incarceration at the jail. In his complaint, the plaintiff alleged that he endured agonizing pain, fainting, a great deal of bleeding, a diminished ability to eat and drink, and so much difficulty breathing that fellow inmates literally had to squeeze the air out of him on occasion. The medical records in no way substantiate those claims. To the contrary, the record indicates that the plaintiff suffered from relatively minor, chronic problems one might expect from having a tracheotomy tube in one's throat.

**\*10** Multiple facts lead the court to the inescapable conclusion that the plaintiff's medical problems did not rise to the level of severity contemplated by *Estelle* and its progeny. First, the plaintiff's "Treatment/Dressing Record," taken in the normal course of business, document tracheotomy care performed nearly every single day of the plaintiff's incarceration, from February 10, 2002, through July 31, 2001, through March 11, 2002. *See* Defendants' Exhibit B, Plaintiff's Medical Records, pp. 42-48. [Presumably, a page is missing from the record covering the plaintiff's last two months at the jail.]

Despite the daily Treatment/Dressing Records, the plaintiff insists that he sometimes went up to ten days without cleanings. But even if there were occasional missed dates, the routine care must have kept the plaintiff's tracheotomy tube reasonably clean, as the nurses' notes reflect no problems. To the contrary, while some of the plaintiff's health request slips described pain and breathing problems, none of the health care providers with whom he came into contact observed any objective

symptoms. Every single medical entry-by the named defendants, by non-defendant jail physicians, and by ENT specialists at both Cermak and the Cook County Hospital-states that the plaintiff's tracheotomy tube was clear and free of obstruction, that the plaintiff evidenced no difficulty breathing, and that there were no lesions or signs of infection.

The notes of both the general practitioners and specialists directed that the plaintiff continue with the "routine" maintenance plan and invariably directed that he return anywhere from four to eight weeks later for follow-up appointments; plainly, no one thought his health situation necessitated close supervision. The plaintiff's medical records make no mention of his ever communicating to the health care staff that he was fainting, unable to eat or drink, or relying on fellow inmates to squeeze the air out of him. The plaintiff's charts reflect no concerns whatsoever about major problems or complications.

The plaintiff did twice complain of bleeding, but occasional, minimal bleeding appears to be completely run-of-the-mill, just as with dental flossing. The first time, the sight of blood only made the plaintiff worry; he was not experiencing pain or other problems. *See* Defendants' Exhibit B, Medical Records, p. 12.) The second time, the defendant Altez examined the plaintiff but found no signs of infection. (*Id.,* p. 27.) The plaintiff has provided no medical evidence that he had any "serious" health problems associated with his tracheotomy tube.

### *No Deliberate Indifference*

Even assuming (without finding) that the plaintiff did have any tracheotomy-related problems serious enough to implicate constitutional concerns, the record does not support a finding that the defendants acted with deliberate indifference to his condition. The plaintiff's medical records reflect a comprehensive maintenance plan, which included his placement in the hospital residential unit for closer observation than the plaintiff would have received had he been housed in general population, daily [or nearly] daily cleanings supervised by the nursing staff, numerous visits to the staff physicians, and frequent examinations by on-site and off-site ENT specialists. The plaintiff was provided with kits for tracheotomy care, and multiple medications were prescribed for antibiotic treatment and for pain. The doctors' notes uniformly reflect that care was "routine," and that the plaintiff was doing reasonably well for someone with a breathing tube inserted in his neck.

**\*11** It is not surprising that the plaintiff sometimes experienced pain, particularly after surgery to replace the

tracheotomy tube. Certainly, prolonged and severe pain can amount to a serious medical need, *Walker v. Benjamin,* 293 F.3d 1030, 1039-40 (7th Cir.2002), and the subjective element of deliberate indifference encompasses conduct such as the refusal to treat a prisoner's chronic pain. *Jones v. Simek,* 193 F.3d 485 (7th Cir.1999). However, not every "ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters,* 111 F.3d 1364, 1370-72 (7th Cir.1997). In this case, the record establishes that the defendants made reasonable efforts to minimize any pain the plaintiff was experiencing.

The plaintiff has made inconsistent statements concerning the treatment of his pain. During the course of this case, the plaintiff has alternately stated that he received only over-the-counter Tylenol, that he never received prescribed pain medication, and that the pain medication he received was entirely ineffective. But as noted in footnote 2, a party may not create issues of credibility or fact by contradicting his own sworn testimony. *See also Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151, 1152 n. 1 (7th Cir.1997); *Eckert v. Kemper Financial Services, Inc.,* No. 95 C 6831, 1998 WL 699656, *5 (N.D.Ill. September 30, 1998)* (Williams, J.), *inter alia.* If a party is allowed to create a genuine issue of material fact by changing his prior testimony, "the very purpose of the summary judgment motion-to weed out unfounded claims, specious denials, and sham defenses-would be severely undercut." *Babrocky,* 773 F.2d at 861. Contradictory testimony will not defeat summary judgment.

In his deposition, the plaintiff admitted that he did receive pain medication and that Dr. Ting would prescribe a different pain medication every time the plaintiff complained that the current drug was not alleviating his pain. *See* Plaintiff's deposition, p. 48. That fact is substantiated by the plaintiff's voluminous medical records, which reflect orders for various pain medications. The defendants' failure to assuage the pain altogether does not rise to the level of deliberate indifference. Where, as here, a physician provides constitutionally acceptable care, his or her inability to effect a final cure is not proof of deliberate indifference. *Snipes v. DeTella,* 95 F.3d 586, 591 (7th Cir.1996), *cert. denied,* 519 U.S. 1126, 117 S.Ct. 980, 136 L.Ed.2d 863 (1997). The defendants were not deliberately indifferent to any pain the plaintiff endured as a result of having a breathing tube.

The record does not conclusively establish whether the plaintiff generally had access to a properly functioning suction machine while he was incarcerated at the jail. Again, some of the confusion is caused by the plaintiff's own, varying representations: he has alternately claimed

that the suctioning machine had a weak vacuum pull, that it did not work at all, and that it was non-existent. But in any event, the court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *Matter of Wildman,* 859 F.2d 553, 556 (7th Cir.1988); *Nash v. DeTella,* No. 00 C 2784, 2001 WL 1160840, *2 n. 5 (N.D.Ill. Oct.2, 2001) (Zagel, J.) In this case, irrespective of whether the plaintiff had the use of a properly working suction pump, there is no genuine dispute that he had regular use of the cleaning tools of a tracheotomy kit, and that doctors never noted any obstructions or infection whenever they examined his breathing tube. The plaintiff's claim that the tube often became clogged is entirely unsubstantiated by his medical records.

**\*12** The medical staff addressed the plaintiff's concerns whenever he submitted a medical request slip complaining of a medical problem. Moreover, each of the defendants, as well as the ENT specialists at Cermak and at the Cook County Hospital, administered the same basic treatment plan. The fact that all of the plaintiff's treating physicians largely agreed on the care of his tracheotomy tube bolsters the conclusion that the defendants were not deliberately indifferent. *See Steele v. Choi,* 82 F.3d 175, 178-79 (7th Cir.), *cert. denied,* 519 U.S. 897, 117 S.Ct. 244, 136 L.Ed.2d 173 (1996); *see also Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 262 (7th Cir.1996), *cert. denied,* 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997) ( "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment").

In *Steele,* a prison physician diagnosed an inmate as suffering from a drug overdose and treated him accordingly. Doctors at an outside hospital reached the same conclusion; only after the inmate's condition deteriorated did health care professionals realize that the inmate was experiencing a brain hemorrhage. The Court of Appeals affirmed the entry of summary judgment in favor of the prison physician, finding that "[i]f two sets of outside doctors could draw the same (erroneous) conclusion [about the nature and seriousness of the plaintiff's condition], it is difficult at best to claim that another diagnosis was 'obvious.' " *Steele,* 82 F.3d at 178. Here, as in *Steele,* other physicians made the same assessment, that the plaintiff was doing well; defendants and non-defendants alike also provided essentially the same, standard maintenance plan for the plaintiff's tracheotomy tube, belying any inference that the defendants' approach was blatantly inappropriate.

Although the plaintiff may have been dissatisfied with the

caliber and efficacy of his overall care, the defendants' treatment did not violate the Constitution. Mere disagreement with a doctor's prescribed course of treatment does not implicate the Fourteenth Amendment. *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996), *cert. denied,* 519 U.S. 1126, 117 S.Ct. 980, 136 L.Ed.2d 863 (1997). Additionally, evidence that some medical professionals would have chosen a different course of treatment-evidence the plaintiff has not even provided in this case-might establish negligence, but is insufficient to make out a constitutional claim. *Collignon v. Milwaukee County,* 163 F.3d 982, 989 (7th Cir.1998), *relying on Steele,* 82 F.3d at 179. The Constitution is not a vehicle for bringing claims for medical malpractice. *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996).

It is not even entirely clear what better or different treatment the plaintiff wanted. Regardless, the question of whether a certain diagnostic technique or form of treatment should be prescribed "is a classic example of a matter for medical judgment." *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A prisoner does not have a right to a particular type of medical treatment. *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987). A plaintiff can show that if the professional disregarded a serious medical need "only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon,* 163 F.3d at 989. The plaintiff has not met his burden of production.

**\*13** Any brief delays in receiving medical attention are not actionable under 42 U.S.C. § 1983 under the facts of this case. Where a plaintiff alleges a constitutional violation based on a delay of medical treatment, "the relevant question is whether the delay in access to treatment was so unreasonable under the circumstances as to suggest deliberate indifference." *Brown v. Briick,* 92 C 2094, 1995 WL 263488, *7 (N.D.Ill. May 3, 1995) (Nordberg, J.) The plaintiff complains that he spent one night in the segregation unit before being transferred to the medical unit, but as discussed above, the plaintiff had no serious condition that warranted hospitalization; his treating physicians placed him in the residential treatment unit only because his tracheotomy tube required regular, ongoing maintenance. In fact, the plaintiff eventually chose not to reside in the treatment unit and was moved to the general population, contrary to the defendants' recommendation.

Furthermore, the replacement of the plaintiff's tracheotomy tube was apparently entirely elective; it is undisputed that the plaintiff himself declined to have the

stoma replaced for some time before he eventually decided he wanted a removable tube. *See* Defendants' Exhibit B, Medical Records, p. 11. Because replacement of the plaintiff's tracheotomy tube was not critical, he is not entitled to damages for having to wait for the procedure. Where, as here, the plaintiff's medical complaints were of a non-emergency nature, the short delays in providing treatment did not amount to deliberate indifference. *See, e.g., Gutierrez v. Peters,* 111 F.3d at 1374; *Lucien v. Godinez,* 814 F.Supp. 754, 755 (N.D.Ill.1993). A plaintiff who complains that a "delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir.1996) (emphasis in original), *quoting Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995).

In sum, the medical care provided by the defendants was not so erroneous or so woefully inadequate as to amount to an essential denial of medical care. *Reed v. McBride,* 178 F.3d 849, 854 (7th Cir.1999). Although the plaintiff alleges that he suffered dire problems stemming from his tracheotomy tube, his medical records do not reflect that he communicated most of the worst of his alleged concerns to the medical staff. As to those problems that he did voice, the medical staff found no objective signs of problems or infections to substantiate the plaintiff's concerns. The plaintiff has provided no medical records and no witnesses to support his claims.

### Conclusion

Even drawing every reasonable inference in favor of the plaintiff, the court finds that the defendants have established that they are entitled to judgment as a matter of law. The record shows that the plaintiff had no serious medical need, apart from routine maintenance of his tracheotomy tube, and that, in any case, the defendants

did not act with deliberate indifference. The plaintiff has failed to cite any independent evidence in support of his claims that he had serious health complications, that he did not receive routine stoma care, or that he was otherwise denied needed medical attention. The vast weight of the evidence supports the defendants' position; the court finds that no reasonable person could conclude that the defendants acted with deliberate indifference to the plaintiff's serious medical needs. Consequently, the defendants' motion for summary judgment must be granted.

**\*14** For the foregoing reasons, the case is terminated. If the plaintiff wishes to appeal this final judgment, he must file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R.App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R.App. P. 24(a)(1)(C); *Hyche v. Christensen,* 170 F.3d 769, 771 (7th Cir.1999). If the plaintiff does choose to appeal, he will be liable for the $105 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections,* 150 F.3d 810, 812 (7th Cir.1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a "strike" for purposes of 28 U.S.C. § 1915(g). The plaintiff is warned that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to slate a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (docket # 52) is granted. The clerk of the court is directed to enter judgment in favor of the defendants pursuant to Fed.R.Civ.P. 56. The case is terminated. The parties are to bear their own costs.

### Footnotes

1   A stoma is an artificial permanent opening made in surgical procedures, according to *Merriam-Webster's Collegiate Dictionary* (10th ed.), at p. 1158.

2   For purposes of summary judgment, the court will accept as true the factual representations the plaintiff makes in his sworn affidavit (unless in conflict with his deposition testimony). However, the plaintiff cannot now retract the statements he made during his deposition. A party may not create issues of credibility by contradicting his own earlier, sworn testimony. *See, e.g., Bank of Illinois v. Allied Signal Safety Restraint Systems,* 75 F.3d 1162, 1168-69 (7th Cir.1996), *relying on Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985), *inter alia.*
    Furthermore, the court has disregarded the plaintiff's references to medical records he altered. Indeed, although the plaintiff has explained in response to the defendants' motion to strike that he did not intend to mislead the court, his submission of tampered medical records could easily be construed as "fraud" upon the court, which must "lead to immediate termination of the suit." *Sloan v. Lesza,* 181 F.3d 857, 859 (7th Cir.1999).

3   The court finds no medical records for November 21, 2001. However, the plaintiff does not contest the representations made by the defendants in this paragraph.

4       The medical progress notes reporting that the plaintiff was completely satisfied with his tracheostomy care just weeks after he filed
        suit may be taken with a grain of salt. However, the plaintiff cannot deny that he declined placement in the hospital wing since the
        signed refusal form is in the record.

**End of Document**                                             © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4073790
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois.

TAYLOR
v.
COUTURE et al.

No. 08 C 4871.  |  Oct. 12, 2010.

**Attorneys and Law Firms**

Barbara Jean Clinite, Attorney at Law, Chicago, IL, for Plaintiff.

Aaron Richard Bond, James Charles Pullos, Chicago, IL, for Defendant.

**STATEMENT**

AMY J. ST. EVE, Judge.

**\*1** On April 23, 2010, Plaintiff John E. Taylor, who was a pretrial detainee at the Cook County Department of Corrections ("CCDOC") during the relevant time period, filed an Amended Complaint pursuant to 42 U.S.C. § 1983. In his Amended Complaint, Taylor alleges a due process claim based on inadequate medical care against Defendants Dr. Eileen Couture and Dr. Ann Marie Dunlap of Cermak Health Services of Cook County ("Cermak"), which is the healthcare provider for detainees housed at the CCDOC. Cook County is not a party to this lawsuit nor is there a claim based on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), at issue, therefore, Taylor is suing Drs. Dunlap and Couture in their individual capacities. Before the Court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the Court grants Defendants' motion and dismisses this lawsuit in its entirety.

**BACKGROUND**

Taylor, a former pretrial detainee, was housed at the CCDOC from the date of his arrest in 2003 until November 15, 2007. (R. 123–1, Defs.' Rule 56.1 Stmt. Facts ¶¶ 2, 3.) Taylor is suing Defendants for refusing to dispense medications to him before he went to court during the time period of April

through October 2007. (*Id.* ¶ 17, Ex. A, Taylor Dep., at 7–8.) Taylor is also suing Dr. Dunlap for reducing his pain medication during the relevant time period. [1] (*Id.* ¶ 4.)

The dispensing of medications in the relevant division, Division X, of the CCDOC was part of the nursing protocol. (*Id.* ¶ 5.) Although Dr. Couture was the Medical Director and Director of Nursing at Cermak during the relevant time period, she did not directly supervise the nurses. (*Id.* ¶ 6; Ex. C, Couture Dep., at 4; R. 140–1, Pl.'s Stmt. Facts ¶¶ 2, 4.) Instead, a registered nurse, Shawn Withers—who is not a named Defendant in this lawsuit—directly supervised the nurses. (Defs.' Stmt. Facts ¶ 7.) As Medical Director, however, Dr. Couture's duties included overseeing current practices and improving services. (Pl.'s Stmt. Facts ¶ 3.) The only medical record showing that Dr. Couture treated Taylor is dated September 11, 2007, at which time Dr. Couture examined Taylor and wrote him a prescription for Robaxin, a non-narcotic muscle relaxant, for his lower back pain. (Defs.' Stmt. Facts ¶¶ 8, 9, 10, Couture Dep., at 27, 30; Ex. B, Dunlap Dep., at 47.) At that time, Dr. Couture made no changes to Taylor's existing prescriptions, including a powerful nerve medication, Neurontin, which Taylor took for neuropathy and pain associated with his previous radiation therapy. (*Id.* ¶¶ 9, 11, Dunlap Dep., at 47.) Meanwhile, Taylor admits that between April 2007 and his criminal trial in August 2007, he did not have any conversations with Dr. Couture. (Taylor Dep., at 44.)

Dr. Dunlap was one of the doctors who treated Taylor while he was housed in Division X at the CCDOC. (*Id.* ¶ 14.) On Division X, nurses distributed medications three times a day —morning, midday, and evening. (Pl.'s Stmt. Facts ¶ 8.) On February 27, 2007, Dr. Dunlap wrote Taylor a prescription for (1) Elavil 50 milligrams at night for eight weeks, (2) Neurontin 900 milligrams three times a day for eight weeks, and (3) clindamycin (a moisturizing cream) to affected areas twice daily. (*Id.* ¶ 11, Dunlap Dep., at 23; Defs.' Stmt. Facts ¶ 16.) Dr. Dunlap prescribed the Neurontin and Elavil for pain. (Dunlap Dep., at 20–21.) On April 20, 2007, Dr. Dunlap reduced Taylor's Neurontin prescription from 900 milligrams three times a day to 900 milligrams two times a day. (Pl.'s Stmt. Facts ¶ 13.) On May 31, 2007, Physician Assistant Manisha Patel wrote a prescription changing Taylor's dosage of Neurontin back to 900 milligrams three times a day. (*Id.* ¶ 14.) On July 20, 2007, Dr. Dunlap reduced Taylor's Neurontin from 900 milligrams three times a day to 600 milligrams three times a day. (*Id.* ¶ 15; Defs.' Stmt. Facts ¶ 18.)

## SUMMARY JUDGMENT STANDARD

**\*2** Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " Anderson, 477 U.S. at 255 (quotation omitted); see also Fed.R.Civ.P. 56(e)(2) (requiring adverse party to "set out specific facts").

## ANALYSIS

In his Amended Complaint, Taylor alleges that Drs. Couture and Dunlap were deliberately indifferent to his serious medical need, namely, his chronic pain. The Fourteenth Amendment's Due Process Clause applies to pretrial detainees' conditions of confinement claims and entitles pretrial detainees to at least the same protections against deliberate indifference as available to convicted prisoners under the Eighth Amendment. See Minix v. Canarecci, 597 F.3d 824, 831 (7th Cir.2010). Thus, under both the Eighth and Fourteenth Amendments, a prison or jail official violates the Constitution if she is deliberately indifferent to a prisoner's serious medical needs. See McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir.2010) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The test for the deliberate indifference to a serious medical need has both objective and subjective elements. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 829 (7th Cir.2009). Specifically, a plaintiff must demonstrate: "(1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition." Berry v. Peterman, 604 F.3d 435, 440 (7th Cir.2010).

Assuming for purposes of this summary judgment motion that chronic pain is a serious medical condition, the Court turns to the second element of establishing a deliberate indifference claim, namely, that Drs. Couture and Dunlap were deliberately indifferent to Taylor's serious medical needs, because this element is dispositive. See Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir.1997) (existence of chronic, substantial pain constitutes objectively serious medical need). As to this second element, Taylor must show that Defendants had the subjective knowledge of the risk to the his health and disregarded that risk. See Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir.2010). "Evidence that the official acted negligently is insufficient to prove deliberate indifference." Id.; see also McGowan, 612 F.3d at 640 ("negligence, even gross negligence, does not violate the Constitution."). Instead, "[d]eliberate indifference is intentional or reckless conduct." Berry, 604 F.3d at 440; see also Lee v. Young, 533 F.3d 505, 509 (7th Cir.2008) ("conduct must be reckless in the criminal sense").

## A. Dr. Dunlap's Reduction of Taylor's Neurontin Prescription

**\*3** First, Taylor argues that Dr. Dunlap knew of his serious medical condition, namely, that he was in chronic pain, and disregarded his condition by decreasing his pain medication. Evidence in the record reflects that Dr. Dunlap reduced Taylor's Neurontin prescription from 900 milligrams three times a day to 900 milligrams two times a day on April 27, 2007 and from 900 milligrams three times a day to 600 milligrams three times a day on July 20, 2007. In her deposition, Dr. Dunlap testified that the first time she reduced Taylor's Neurontin prescription was because she had examined Taylor and concluded that he had relatively minor pain. (Dunlap Dep., at 33–34.) The second time she reduced Taylor's pain medication—after PA Patel had increased it—was when she found out that Taylor was doing manual labor, including scrubbing and mopping floors, and that "he was in danger of harming himself by doing such hard manual labor with the pain medications masking the pain." (Id. at 39–41; Taylor Dep., at 16, 27.)

Under these circumstances, Dr. Dunlap was exercising her independent medical judgment regarding the appropriate amount of medication and treatment for Taylor's chronic pain, and thus she was not deliberately indifferent to Taylor's

medical need. *See Berry,* 604 F.3d at 441 ("Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference"). In addition, there is no evidence in the record that Dr. Dunlap's reduction of Taylor's Neurontin prescription was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *See Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir.2006) ("To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment"). Therefore, Taylor has failed to present evidence raising a genuine issue of material fact for trial that Dr. Dunlap's reduction of his Neurontin prescription amounted to deliberate indifference to his chronic pain.

**B. Failure to Provide Medications Before Court**

Next, Taylor argues that both Drs. Dunlap and Couture were deliberately indifferent to his chronic pain because he did not receive his morning and noon Neurontin dosage before leaving for court on certain days from April through October 2007, including four days during his August 2007 criminal trial. On May 28, 2007 and July 26, 2007, Taylor wrote grievances about not receiving his medications before leaving for court, and, although there is evidence in the record that the grievances concerning Taylor's medical care were sent to the applicable medical department and physicians, there is no evidence in the record that the grievances were referred to either Dr. Dunlap or Dr. Couture. (Pl.'s Stmt. Facts ¶¶ 21, 22, 23.) That being said, viewing the evidence and all reasonable inferences in a light most favorable to Taylor, there is sufficient evidence in the record creating a genuine issue of material fact that Drs. Dunlap and Couture were aware that the nurses did not distribute Taylor's medications to him before he went to court on these days. (*See id.* ¶¶ 24, 27, 31, 35.)

**\*4** Meanwhile, courts examine the totality of a prisoner's medical care in determining whether prison officials have been deliberately indifferent to a prisoner's serious medical needs—keeping in mind that serious mistreatment for a short period of time may evidence deliberate indifference. *See Cavalieri v. Shepard,* 321 F.3d 616, 626–27 (7th Cir.2003); *Reed v. McBride,* 178 F.3d 849, 855–56 (7th Cir.1999). On the other hand, isolated instances of neglect cannot support a finding of deliberate indifference. *See Gutierrez,* 111 F.3d at 1375. The Court thus turns to Taylor's overall treatment to

determine whether Defendants were deliberately indifferent to Taylor's chronic pain.

Evidence in the record reveals that during the relevant time period, Taylor saw a neurologist at least once a month, along with a urologist, a podiatrist, and an oncologist. (Taylor Dep., at 17, 20–21, 66; Dunlap Dep., at 39.) Further, Taylor went to Stroger Hospital's pain clinic and physical therapy on numerous occasions during this time period. (Taylor Dep., at 66; Dunlap Dep., at 39, 50.) Taylor's treatment also included different medications to manage his pain, including cortisone injections. (Taylor Dep., at 21–22.) In addition, Taylor testified that the neurologist and other doctors at Cermak monitored his pain medications and that the medications he was taking—including Neurontin, Elavil, and Naproxen—complemented his treatment at the pain clinic. (*Id.* at 21, 25–26, 34.)

In his deposition, Taylor also testified that between April and October of 2007, he went to court once or twice a month except during his trial in August 2007. (*Id.* at 17–18.) Taylor testified that he went to court four times during his criminal trial and on one of those days a nurse distributed his medications before court. (*Id.* at 37–38.) Accordingly, Taylor went to court approximately ten to twelve times during this six month period, and thus took his Neurontin medication only in the evening on these days, as well as Elavil at night. (*Id.* at 37; *see also* Dunlap Dep., at 23.) Meanwhile, although Taylor suggests that the nurses should have given him his medication for the morning and midday dosages when he went to court, Taylor admits that the reason that CCDOC medical staff did not distribute packages of daily or weekly medication, also known as blister packs, was out of concerns of inmate overdose. (Taylor Dep., at 60; *see also* Dunlap Dep., at 15; Couture Dep., at 22–23.)

Construing the facts and all reasonable inferences in Taylor's favor, CCDOC personnel acted with diligence in treating Taylor's chronic pain during the time period between April and October 2007 by providing numerous medical services and medication for his chronic pain. In addition, evidence in the record reveals that—at most—Division X nurses did not distribute Taylor's Neurontin in the morning and midday on ten to twelve occasions during the six month period in question. The nurses, however, continued to distribute Neurontin in the evening, as well as Elavil at night. Meanwhile, as Taylor admits, health care personnel did not distribute daily blister packets of medication out of concern for potential inmate overdoses. As such, considering Taylor's

total care during the six month period in which he received continuous care, the nurses' delay in administering Taylor's pain medication on ten to twelve occasions is not deliberate indifference to his chronic pain. *See Walker v. Peters,* 233 F.3d 494, 501 (7th Cir.2000) (isolated incidents of delay in administering medications not deliberate indifference). At best, the nurses' delay in distributing Taylor's pain medication constitutes negligence, namely, an inadvertent or neglectful failure to provide Taylor's medication in a timely manner. *See Estelle v. Gamble,* 429 U.S. at 105–06; *see also Duckworth v. Ahmad,* 532 F.3d 675, 679 (7th Cir.2008) ("Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts."); *Norfleet,* 439 F.3d at 396 ("medical malpractice does not give rise to a constitutional violation").

**\*5** As the Seventh Circuit instructs, "the Eighth Amendment does not require that prisoners receive 'unqualified access to health care,' " but "[r]ather, they are entitled to only 'adequate medical care.' " *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir.2006) (citations omitted). Here, the physicians and nurses of Cermak Health Services provided Taylor with continuous, adequate medical care to manage his chronic pain despite the occasions when the nurses did not distribute his pain medications until the evening. *See Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir.1997) (under the Constitution, a prisoner entitled to "reasonable measures to meet a substantial risk of serious harm"). Based on the medical treatment provided by Cermak Health Services and Drs. Dunlap and Couture, there is insufficient evidence in the record creating a genuine issue of fact for trial that Drs. Dunlap and Couture were deliberately indifferent to Taylor's chronic pain in violation of the Constitution. Therefore, the Court grants Defendants' summary judgment motion.

**Footnotes**

1    In his Amended Complaint, Taylor also alleges that the nurses did not distribute his pain medication before he went to Stroger Hospital to see his specialists at the pain clinic. Taylor fails to support this argument in his response brief, and thus he has waived this claim. *See Steen v. Myers,* 486 F.3d 1017, 1020 (7th Cir.2007) (absence of discussion in legal brief amounts to abandonment of claim).

---

**End of Document**                                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 386831
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Treondous ROBINSON, Plaintiff,
v.
Salvador GODINEZ, et al., Defendants.

No. 08 C 5393.    |    Feb. 3, 2011.

**Attorneys and Law Firms**

Treondous Robinson, Menard, IL, pro se.

Ronald Weidhuner, James Charles Pullos, Chicago, IL, for
Defendants.

#### MEMORANDUM OPINION AND ORDER

VIRGINIA M. KENDALL, District Judge.

**\*1** Plaintiff, Treondous Robinson, currently an inmate at
the Menard Correctional Center, filed this 42 U.S.C. §
1983 action against Cook County Jail officials and doctors,
claiming that they acted with deliberate indifference to his
recurring left knee injury, chronic right heel pain following
his 2002 surgery, and a recurring problem with genital warts.
More specifically, he alleges that the Defendants responded
too slowly to his requests for medical attention and the
medical treatment he received was inadequate.

Currently before this Court is a motion for summary judgment
filed by the Defendants. Plaintiff has responded, and the
Defendants have replied. For the following reasons, the Court
grants the motion.

#### I. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact
and that the movant is entitled to judgment as a matter of
law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,*
477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In
determining the existence of a genuine issue of material fact,
the court construes all facts in a light most favorable to the
non-moving party and draws all reasonable inferences in that
party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The evidence of
the non-movant is to be believed, and all justifiable inferences
are to be drawn in his favor." *Id.* at 255.

If the moving party meets its burden of showing that there
are no issues of material fact and that he is entitled to a
judgment as a matter of law, the non-moving party must
"go beyond the pleadings and affirmatively demonstrate, by
specific factual allegations, that there is a genuine issue of
material fact." *Borello v. Allison,* 446 F.3d 742, 748 (7th
Cir.2006) (internal quotation marks and citations omitted);
*Celotex,* 477 U.S. at 322–26. A genuine issue of material fact
is not demonstrated by the mere existence of "some alleged
factual dispute between the parties," *Anderson,* 477 U.S. at
247, or by "some metaphysical doubt as to the material facts."
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.
574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a
genuine issue of material fact exists only if a reasonable finder
of fact could return a decision for the nonmoving party based
upon the record. *See Anderson,* 477 U.S. at 252; *Insolia v.
Phillip Morris Inc.,* 216 F.3d 596, 598–99 (7th Cir.2000).

When addressing a summary judgment motion, the Court
derives the background facts from the parties' Local Rule
56.1 Statements, which assist the court by "organizing the
evidence, identifying undisputed facts, and demonstrating
precisely how each side propose[s] to prove a disputed fact
with admissible evidence." *Bordelon v. Chicago Sch. Reform
Bd. of Trs.,* 233 F.3d 524, 527 (7th Cir.2000). Because
Plaintiff is proceeding *pro se,* the Defendants served him
with a "Notice to *Pro Se* Litigant Opposing Motion for
Summary Judgment" as required by N.D. Ill. Local Rule 56.2.
(R. 69.) The notice explains the consequences of failing to
properly respond to a motion for summary judgment and to
the undisputed material facts in the movant's Local Rule 56.1
Statement. (*Id.*) A litigant's failure to respond to a statement
of fact in a Local Rule 56.1 Statement results in the court
considering the uncontroverted statement admitted. *Raymond
v. Ameritech Corp.,* 442 F.3d 600, 608 (7th Cir.2006). The
court may also disregard responses that do not properly cite
to the record or that offer only evasive denials. *Cichon v. Exelon
Generation Co., L/L.C.,* 401 F.3d 803, 809–10 (7th Cir.2005);
*Brasic v. Heinemann's Inc.,* 121 F.3d 281, 284 (7th Cir.1997).

**\*2** In the present case, the Defendants filed their Rule
56.1 Statement (R. 68) and provided notice to Plaintiff
of his need to respond. (R. 69.) Plaintiff responded to

the motion for summary judgment, (R. 72), but did not respond the Defendants' Rule 56.1 Statement. The court may thus consider the Defendants' Rule 56.1 Statement's facts admitted, to the extent they are supported by the record. *Raymond,* 442 F.3d at 608. With these standards in mind, the court considers the evidence of this case.

## II. FACTS

This case involves Plaintiff's inability to obtain adequate medical treatment for his knee, his ankle, and his genital warts in 2008. Plaintiff's claims begin with the reinjury of his knee on April 17, 2008. The evidence shows the following.

In 2002, Plaintiff Treondous Robinson had ankle surgery and had four screws and a plate placed in his right ankle. (R. 68, Defs. Rule 56.1 Statement ¶ 16, citing Exh. 3, Pl.2009 Depo. 21 [1] .) In 2006, while he was incarcerated at the Cook County Jail, he injured or reinjured his left knee while playing basketball. (R. 68, Defs. Rule 56.1 Statement ¶ 27, citing Exh. 4, Pl.2010 Depo. 7.) Plaintiff states that he heard his knee pop and that he was treated in an emergency room. (R. 68, Exh. 4, Pl.2010 Depo. 7–8.) He contends that he was told that he tore his ACL, but no MRI was taken, and he was given only a brace. (R. 68, Rule 56.1 Statement ¶¶ 27–28; *see also* R. 68, Exh. 4, Pl.2010 Depo. 9–11.)

In 2006 he was released from Cook County Jail ("CCJ"), but was reincarcerated in October 2007 and returned to CCJ. (R. 68, Exh. 4, Pl.2010 Depo. 7–8.) When he entered CCJ, he was not wearing orthopaedic shoes, but instead wore high top gym shoes. (R. 68, Rule 56.1 Statement ¶ 17.) His high tops were confiscated, and he was given regular tennis shoes. (*Id.* ¶ 18.) He states that he had constant pain in his Achilles heel when he walked. (*Id.* ¶¶ 19–20.)

On Apiril 17, 2008, Plaintiff hurt his left knee again. The record contains two versions of how he hurt his knee. According to a grievance he filed on April 17, 2008, he injured his knee when getting out of his top bunk. (*Id.,* ¶ 21, citing Exh. 2 (copy of 4/17/08 Grievance).) According to his deposition, Plaintiff's knee popped while he was playing basketball or wiggled as he walking down stairs. (*Id.,* ¶ 22, citing Exh. 3, Pl.2009 Depo. 22; *see also* Exh. 4, Pl.2010 Depo. 8.)

Whichever way he hurt his knee, on April 17, 2008, Plaintiff filed a grievance stating (1) he injured his knee, (2) he

informed Officer Lee that his knee was swollen and he could not bend it, and (3) he needed medical attention. (R. 68, Rule 56.1 Statement, ¶ 21, citing Exh. 2, copy of 4/17/08 Grievance.) The bottom of the grievance form indicates that it was received on April 23, 2008, by an officer or social worker named Smith; the upper right portion of the grievance indicates that it was referred to "medical staff;" and the second page of the grievance states that a "sick call" appointment was scheduled for April 29, 2008. (R. 68, Exh. 2, copy of 4/17/08 Grievance.)

**\*3** Plaintiff includes copies of several grievances with his response to the summary judgment motion. On April 18, 2008, he filed a grievance, stating that he went to the jail's dispensary and informed staff of pain in his knee and ankle. (R. 72, Pl.Response, Exh. F.) Plaintiff did not state in the grievance that he injured his knee the day before. Instead, the 4/18/08 grievance states that he previously had ankle surgery; that his jail-issued shoes were too big and had no arch support, causing pain when he walked; and that he had genital warts. (*Id.*) Like the April 17th grievance, the April 18th grievance form indicates that it was received by Officer Smith on April 23, 2008, that it was processed as a medical request, and that it was referred to medical staff. (*Id.*)

On April 20, 2008, Plaintiff submitted a health service request form, which sought medical attention for a variety of reasons: an eye exam, a dental exam, a genital problem, and knee, ankle, and back pain. (R. 68, Rule 56.1 Statement ¶ 23; *see also* R. 68, Exh. 5, p. 9 (copy of 4/20/08 med. request form)). The request did not mention an injury to his knee on April 17th. (*Id.*)

Plaintiff was seen by Dr. Maarghoob Khan on April 29, 2008. (*Id.,* ¶ 24; *see also* R. 68, Exh. 6, Dr. Khan Aff. ¶ 9.) Plaintiff complained of knee and ankle pain and was sent to Cermak Hospital the following day (April 30, 2008) for x-rays of his left knee and right ankle. (R. 68, Rule 56.1 Statement ¶¶ 24–25.) He was also given pain medication (Naprosyn 500mg) to reduce swelling, and an Ace bandage for knee support. (*Id.* ¶¶ 25–26; R. 68, Exh. 6, ¶ 9.) The x-rays revealed Mild Degenerative Disease in the knee and patella, indicating the beginning of arthritis, but no evidence of joint effusion indicating an ACL tear. (R. 68, Exh. 6, ¶ 10; *see also* R. 68, Exh. 5, p. 11 (copy of radiologist's report).) X-rays of the ankle revealed a properly healed fracture with good position and alignment and a compression plate. (R. 68, Exh. 6, ¶ 10; *see also* R. 68, Exh. 5, p. 10.) The x-rays showed nothing that would cause pain. (R. 68, Exh. 6, ¶ 10.)

On May 14, 2008, Plaintiff filed another grievance, in which he stated that he saw a doctor on April 29, 2008, and had x-rays on April 30th for a knee injury and Achilles heel pain, but that he was still experiencing pain. (R. 72, Exh. C.) Plaintiff requested to see the doctor again and receive regular shoes with better arch support. (*Id.*)

Plaintiff was next seen by Dr. Khan on May 20, 2008, at which time Plaintiff reported that his knee pain was improving, (R. 68, Exh. 6, ¶ 10.) Plaintiff complained of genital warts at that time. (*Id.*) Dr. Khan prescribed Aldura cream 5% to be applied three times a week. (*Id.;* R. 68, Rule 56.1 Statement, ¶ 37.) The record also contains a grievance from Plaintiff dated May 20, 2008, in which he complained of chronic back and neck pains and requested to the see a doctor to obtain an extra pillow and mattress. (R. 72, Exh. E.)

**\*4** At a follow-up exam on June 24, 2008, Plaintiff had no complaints. (R. 68, Rule 56.1 Statement ¶ 41, citing R. 68, Exh. 6, Dr. Khan Aff. ¶ 11.) On July 15, 2008, Plaintiff submitted another grievance, in which he stated that he had a medical exam during the last week of June 2008, that certain medical ailments were not attended to, and that Social Worker Smith had not responded to Plaintiff's previous grievance. (R. 72, Exh. D.) Plaintiff had another follow-up exam with Dr. Khan on September 9, 2008, and again had no complaints. (R. 68, Exh. 6, ¶ 9.)

On October 6, 2008, Plaintiff was seen by Physician's Assistant Kevin Sims. Sims scheduled Plaintiff for a doctor's exam on October 17, 2008. (R. 68, Rule 56.1 Statement, ¶ 42.) The medical records indicate that he was examined on October 17, 2008, at which time he was again prescribed Naprosyn, an Ace Bandage, and Aldura cream. (*Id.,* ¶ 43, citing R. 68, Exh. 6, Dr. Khnn Aff. ¶ 13.) Plaintiff was next seen on January 2, 2009, again complaining of knee pain and genital warts. He was prescribed Motrin, told to continue the Ace bandage, as well as Aldura cream for his genital warts. (R. 68, Rule 56.1 Statement, ¶ 43; R. 68, Exh. 6, Dr. Khan Aff. ¶ 14.) According to Dr. Khan, there was no evidence of swelling in Plaintiff's knee at the January 2nd visit. (R. 68, Exh. 6, Dr. Khan Aff. ¶ 14.) Plaintiff was next seen on March 27, 2009, at which time he was told to continue Aldura cream for his warts. (*Id.,* ¶ 15.) Dr. Khan states in his affidavit that, in his professional opinion, Aldura cream is an appropriate treatment for genital warts and Naproxen is an appropriate treatment for joint swelling. (*Id.,* ¶¶ 16, 18.)

Plaintiff was transferred from Cook County Jail to an Illinois prison in April 2009. (R. 68, Exh. 3, Pl.2009 Depo. 25.) At that time, he had been using the topical Aldura cream for his genital warts for about nine months, but it never worked. (*Id.;* R. 68, Rule 56.1 Statement ¶¶ 31–32.)

## III. DISCUSSION

Plaintiff's amended complaint names the following parties as Defendants: Sheriff Tom Dart, Executive Director Salvador Godinez, Superintendent Salazar, Superintendent Thomas, Dr. Maarghoob Khan, and Physician's Assistant Sims. (R. 48, Amended Complaint.) According to Plaintiff, Dart and Godinez should have implemented better procedures to address inmates' medical emergencies and medical needs. (R. 48, Amended Compl., p. 1; R. 68, Exh. 3, Pl.2009 Depo.17.) Superintendents Salazar and Thomas allegedly did not address Plaintiff's grievances, (R. 48, Amended Compl., p. 2), and Dr. Khan and Sims allegedly provided inadequate treatment for Plaintiff's genital warts, knee, and heel conditions. (*Id.,* p. 2; *see also* R. 68, Exh. 3, Pl.2009 Depo.19 (although Plaintiff's complaint is unclear as to whether Dr. Khan and Sims are named for their alleged lack of treatment for his knee and ankle, he states in his deposition that he named for all three conditions)). Plaintiff does not indicate whether he is suing each Defendant in his individual or official capacity; however, the evidence shows that the Defendants are entitled to summary judgment for both types of claims.

## A. Deliberate Indifference Standards for Individual and Official Capacity Claims

**\*5** The Constitution requires prison and jail officials to take reasonable measures to guarantee the safety of inmates, including providing them with adequate medical care. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment's proscription against cruel and unusual punishment applies to prisoners, while the Fourteenth Amendment's due process protections apply to pretrial detainees, which Plaintiff was at the time his claims arose. The analysis for claims under both amendments, however, are similar and courts apply the same legal standards for prisoners and pretrial detainees. *Minix v. Canarecci,* 597 F.3d 824, 830–31 (7th Cir.2010).

To sustain a § 1983 claim against the Defendants in their individual capacities, Plaintiff must be able to establish: (1)

that he had objectively serious medical conditions; (2) that the Defendants acted with deliberate indifference to them; and (3) that their indifference caused him an injury. *See Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir.2010). An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder,* 546 F.3d 516, 522 (7th Cir.2008). The condition need not be life-threatening; rather, a condition that would result in further significant injury or unnecessary pain if not treated is sufficient. *See Gayton,* 593 F.3d at 620.

A defendant acts with deliberate indifference only if he both (1) had actual, subjective knowledge of the risk to the inmate's health, and (2) disregarded that risk. *Id.* An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Higgins v. Corr. Med. Serv. of Ill., Inc.,* 178 F.3d 508, 510 (7th Cir.1999)).

With respect to claims against the Defendants in their official capacities, Plaintiff must show that they maintained a policy or custom that infringed upon his constitutional rights. *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir.2010). If Plaintiff cannot identify a formal policy that is unconstitutional, he may show deliberate indifference through "a series of bad acts," i.e., a widespread or repeated occurrence of events that creates an inference that municipal officials were aware of and condoned the misconduct of their employees. *Id.*

## B. Plaintiff's Claims Against Dart, Godinez, Salazar, and Thomas

### 1. Individual–Capacity Claims

It is clear that Plaintiff's claims against Sheriff Tom Dart and Executive Director Salvador Godinez do not involve their personal knowledge of his medical needs. Plaintiff's amended complaint does not allege that Dart or Godinez knew of Plaintiff's complaints or grievances. (R. 51, Amended Compl., p. 1.) Furthermore, Plaintiff acknowledges in his deposition that he named them because they are in "the chain of command" and the medical needs of inmates "should be their responsibility." (R. 68, Exh. 3, Pl.2009 Depo. 17.)

**\*6** The evidence also indicates that Superintendents Salazar and Thomas did not have personal knowledge.[2] Plaintiff acknowledged in his deposition that he did not talk to the superintendents about his medical conditions. (R. 68, Exh. 3, Pl.2009 Depo, 15–16.) Plaintiff contends that his

grievances were referred to them, (*see* R. 72, Pl. Response, 5), but the majority of Plaintiff's grievances state that they were referred to "medical staff." (R. 72, Exhs.A–M) (upper right corner of grievances show to whom the grievance was referred). Only three of Plaintiff's grievances were referred to "Division 9 Supt." (*Id.,* Exhs A, B, L (grievances from 12/19/08, 12/5/08, and 11/14/08 respectively)). Of these grievances, only Plaintiff's November 14, 2008, grievance sought treatment for his recurring Achilles heel pain. (*Id.,* Exh. L.) The December 2008 grievances complained about a strip search and searches of Plaintiff's cell. (*Id.,* Exhs. A and B.) The November 14, 2008, grievance, which is almost illegible, appears to complain about chronic back and heel pain possibly related to Plaintiff not being able to obtain better shoes. (*Id.,* Exh. L.) As noted by the Defendants, (R. 79, Reply, 2), Plaintiff does not provide the second page of the grievance, and has not shown what actions may have been taken with it. (R. 72, Exh. L.)

Other than Exhibit L of Plaintiff's Response, the only evidence that Superintendents Salazar and Thomas had actual knowledge Plaintiff's grievances is the notation at the bottom of each grievance stating that copies the grievance are provided to the following parties: Program Services, C.R.W., the Detainee, and "Division/Supt./Office." (*See* R. 72, Exhs. A–M, preprinted last line of grievance.) The notation at the bottom of each grievance, however, appears to be for record-keeping purposes, and it would unreasonable to infer that Salazar and Thomas had actual knowledge from the fact that they were one of several parties that received a carbon copy.

Even if Plaintiff could establish that Salazar and Thomas' receipt of a copy of every grievance indicated that they had actual knowledge, the evidence still shows that there was no deliberate indifference, given that the grievances were referred to medical staff. Plaintiff's April 17 and 18, 2008, grievances complaining about his need for medical attention were referred to medical staff and an appointment was made with a doctor for April 29, 2008. (R. 68, Exh. 2; R. 72, Exhs. F & G.) Plaintiff's next grievance on May 14, 2008, and May 20, 2008, about his need for medical attention were also submitted to medical staff and Plaintiff saw a doctor on May 20, 2008. (R. 72, Exhs. C & E (copies of grievances); R. 68, Exh. 6, ¶ 10 (Dr. Khan's affidavit) (it appears that Plaintiff submitted his 5/20/08 grievance before his doctor visit that same day, given that the 5/20/08 grievance does not mention that he had just had a visit with a doctor).) With respect to Plaintiff's November 14, 2008, grievance seeking medical attention for chronic knee and ankle pain, which was referred

to a superintendent, Plaintiff had a doctor visit on January 2, 2009. (R. 72, Exh. L; R. 68, Exh. 6 ¶ 14.) At that visit, Dr. Khan noted Plaintiff's medical complaints, reported that there was no swelling, and prescribed Motrin and continued use of an Ace bandage for knee support. (R. 68, Exh. 6 ¶ 14.)

**\*7** The evidence thus demonstrates that, if Superintendents Salazar and Thomas were made aware of Plaintiff's grievances, they were also made aware that the grievance had been processed as a request, referred to medical staff, and an appointment had been made. (*See, e.g.,* R. 68, Exh. 2, copy of 4/17/08 grievance.) Such evidence demonstrates that there was no deliberate indifference. *See Burks v. Raemisch,* 555 F.3d 592, 595–96 (7th Cir.2009) (a division of duties is proper, such that a complaint examiner's referral of a grievance seeking medical attention to the facility's medical staff in accordance with the examiner's duties cannot be the basis of liability with respect to the medical staff's handling of the medical request). The evidence thus shows that Plaintiff cannot succeed on claims against Dart, Godinez, Salazar, and Thomas in their individual capacities.

### 2. Official–Capacity Claims

Nor may Plaintiff proceed with official-capacity claims against these Defendants. An official-capacity claim must establish an unconstitutional policy or custom. Plaintiff points to no express policy of not adequately tending to inmates' medical requests, and it appears that the only basis for official-capacity claims are his contentions of a widespread practice of such inaction. As noted above, however, almost all of Plaintiff's grievances seeking medical attention were referred to medical staff and doctor appointments were made.

Plaintiff contends that there was a significant delay with receiving treatment. (R. 72, p. 1–2.) However, only Plaintiff's April 17, 2008, grievance that his knee swelled following an injury that day could be read as notice of a condition needing immediate attention. Even if this grievance provided notice of an emergency, one incident of a delay, by itself, does not establish an unconstitutional custom. "Proof of a single incident of unconstitutional activity is not sufficient" to establish an unconstitutional custom, "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Palmer v. Marion County,* 327 F.3d 588, 596 (7th Cir.2003) (quoting *Jackson v. Marion County,* 66 F.3d 151, 152 (7th Cir.1995)). Other than the time between Plaintiff's April 17, 2008, injury and his April 29, 2008, doctor visit, the record contains

no evidence that jail officials routinely ignored inmates' medical emergencies or medical needs. In fact, the referral of Plaintiff's grievances to the medical staff and the subsequent setting up of appointments with a doctor noted above, demonstrate the opposite.

The evidence, at best, demonstrates only one day (April 17, 2008) where Plaintiff may not have received immediate medical treatment for an injury that occurred that day, which is insufficient to establish a custom or policy of constitutionally inadequate medical care by jail officials. It is thus clear that Plaintiff cannot establish liability by the jail officials (Tom Dart, Salvador Godinez, and Superintendents Thomas and Salazar) in their official capacities, as well as their individual capacities. Summary judgment is thus warranted for these Defendants.

### C. Plaintiff's Claims Against Dr. Khan and Physician Assistant Sims

**\*8** Nor can Plaintiff succeed with his claims against Dr. Khan and Physician Assistant Sims. As noted above, Plaintiff must prove: (1) he suffered a serious medical need, (2) the Defendants acted with deliberate indifference to that need, i.e., they were actually aware of Plaintiff's medical condition and they consciously disregarded the need to provide adequate medical attention; and (3) the Defendants' disregard caused Plaintiff an injury. *Gayton,* 593 F.3d at 620. Neither negligence nor medical malpractice give rise to a constitutional violation. *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir.2006) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *Norfleet,* 439 F.3d at 396.

The evidence in this case shows that neither Dr. Khan nor Sims acted with deliberate indifference. Dr. Khan saw Plaintiff on April 29, 2008; prescribed Naprosyn for swelling and pain; provided an Ace bandage for knee support; and ordered that x-rays be taken the following day. (R. 68, Rule 56.1 Statement ¶¶ 24–26.) The x-rays, which were read by a radiologist at Cermak, showed only mild degenerative disease and the beginning of arthritis, but no joint effusion or ACL tear. (R. 68, Exh. 5, p. 11.) With respect to the ankle, x-rays showed proper alignment with the plate such that there was no evidence of anything that would cause pain. (R.

68, Exh. 5, p. 10–11; Exh. 6 ¶ 10.) Plaintiff then had a follow-up examination three weeks later on May 20, 2008, where he reported that his knee pain was improving, and he was prescribed topical medication, Aldura 5% cream, for his genital warts. (R. 68, Rule 56.1 Statement, ¶¶ 37, 40.) Plaintiff again saw Dr. Khan on June 24, 2008, and again on September 9, 2008, and had no complaints on those visits. (*Id.,* ¶ 41.) On October 6, 2008, Plaintiff saw Physician Assistant Sims, who scheduled an appointment with a doctor on October 17, 2008. (*Id.,* ¶ 42.) Plaintiff continued to see doctors at the jail on October 17, 2008, January 2, 2009, and March 27, 2009, at which times doctors noted Plaintiff's complaints of knee pain and genital warts, but also noted that there was no swelling in the knee. On these occasions, Plaintiff was prescribed either Naprosyn or Motrin and Aldura cream 5%. (*Id.,* ¶ 43–44.)

The treatment Plaintiff received by Dr. Khan and Sims described above establishes no deliberate indifference by either Defendant. Plaintiff may have disagreed with the course of treatment he received, which could possibly support

a claim of negligence or malpractice. But, the evidence demonstrates clearly he cannot prove that their decisions were so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment. *See Norfleet,* 439 F.3d at 396.

**\*9** Accordingly, the evidence shows that there are no issues of material fact with respect to Plaintiff's claims against Dr. Khan and Physician Assistant Sims and that, like the claims against the other Defendants, summary judgment is proper in favor of Dr. Khan and Sims.

### CONCLUSION

For the reasons stated in this opinion, the Defendants' motion for summary judgment [66] is granted. Plaintiff's claims are denied. Judgment is to be entered in favor of the Defendants pursuant to Fed.R.Civ.P. 56. This case is terminated.

Footnotes

1    Plaintiff was deposed twice: on June 17, 2009, and June 11, 2010. (R. 68, Exhs. 2 & 4.)

2    The record indicates that the only non-medical officers who had knowledge of Plaintiff's medical needs were Officer Lee, who Plaintiff allegedly informed immediately following his April 17, 2008, injury, (*see* R. 68, Exh. 2, copy of 4/17/08 grievance), and Officer Smith, who received and processed Plaintiff's grievances as medical requests. (*Id.; see also* R. 72, Exhs. E–G.) However, Plaintiff names neither Lee nor Smith as Defendants.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 275592
Only the Westlaw citation is currently available.
United States District Court,
N.D. Indiana,
Hammond Division.

Kwasi MITCHEL, Plaintiff,
v.
John BUNCICH, individually and in his capacity
as Lake County Sheriff; Lake County Sheriff's
Department; Jeffrey Kumorek, individually and
in his capacity as Administrator of the Lake
County Jail; and Med–Staff, Inc., Defendants.

Cause No. 2:11–CV–91–PRC.  |  Jan. 24, 2013.

**Attorneys and Law Firms**

Mitchell A. Peters, Millerfisher Law LLC, Merrillville, IN,
for Plaintiff.

Michael J. Bolde, Patricia Hass, John P. Bushemi, Burke
Costanza & Carberry LLP, Merrillville, IN, Kenneth B.
Elwood, Peter L. Boyles, Rhame & Elwood, Portage, IN, for
Defendants.

*OPINION AND ORDER*

PAUL R. CHERRY, United States Magistrate Judge.

**\*1** This matter is before the Court on (1) a Sheriff
Defendants[sic] Motion for Summary Judgment [DE 48],
filed by Defendants John Buncich, individually and in his
official capacity as Lake County Sheriff, Lake County
Sheriff's Department, and Jeffrey Kumorek, individually and
in his capacity as Administrator of the Lake County Jail
(collectively "Sheriff Defendants") on June 15, 2012, and (2)
a Sheriff Defendants[sic] Motion to Strike Plaintiff Affidavits
Filed in Response to Motion for Summary Judgment [DE
61], filed by the Sheriff Defendants on September 26, 2012.
For the following reasons, the Court grants the Motion to
Strike and grants summary judgment in favor of the Sheriff
Defendants and against Plaintiff Mitchell on all claims.

**PROCEDURAL BACKGROUND**

On February 16, 2011, Plaintiff filed his Complaint in
the Lake Superior Court against Lake County, Indiana,
John Buncich as Lake County Sheriff, the Lake County
Sheriff's Department, Jeffrey Kumorek as Administrator of
the Lake County Jail, and Med–Staff, Inc. On March 9, 2011,
Defendant Lake County, Indiana removed the case to this
Court.

On April 28, 2011, Defendant Lake County, Indiana filed
an Answer. On May 9, 2011, the Sheriff Defendants filed a
Motion to Dismiss for Failure to State a Claim. On May 27,
2011, Defendant Med–Staff, Inc. filed a Motion to Dismiss
for Failure to State a Claim and filed an Answer.

On June 30, 2011, Plaintiff filed a Motion to Amend
Complaint. On August 1, 2011, the Court granted the Motion
to Amend Complaint and denied the Sheriff Defendants'
Motion to Dismiss as moot. On August 1, 2011, the Court also
denied Med–Staff, Inc.'s Motion to Dismiss.

On August 5, 2011, Plaintiff filed an Amended Complaint
against the same Defendants, bringing the Amended
Complaint against John Buncich and Jeffrey Kumorek in both
their individual and official capacities. In Count I, brought
against the Sheriff Defendants, Plaintiff alleges that the
guards and medical personnel at the Lake County Jail failed
to provide adequate medical treatment, medical screening,
and/or medication to Plaintiff as required for his injuries and
illness, including failing to hospitalize him when informed
that he required hospitalization, all while acting under color
of state law and in the execution of deliberate official policy
and custom of the Lake County Sheriff's Department. Plaintiff
also alleges that, by delegating responsibility for medical
care and treatment to Defendant Med–Staff, Inc., the Sheriff
Defendants violated Plaintiff's right under Indiana law to
receive adequate medical care as an inmate of a county
jail. Plaintiff further alleges that the Defendants acted with
deliberate and callous indifference toward the injuries and
illness of Plaintiff and failed to provide him with adequate
treatment, all while acting under color of state law and in
the execution of deliberate official policy and custom of
the Lake County Sheriff's Department. Plaintiff alleges that
Defendants Buncich, Kumorek, and Med–Staff, Inc. knew of
the failure to provide adequate treatment to Plaintiff for his
injuries and illness, and personally, actively, maliciously, and
willfully acquiesced in and approved of this neglect of and
negligence toward Plaintiff, all while acting under color of
state law. Plaintiff alleges that these acts constitute violations
of Plaintiff's rights under Article 1, Sections 15, 16, and 23

of the Indiana State Constitution and under the Eighth and Fourteenth Amendments of the United States Constitution, brought under 42 U.S.C. § 1983.

**\*2** Count II of the Amended Complaint is brought against Defendant Med–Staff, Inc. only.

In Count III, Plaintiff alleges that the Lake County Sheriff's Department had a duty to staff the Jail with officers, administrators, and medical personnel properly trained to uphold the civil rights of its prisoners and pretrial detainees and that the Sheriff's Department breached this duty by failing to subject officers, administrators, and medical personnel to adequate hiring and training procedures, all while acting under color of state law. Plaintiff alleges that the Sheriff's Department further breached this duty by failing to reprimand or discipline officers, administrators, and medical personnel for the incident that is the subject of the Complaint, all while acting under the color of state law. Plaintiff alleges that these actions on the part of the Lake County Sheriff's Department are in violation of his rights under Article I, Sections 15, 16, and 23 of the Indiana State Constitution and under the Eighth and Fourteenth Amendments of the United States Constitution, brought under 42 U.S.C. § 1983.

The Sheriff Defendants filed an Answer on October 3, 2011, Lake County, Indiana filed an Answer on October 4, 2011, and Med–Staff, Inc. filed an Answer on October 14, 2011.

On March 29, 2012, the parties filed a Stipulation of Dismissal as to Defendant Lake County, Indiana.

The Sheriff Defendants filed the instant Motion for Summary Judgment and memorandum in support on June 15, 2012. On July 11, 2012, Plaintiff filed a Verified Motion for Extension of Time. The Court granted the motion, extending the response deadline to September 17, 2012.

On September 17, 2012, Plaintiff filed his response brief and four affidavits.

On September 26, 2012, the Sheriff Defendants filed a reply in support of the Motion for Summary Judgment.

The same date, the Sheriff Defendants filed the instant Motion to Strike Plaintiff Affidavits filed in Response to Motion for Summary Judgment. Plaintiff filed a response on October 6, 2012, and the Sheriff Defendants filed a reply on October 9, 2012.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Rule 56 further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir.1994) (citations and quotations omitted).

**\*3** A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323; Fed.R.Civ.P. 56(c). The moving party may discharge its initial responsibility by simply " 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex,* 477 U .S. at 323, 325; *Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 n. 3 (7th Cir.1994); *Fitzpatrick v. Catholic Bishop of Chi.,* 916 F.2d 1254, 1256 (7th Cir.1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials, and, if the moving party has "produced sufficient evidence to support a conclusion

that there are no genuine issues for trial," then the burden shifts to the nonmoving party to show that an issue of material fact exists. *Becker v. Tenenbaum–Hill Assoc.,* 914 F.2d 107, 110–111 (7th Cir.1990) (citations omitted); *see also Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See*Fed.R.Civ.P. 56(e); *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir.1994).Rule 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it ..."Fed.R.Civ.P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, to demonstrate a genuine issue of fact, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," but must "come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *See Anderson,* 477 U.S. at 255; *Srail v. Vill. of Lisle,* 588 F.3d 940, 948 (7th Cir.2009); *NLFC, Inc. v. Devcom Mid–Am., Inc.,* 45 F.3d 231, 234 (7th Cir.1995). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson,* 477 U.S. at 249–50.

## MOTION TO STRIKE

**\*4** In support of his response to the Motion for Summary Judgment, Plaintiff submits four Affidavits—those of himself, his father Sam Mitchell, and fellow Lake County Jail inmates Brian Loggman and Ramsey Alexander. The Sheriff Defendants ask the Court to strike the four Affidavits because they are undated and because they contain information that is hearsay, lacks personal knowledge, or is otherwise inadmissible.

The Sheriff Defendants first argue that the Affidavits should be stricken because they are all undated. Federal statute sets forth the requirements for an unsworn declaration made under penalty of perjury, which includes that the statement be made in a writing, that the person states "as true under penalty of perjury," and that the statement be dated. 28 U.S.C. § 1746. Defendants recognize that the absence of a date is not, in and of itself, a reason to discount an affidavit or a declaration but contend that courts typically excuse such an omission only when extrinsic evidence demonstrates the approximate date of signing. *Brown v. White's Ferry, Inc.,* 280 F.R.D. 238, 244 (D.Md.2012); *see also Peters v. Lincoln Elec. Co.,* 285 F.3d 456, 475–76 (6th Cir.2002); *Davis v. Wells Fargo Bank,* 685 F.Supp.2d 838, 842 (N.D.Ill.2010). Plaintiff has offered no response to the argument and has offered no extrinsic evidence demonstrating the approximate date of signing. Accordingly, the Court grants the Motion to Strike on the basis that the Affidavits are undated, striking the Affidavits of Kwasi Mitchell, Sam Mitchell, Brian Loggman, and Ramsey Alexander submitted as exhibits A through D respectively in support of Plaintiff's response to Defendants' Motion for Summary Judgment.

The Sheriff Defendants have also submitted an undated affidavit. The Affidavit of John Buncich, attached as Exhibit 11 in support of the Motion for Summary Judgment, is undated. Defendants have offered no extrinsic evidence demonstrating the approximate date of signing. Accordingly, the Court *sua sponte* strikes the Affidavit of John Buncich.

Although the Court strikes each of the four Affidavits offered by Plaintiff on the basis that they are undated, the Court also considers the Sheriff Defendants' Motion to Strike specific paragraphs within each Affidavit.Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."Fed.R.Civ.P. 56(c)(4). The Federal Rules of Evidence further provide, in relevant part, that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."Fed.R.Evid. 602. Hearsay, which is defined as a declarant's out-of-court statement that a "party offers in evidence to prove the truth of the matter asserted in the statement,"Fed.R.Evid. 801(a)(c), is not admissible

unless allowed by statute, the Federal Rules of Evidence, or other rules created by the United States Supreme Court, see Fed.R.Evid. 802.

**\*5** The Seventh Circuit Court of Appeals has found the following categories of statements not properly included in an affidavit: "(1) conclusory allegations absent supporting evidence; (2) legal argument; (3) selfserving statements without factual support in the record; (4) inferences or opinions not "grounded in observation or other first-hand experience; and (5) mere speculation or conjecture."Paniaguas v. Aldon Cos., Inc., No. 2:04–CV–468, 2006 WL 2568210, \*4 (N.D.Ind. Sept. 5, 2006) (quoting Moore v. Ashland Inc., No. IP–99–1173–C–T/G, 2000 WL 1672747, at \*1 (S.D.Ind. Oct.30, 2000) (internal citations omitted)). In addition, statements or conclusions that contradict prior deposition or other sworn testimony, without explaining the contradiction or attempting to resolve the disparity are not properly included in an affidavit. See Snyder v. Livingston, No. 1:11–CV–77, 2012 WL 1493863, at \*1 (N.D.Ind. Apr.27, 2012) (citing LaFary v. Rogers Grp., Inc., 591 F.3d 903, 908 (7th Cir.2010); Buckner v. Sam's Club, Inc., 75 F.3d 290, 292 (7th Cir.1996)).

With these standards in mind, the Court considers each Affidavit in turn.

### A. Affidavit of Kwasi Mitchell

The Sheriff Defendants argue that paragraphs 3, 4, 5, 7, and 8 should be stricken.

#### 1. Paragraph 3

Paragraph 3 provides, in relevant part, that Defendants "failed to provide me with any medical treatment request cards and, on multiple occasions, refused to provide me with medical treatment after I orally requested it."Pl. Resp., Exh. A, ¶ 3. Defendants argue that this statement is a conclusory allegation lacking supporting evidence of specific incidents, that they have submitted documentation and records from many sources to demonstrate that adequate medical care was promptly provided, and that this statement is self-serving and factually inaccurate. Plaintiff offers no response in support of this paragraph. Although Plaintiff's statement concerns events that would be within his personal knowledge about events that allegedly happened to him, because they are conclusory allegations lacking support that do not identify when Plaintiff

requested treatment or what he requested treatment for, the statements should be disregarded. The Motion to Strike as to paragraph 3 is granted on this additional basis.

#### 2. Paragraph 4

Paragraph 4 provides: "On March 13, 2009, I suffered a seizure severe[sic] causing me to fall unconscious, hitting my head against the floor of my cell. During this seizure, I lost control of my bowels. Defendants were aware of my condition and that I was not in physical control of myself, but left me lying on my cell floor, in my own excrement, without providing me with any medical treatment or other assistance. These refusals were by both the Jail Staff and the Medical Staff."Pl. Resp., Exh. A, ¶ 4. Defendants challenge the statements regarding the failure to provide medical treatment and argue that the statements run counter to factual evidence and numerous sources of record submitted by Defendants in support of the Motion for Summary Judgment. Plaintiff responds that his burden is to offer more than a "scintilla" of evidence to demonstrate the existence of a genuine issue of material fact, and that he has done so by offering the four Affidavits.

**\*6** Although the jail and ambulance records submitted in support of the motion for summary judgment appear to be contrary to Plaintiff's statements, these statements are within Plaintiff's personal knowledge and are specific as to the date the events occurred. This is not a case in which an affidavit is offered to contradict a prior deposition or prior sworn testimony. The Court denies the Motion to Strike as to paragraph 4 on this basis.

#### 3. Paragraph 5

Paragraph 5 provides: "Following this incident, I continued to suffer from increasingly severe, life-threatening seizures, which caused me further physical injury. Defendants continued to refuse to provide me with medical treatment despite multiple requests for treatment on my part, and refused to refer me for outside medical treatment."Pl. Resp., Exh. A, ¶ 5. Defendants challenge the statements regarding the failure to provide medical treatment and argue that the statements run counter to factual evidence and numerous sources of record. For the same reasons given as to Paragraph 4, the Court denies the Motion to Strike on this basis.

#### 4. Paragraph 7

**Mitchel v. Buncich, Not Reported in F.Supp.2d (2013)**
4:12-cv-04068-SLD # 37-18 Page 29 of 42
2013 WL 275592

Paragraph 7 provides: "I was subsequently diagnosed with multiple medical conditions including hepatitis C, chronic seizure disorder, anxiety disorder, neuropathy and concussion-related brain damage. Except for the hepatitis C, all my medical symptoms were nonexistent before my incarceration and the Defendants' refusal to provide me with adequate medical treatment."Pl. Resp., Exh. A, ¶ 7. Defendants challenge the statements regarding the failure to provide medical treatment and argue that the statements run counter to factual evidence and numerous sources of record. Defendants also argue that this paragraph contains inadmissible hearsay and unqualified medical opinions. Defendants reason that this paragraph confirms that the Sheriff Defendants did provide medical treatment because it was that treatment that revealed Plaintiff's chronic ailments, allegedly previously unknown to Plaintiff.

In response, Plaintiff argues that these statements qualify for the hearsay exception under Federal Rule of Evidence 803(4), which provides that the following is not excluded by the hearsay rule:

> Statement Made for Medical Diagnosis or Treatment. A statement that:
>
> (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and
>
> (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

Fed.R.Evid. 803(4). [1] Rule 803(4) is inapplicable to the statements in paragraph 7 because the statements Plaintiff is making in the Affidavit in this court proceeding are not being made for the purpose of medical diagnosis or treatment to a person providing a medical diagnosis or medical treatment. See *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 564 (7th Cir.1996). Similarly, statements that doctors may have made to Plaintiff in the past are also not made for the purpose of medical diagnosis or treatment and do not fall within the exception.

**\*7** In addition, the first sentence is inadmissible hearsay because it is not testimony by Plaintiff regarding his subjective symptoms or the treatment he underwent; rather, the statement offers the medical opinions of Plaintiff's physicians who have diagnosed him with "medical conditions." See *Taylor v. Ne. Ill. Reg'l Commuter R.R. Corp.,* No. 04C7270, 2008 WL 244303, \*6 (N.D.Ill. Jan.28, 2008) (citing cases). However, as to his statement in the second

sentence that his "medical symptoms" were nonexistent prior to his incarceration, that statement is within his personal knowledge because he is aware of symptoms that he experiences because he is referring to "symptoms" rather than "conditions." Finally, as to the statement that the Defendants refused to provide him with medical treatment, that statement is within his personal knowledge. Therefore, the Court grants the Motion to Strike as to the first sentence of paragraph 7 on this additional basis and denies the Motion to Strike as to the second sentence of paragraph 7.

### 5. Paragraph 8

Paragraph 8 provides: "I have been informed by medical personnel that my conditions and symptoms are now permanent."Pl. Resp., Exh. A, ¶ 8. Defendants argue that this paragraph contains inadmissible hearsay and unqualified medical opinion. Plaintiff responds that this statement falls within the hearsay exception for statements made for medical diagnosis or treatment under Rule 803(4). As with paragraph 7, the exception is inapplicable because Plaintiff is making the statement in his Affidavit for the purpose of this court proceeding and is not making the statement for the purpose of medical diagnosis or treatment to a person providing the diagnosis or treatment. See *Bombard,* 92 F.3d at 564. The statement is inadmissible hearsay, and the Court grants the Motion to Strike as to paragraph 8 on this additional basis.

### B. Affidavit of Sam Mitchell

Although the Court has stricken Sam Mitchell's Affidavit on the ground that it is undated, the Court considers the additional bases for striking paragraphs 4, 5, 6, and 7 argued by the Sheriff Defendants. Sam Mitchell is Plaintiff's father.

### 1. Paragraphs 4, 6, and 7

Defendants contend that paragraphs 4, 6, and 7 all contain allegations that the Sheriff Defendants did not provide medical treatment to Plaintiff and argue that the statements should be stricken because Sam Mitchell is without personal knowledge of these statements. Defendants reason that Sam Mitchell was not in the jail and did not have personal contact with his son throughout the dates of his son's incarceration at the Lake County Jail. Defendants argue that paragraph 7 also contains inadmissible hearsay and unqualified medical opinions.

Paragraph 4 provides: "I continued to call the Lake County Jail every day of my son's incarceration, every time reiterating the need for my son to have proper medical treatment for his substance abuse and chronic asthma. Each time I called, Defendants informed me that he was receiving proper medical treatment. However, I continued to call because I was aware that he was in fact suffering from serious medical complications that were not being adequately addressed."Pl. Br., Exh. B, ¶ 4. Plaintiff does not offer a response in support of this paragraph. The first sentence is within Sam Mitchell's personal knowledge regarding his personal actions. The second sentence is offered for the truth of the matter asserted and Plaintiff does not argue that it qualifies for a hearsay exception. To the extent the third sentence is offered to show *why* Sam Mitchell called the jail, the sentence would not be hearsay; however, given the use of Sam Mitchell's Affidavit by Plaintiff, it appears that Plaintiff is using the statement "he was in fact suffering from serious medical complications that were not being adequately addressed" for the truth of the matter asserted. The Court denies the Motion to Strike as to the first sentence of paragraph 4 and grants the Motion to Strike as to the remainder of paragraph 4 for these additional reasons.

**\*8** Paragraph 6 provides: "On or about March 8, 2009, my son was found unconscious and unresponsive on the floor of his jail cell. He was then taken to a hospital for outside medical treatment."Pl. Br., Exh. B, ¶ 6. There is no basis for viewing these statements as within Sam Mitchell's personal knowledge as there is no evidence that he was in the jail or at the hospital to observe either event or that he has personal knowledge of the events in some other way. Plaintiff argues that this statement falls under the hearsay exception for statements made for medical diagnosis or treatment under Rule 803(4). These statements are not made to a person providing a diagnosis or treatment and they are not being made for the purposes of diagnosis or treatment. The statements are outside Sam Mitchell's personal knowledge and are being offered for the truth of the matter asserted. Accordingly, the Court grants the Motion to Strike paragraph 6 on this additional basis.

Paragraph 7 provides: "My son continues to suffer from medical conditions including hepatitis C, chronic seizure disorder, anxiety disorder, neuropathy and concussion-related brain damage. Except for the hepatitis C, all his medical symptoms were nonexistent before his incarceration and the Defendants' refusal to provide him adequate medical treatment. He has been informed by medical personnel that

these conditions are now permanent."Pl. Br., Exh. B, ¶ 7. The first sentence constitutes unqualified medical opinions. To the extent Sam Mitchell is repeating diagnoses provided by medical professionals, the sentence constitutes inadmissible hearsay. As for the second sentence, Sam Mitchell does not state that he has personal knowledge of Plaintiff's medical condition, other than implying in paragraph 3 that he had knowledge that Plaintiff was a chronic heroin addict and abuser and that Plaintiff suffers from chronic asthma. The third statement is an out-of-court statement being offered for the truth of the matter asserted that does not fall within the exception of Rule 803(4). The Court grants the Motion to Strike paragraph 7 on this additional basis.

### 2. *Paragraph 5*

Paragraph 5 provides: "On or about March 6, 2009, I received a phone call from inmate Brian Loggman, who shared a jail cell with my son and was aware of my son's medical condition. Brian Loggman informed me that my son was not in fact receiving adequate medical treatment. He further said that my son was seriously and dangerously ill due to this lack of medical treatment, and that someone needed to provide my son with medical treatment or he was 'gonna die up there.' " Pl. Br., Exh. B, ¶ 5. Defendants argue that the statements that were made by declarant Brian Loggman to Sam Mitchell are being offered for the truth of the matter asserted, namely that Plaintiff did not receive adequate medical treatment, which would be inadmissible hearsay.

Plaintiff responds that Brian Loggman's statement was an "excited utterance" and, thus, an exception to the hearsay rule under Federal Rule of Evidence 803(2).Rule 803(2) provides that "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is not excluded by the rule against hearsay. Fed.R.Evid. 803(2)."Hearsay statements are admissible under the excited utterance exception if (1) a startling event occurred; (2) the declarant made the statement while under the stress of excitement caused by the startling event; and (3) the declarant's statement relates to the startling event."*United States v. Wesela,* 223 F.3d 656, 663 (7th Cir.2000) (citing *United States v. Sowa,* 34 F.3d 447, 453 (7th Cir.1994))."All that the exception requires is 'that the statement be made contemporaneously with the excitement resulting from the event, not necessarily with the event itself.' " *Id.* (quoting *Smith v. Fairman,* 862 F.2d 630, 636 (7th Cir.1988) (quoting *United States v. Moore,* 791 F.2d 566, 572 n. 4 (7th Cir.1986))). The statements Loggman allegedly made to Sam Mitchell do not qualify as excited

**Mitchel v. Buncich, Not Reported in F.Supp.2d (2013)**
4:13-cv-04068-SLD # 37-18    Page 31 of 42
2013 WL 275592

utterances because there is no identification of a startling event and no indication that the statements were made under the stress of the excitement caused by any such startling event. Although the words "gonna die up there," and indeed the entire conversation, may have been animated or even excited, that fact alone does not qualify the statements as an excited utterance.

**\*9** Plaintiff also argues that Loggman's statements are not being offered for the truth of the matter asserted but rather to establish why Sam Mitchell contacted jail officials and why he was concerned for his son. This characterization is disingenuous. Plaintiff offers the out-of-court statement allegedly made by Loggman to Sam Mitchell to show the level of quality of medical care Plaintiff was receiving at the jail.

The opening phrase of paragraph 5—"On or about March 6, 2009, I received a phone call from inmate Brian Loggman"—is within Sam Mitchell's personal knowledge and is not hearsay. The Court grants the Motion to Strike as to the remainder of paragraph 5 on the additional ground that it is inadmissible hearsay.

### C. Affidavit of Brian Loggman

Although the Court has stricken the Affidavit of Brian Loggman because it is undated, the Court considers the additional bases for striking paragraphs 4, 5, and 6 of the Affidavit argued by the Sheriff Defendants. Brian Loggman was incarcerated at the Lake County Jail between March 2, 2009, and March 13, 2009, and he states that he and Plaintiff were "incarcerated in close physical proximity to one another. I was able to see and hear what occurred in his jail cell, and also to communicate with [Plaintiff] and see and hear his communication with others."Pl. Br., Exh. C, ¶ 3.

### 1. Paragraph 4

Paragraph 4 provides: "Between March 3, 2009 and March 13, 2009, I witnessed [Plaintiff] suffering from severe narcotic and other drug withdrawal symptoms, which symptoms included seizures. I also witnessed multiple requests for medical treatment for his symptoms, but Defendants in this matter refused to provide [Plaintiff] with medical treatment."Pl. Br., Exh. C, ¶ 4. Defendants argue that this statement is conclusory and lacks factual support and that the statement runs contrary to the documented evidence

they submitted in support of summary judgment. Defendants also argue that this statement contains unqualified medical opinions and that Loggman lacks personal knowledge of whether medical treatment was given.

Loggman cannot offer an opinion as to the medical cause of what Loggman observed Plaintiff experiencing, although he can offer his personal knowledge that he observed Plaintiff suffer a seizure. The Court grants the Motion to Strike the first sentence in part on this additional basis, striking the phrase "severe narcotic and other drug withdrawal symptoms, which symptoms included."That Loggman observed Plaintiff request medical treatment would be within his personal knowledge; however, the evidence of record that Plaintiff received medical treatment demonstrates that Loggman does not have personal knowledge of the medical treatment Plaintiff received. The Court denies the Motion to Strike as to the second sentence of paragraph 4 before the comma and grants the Motion to Strike on this additional basis as to the remainder of the sentence.

### 2. Paragraph 5

**\*10** Paragraph 5 provides: "On March 13, 2009, I witnessed [Plaintiff] suffer a seizure severe enough that he fell unconscious, hitting his head against the floor of his cell and losing control of his bowels. Defendants were aware of [Plaintiff's] condition, but I witnessed them leave [Plaintiff lying on my[sic] cell floor, in his own excrement, and provide no medical treatment or other assistance."Pl. Br., Exh. C, ¶ 5. Defendants argue that these statements are conclusory and lack factual support and that they run contrary to the documented evidence submitted by Defendants. Defendants also argue that Loggman does not have personal knowledge of the medical treatment received by Plaintiff. The Court denies the Motion to Strike as to the first sentence of paragraph 5 because it is within Loggman's personal knowledge based on first-hand observation. The second sentence is also within Loggman's personal knowledge with the exception of the final phrase following the word "excrement" because the evidence of record that Plaintiff received medical treatment on March 13, 2009 for a seizure demonstrates that Loggman does not have personal knowledge of Plaintiff's medical treatment. The Court denies the Motion to Strike the second sentence through the word "excrement" and grants the Motion to Strike on this additional basis as to the remainder of the sentence.

### 3. Paragraph 6

Paragraph 6 provides: "Following this incident, I witnessed [Plaintiff] continued[sic] to suffer from increasingly severe seizures and his physical condition deteriorate, and witnessed him make multiple requests to the Defendants for medical treatment. The Defendants, who also witnessed his deteriorating condition, refused to provide him medical treatment and did not refer him for outside medical treatment."Pl. Br., Exh. C, ¶ 6. Defendants argue that this paragraph suffers from the same flaws as paragraphs 4 and 5 and that this paragraph is also factually inaccurate because Defendants did refer Plaintiff for outside treatment. The first sentence is within Loggman's personal knowledge based on first-hand observation, and the Court denies the Motion to Strike as to that sentence on this basis. The Court grants the Motion to Strike the second sentence on the additional basis that the evidence of record that Plaintiff received medical treatment for seizures on March 13, 2009, demonstrates that Loggman does not have personal knowledge of Plaintiff's medical treatment.

### D. Affidavit of Ramsey Alexander

Although the Court has stricken the Affidavit of Ramsey Alexander because it is undated, the Court considers the additional bases for striking paragraphs 4 and 5 argued by the Sheriff Defendants. Paragraphs 4 and 5 of Alexander's Affidavit are almost identical to paragraphs 4 and 5 of Loggman's Affidavit. Like Loggman, Alexander states that he was incarcerated at the Lake County Jail between the period of March 2, 2009, and March 13, 2009, and he states that he and Plaintiff were "incarcerated in close physical proximity to one another. I was able to see and hear what occurred in his jail cell, and also to communicate with [Plaintiff] and see and hear his communication with others."Pl. Br., Exh. D, ¶ 3.

#### 1. Paragraph 4

**\*11** Paragraph 4 of Alexander's Affidavit is identical to paragraph 4 of Loggman's Affidavit. For the same reasons set forth above as to paragraph 4 of Loggman's Affidavit, the Court finds that Alexander cannot offer an opinion as to the medical cause of what Alexander observed Plaintiff experiencing, although he can offer his personal knowledge that he observed Plaintiff suffer a seizure. The Court grants the Motion to Strike the first sentence in part, striking the phrase "severe narcotic and other drug withdrawal symptoms, which symptoms included."That Alexander observed Plaintiff request medical

treatment would be within his personal knowledge; however, the evidence of record that Plaintiff received medical treatment demonstrates that Alexander does not have personal knowledge of the medical treatment Plaintiff received. The Court denies the Motion to Strike as to the second sentence of paragraph 4 before the comma and grants the Motion to Strike on this additional basis as to the remainder of the sentence.

#### 2. Paragraph 5

As for paragraph 5, it appears that there is an error in the drafting of the Affidavit. Paragraph 5 of Alexander's Affidavit begins identically to paragraph 5 of Logmann's Affidavit, ending at the bottom of the first page with the phrase "... but I witnessed them leave [Plaintiff]". Pl. Br., Exh. D, p. 1, ¶ 5. However, at the top of page 2, the continuance of what should be paragraph 5 is a non sequitur; the words at the top of page 2 are identical to the last phrase of paragraph 6 of Loggman's Affidavit: "his deteriorating condition, refused to provide him medical treatment and did not refer him to outside medical treatment."Pl. Br., Exh. D., p. 2 (Alexander Affidavit); Pl. Br., Exh. C, p. 2 (Loggman Affidavit). Alexander's Affidavit does not have a paragraph 6. Therefore, the Court disregards the phrase at the top of page 2 and considers paragraph 5 of Ramsey's Alexander's Affidavit to end at the bottom of page 1. Thus, paragraph 5 provides, in its entirety: "On March 13, 2009, I witnessed [Plaintiff] suffer a seizure severe enough that he fell unconscious, hitting his head against the floor of his cell and losing control of his bowels. Defendants were aware of [Plaintiff's] condition, but I witnessed them leave [Plaintiff]." Pl. Br., Exh. D., p. 1.

For the same reasons set forth above as to paragraph 4 of Loggman's Affidavit, the Court denies the Motion to Strike as to the first sentence of paragraph 5 because it is within Alexander's personal knowledge based on first-hand observation. The fragment of the second sentence included in the Affidavit is also within Alexander's personal knowledge, and the Court denies the Motion to Strike the second sentence.

### FACTUAL BACKGROUND [2]

Plaintiff Kwasi Mitchell was brought to the Lake County Jail on March 2, 2009, upon arrest by the United States Marshal. On the same date, jail staff completed a "Medical History and Screening" form for Plaintiff. Staff noted on the form that Plaintiff reported that he used heroin daily, that he used tobacco, and that he has a medical history of asthma

and stomach ulcers. Plaintiff answered "yes" to the question, "Have you had withdrawal problems when you stop taking drugs."Def. Br., Exh. 4. Plaintiff informed medical personnel that he had seen a doctor, Dr. Gupta in Michigan City, within the past six months and that Plaintiff filled prescriptions for Nexium and a Combivent inhaler at the CVS pharmacy in Michigan City. On March 7, 2009, jail medical staff contacted the CVS pharmacy in Michigan City and learned that Plaintiff had not filled a prescription since October of 2008 and that he had never filled a prescription for Nexium or a Combivent inhaler.

**\*12** On intake on March 2, 2009, jail medical staff assessed Plaintiff's vital signs and placed Plaintiff on the opiate checklist. On March 3, 2009, the jail physician placed Plaintiff on the opiate check list for five days and ordered prescriptions of thiamine, folic acid, Imodium, Tigan, and Clonidine. Defendants' medical expert, Johann Farley, M.D., a Board Certified Specialist in Family Medicine and Addiction Medicine, opined that from March 2 through March 6, 2009, Plaintiff's withdrawal symptoms were managed well by the medical staff at the jail.

In addition to the medical history and screening, Plaintiff was also given a routine mental health evaluation on March 2, 2009. Plaintiff was found suitable for placement in the general population. During his incarceration, Plaintiff was monitored by the jail's mental health provider, Edgewater Systems for Balanced Living. Plaintiff was checked by mental health professionals on several occasions. In the treatment notes for March 6, 2009, Plaintiff was referred to the medical department for continuation of the "opiate protocol" and it was indicated that the mental health staff was to continue monitoring Plaintiff and to make appropriate referrals. Def. Br., Exh. 8, p. 1. On the March 7, 2009 treatment note, Plaintiff reported for the first time that he takes Xanax, and a nurse was notified. It was also noted that he "will be seen daily on rounds."Def. Br., Exh. 8, p. 2. On March 9, 2009, after seeing Dr. William Pierce in the clinic, Plaintiff was referred by Dr. Pierce for mental health review.

On March 9, 2009, a nurse was notified by a counselor that Plaintiff was not responding. The nurse went to his cell, checked his vitals, and noted in the medical records that he was alert to person and time but disoriented to place.[3] She spoke with Dr. Pierce. She noted that Dr. Pierce was aware of Plaintiff's condition and that he ordered that Plaintiff be put on the opiate checklist for an additional three days and that he be seen in clinic the following day, March 10, 2009. Plaintiff

was given thiamine, Imodium, and folic acid, among other medications. Plaintiff was seen in the clinic on March 11, 2009. On March 12, 2009, Plaintiff was prescribed Risperdal by the attending jail physician.

On March 13, 2009, the jail medical record shows that, at 6:10 a.m., upon arriving back from passing medications, the author heard a commotion in the hall, noted officers talking to Plaintiff, and then returned to the nursing station. At 6:30 a.m., the same author noted that she attempted to give Plaintiff Immodium 2mg for loose stool. She indicted that Plaintiff was lying on the floor in his shower stall with his hands hand-cuffed behind him. She requested that he be placed in an upright position to take his medications but that he refused the medications. At 7:00 a.m., the nurse informed the FNP of Plaintiff's behavior.

At 8:00 a.m., a corrections officer requested that a nurse come to Plaintiff's cell. The nurse noted that Plaintiff was laying "flat on posterior side" in the middle of the hallway outside his cell door. *Id.* at 3. The nurse noted that Plaintiff was having difficulty getting up. The nurse noted that Plaintiff was soiled with both urine and feces. The correctional officer assisted Plaintiff into a wheelchair and wheeled Plaintiff into the shower. The nurse attempted to assist Plaintiff in taking his oral medication, but Plaintiff repeated, while yelling, "I don't want no pills!" The nurse indicated that Plaintiff refused his medication and spit them out on the floor. Plaintiff was then assisted out of the wheelchair by the correctional officer and proceeded to walk into the shower. The nurse indicated that Plaintiff "was being cleaned up & dressed for court."*Id.*

**\*13** There is an entry at 7:50 p.m. "Called to 4F8. Inmate observed laying face down, non-responsive. Appears to be in postictal state with heavy labored respirations @ 40/ min. O2 sat 84%. O2 started @ 15L per mask. Apical pulse 155. Inmate urinated on himself. Unable to get BP d/ t inmate with spontaneous jerking. Sgt. notified to dispatch ALS ambulance."Def. Br., Exh. 7, p. 2. The record contains a second entry for 3/13/09, which provides: "8pm Seizure activity, noted @ this time approx. 2 min long. Ativan 2mg 1M given apical pulse 140 O2 sat 98%. Respiration labored @ 40/min. O2 remains in place @ 15L per mask. [signature]."*Id.* at p. 3. A third entry provides: "829 pm Inmate with seizure activity O2 remains in place @ 15L per mask. Ambulance arrives @ this time. [signature]."*Id.*A fourth entry provides: "825 pm ambulance transporting to hospital. [signature]."*Id.*Lastly, the nurse indicated at 9:40 pm that Dr. Pierce was "aware" of the situation and at 8:45 p.m.

the nurse indicated, "called D.O.M. & left message to call facility."*Id.*

The Superior Air–Ground Ambulance Service records indicate that at 8:08 p.m., a jail sergeant called for an ambulance to transport Plaintiff, that the ambulance arrived at Plaintiff's side at 8:19 p.m., and that at 8:41 p.m., the ambulance transported Plaintiff to Methodist Hospital, arriving at 8:46 p.m. Dr. Pierce's report shows that Plaintiff was admitted to Methodist Hospital on March 14, 2009, after having been treated in the emergency room.

Upon review of the Jail Medical Records and the Methodist Hospital Medical Records, Dr. Farley, the Sheriff Defendants' medical expert, opined that Plaintiff was suffering from neuroleptic malignant syndrome and hepatic failure due to his hepatitis C infection and abuse of multiple drugs. In his expert report, Dr. Farley opined that "the inmate's failure to disclose his true drug habits was the most influential factor to cause these events."Def. Br., Exh. 1. Dr. Farley adds that "there is no evidence of failure by correctional officers to promptly notify medical personnel when needed or failure to promptly assist medical personnel when needed."*Id.* He also opined that Plaintiff's injuries were not caused by any failure to manage his opioid withdrawal. In fact, Dr. Farley opined that most opioid withdrawals happen shortly after the drug's half-life, which, for heroin, is eight to twelve hours after use. Furthermore, he opined that the jail medical personnel provided adequate screening, medical treatment, and medication based on the information known to them and that Plaintiff was hospitalized when it became medically necessary.

Dr. Pierce, who treated Plaintiff at Methodist Hospital, indicated that Plaintiff's diagnosis at discharge was neural malignant syndrome, status epilepticus, rhabdomyolysis, heroin addiction withdrawal, and pneumonia. On March 20, 2009, Plaintiff was discharged by Dr. Pierce from Methodist Hospital back to the Lake County Jail. On March 24, 2009, Mitchell was granted pre-trial release from Lake County Jail on condition that he enroll in the intensive outpatient substance abuse treatment program at Swanson Center.

## ANALYSIS

**\*14**  The Sheriff Defendants seek summary judgment in their favor on both the federal and state claims brought against

them by Plaintiff in the Amended Complaint. The Court considers each in turn.

### A. 42 U.S.C. § 1983

Plaintiff alleges that the Sheriff Defendants violated his constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution by failing to provide him with adequate medical screening and medical treatment and failing to hospitalize him when necessary. Plaintiff alleges that all of these failures took place "in the execution of deliberate official policy and custom of Defendant, Lake County Sheriff's Department."Am. Compl. ¶ 5. Plaintiff also alleges that Defendant Lake County Sheriff's Department violated his constitutional rights under the same constitutional amendments by failing to properly train and discipline jail staff.

Plaintiff brings these claims under 42 U.S.C. § 1983, which provides "a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."*City of Monterey v. Del. Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 749 n. 9, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) (quotation omitted). A cause of action may be brought under § 1983 against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must show (1) that he "was deprived of a right secured by the Constitution or federal law" (2) "by a person acting under color of law."*Thurman v. Vill. of Homewood,* 446 F.3d 682, 687 (7th Cir.2006).

### *1. Deliberate Indifference Claims*
Plaintiff alleges that the Sheriff Defendants, namely the Lake County Sheriff's Department, Sheriff John Buncich in his individual capacity, and Jail Administrator Jeffrey Kumorek in his individual capacity, [4] are liable under 42 U.S.C. § 1983 for exhibiting deliberate indifference to Plaintiff's serious medical needs while he was incarcerated in the Lake County Jail in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

"The Supreme Court has interpreted the Eighth Amendment's prohibition against cruel and unusual punishment, as incorporated by the Fourteenth Amendment, to impose a duty on states 'to provide adequate medical care to incarcerated individuals.' " *Holloway v. Delaware County Sheriff,* 700 F.3d 1063, 1072 (7th Cir.2012) (quoting *Boyce v. Moore,* 314 F.3d 884, 888–89 (7th Cir.2002) (citing *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976))). Prison officials violate this constitutional prohibition when they act with deliberate indifference to the serious medical needs of an inmate. *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). A plaintiff asserting a claim of deliberate indifference must demonstrate (1) that his medical condition is "objectively, sufficiently serious" and (2) that the defendants acted with a "sufficiently culpable state of mind." *Id.* (citing *Farmer,* 511 U.S. at 834).

**\*15** In his Amended Complaint, Plaintiff alleges that he became ill and injured and required urgent treatment on March 3, 2009. However, Plaintiff has not offered any evidence to support this allegation. In his response brief, Plaintiffs asserts generally that he was not provided "adequate treatment for his drug addiction and other medical conditions."Pl. Resp., p. 1. He does not identify what the "other medical conditions" are. The evidence of record shows that Plaintiff was addicted to heroin and Xanax and that he suffered seizures on March 13, 2009, for which he was taken to Methodist Hospital. Thus, for the purposes of this analysis, the Court presumes that Plaintiff had the serious medical conditions of drug addiction, beginning at the time of his incarceration on March 2, 2009, and of seizures that occurred on March 13, 2009.

Under the second element, deliberate indifference is "more than mere negligence but less than the purposeful or knowing infliction of harm .... Deliberate indifference requires that a prison official knows of and disregards a substantial risk of serious harm to inmate health or safety."*Estate of Novack v. County of Wood,* 226 F.3d 525, 529 (7th Cir.2000); *see also Holloway,* 700 F.3d at 1073 (citing *Johnson v. Doughty,* 433 F.3d 1001, 1010 (7th Cir.2006); *Collignon v. Milwaukee Cnty.,* 163 F.3d 982, 988 (7th Cir.1998)). Plaintiff has not met his burden of creating a genuine issue of material fact that the Sheriff Defendants knowingly disregarded a substantial risk of serious harm to Plaintiff as to either medical condition.

As for Plaintiff's drug addiction, during his medical intake evaluation on the date of his arrival at the jail, Plaintiff

informed the medical staff that he abused heroin. That same day, he was placed on the opiate checklist. The following date, March 3, 2009, the physician placed him on the opiate checklist for five additional days. It was not until March 7, 2009, that Plaintiff informed staff that he also abused Xanax. On March 9, 2009, Plaintiff was placed on the opiate checklist for an additional three days. In his brief, Plaintiff argues only that Defendants knew that Plaintiff had abused heroin and Xanax, facts that Defendants acknowledge. Plaintiff has offered no evidence or argument that Defendants knowingly disregarded his medical needs related to his drug addiction. Moreover, Dr. Farley, a Board Certified Specialist in Family Medicine and Addiction Medicine, offered his expert opinion that from March 2 through March 6, 2009, Plaintiff's withdrawal symptoms were managed well by the medical staff at the jail. He also opined that any injuries Plaintiff suffered were not caused by any failure to manage his opioid withdrawal. Dr. Farley opined that most opioid withdrawals happen shortly after the drug's half-life, which, for heroin, is eight to twelve hours after use.

Regarding his seizures on March 13, 2009, the evidence of record shows that when medical staff was called to Plaintiff's cell at 7:50 p.m., the medical staff immediately began caring for Plaintiff and notified the correctional staff to call for an ambulance. The ambulance was called, and Plaintiff was transported to Methodist Hospital. Plaintiff has not offered any evidence to demonstrate that any of the Sheriff Defendants knowingly disregarded his medical needs. Nor has Plaintiff discussed or questioned the evidence offered by the Sheriff Defendants demonstrating the medical care provided to Plaintiff. Dr. Farley opined in his medical expert opinion that "there is no evidence of failure by correctional officers to promptly notify medical personnel when needed or failure to promptly assist medical personnel when needed."*Id.* He also opined that the jail medical personnel provided adequate screening, medical treatment, and medication based on the information known to them and that Plaintiff was hospitalized when it became medically necessary.

**\*16** Therefore, summary judgment in favor of the Sheriff Defendants is appropriate on all of Plaintiff's claims in Count I because Plaintiff cannot demonstrate that they were deliberately indifferent to his serious medical needs.

*2. Claims Against Sheriff John Buncich and Jail Administrator Jeffrey Kumorek in their Individual Capacities*

Mitchel v. Buncich, Not Reported in F.Supp.2d (2013)
4:12-cv-04068-SLD # 37-18    Page 36 of 42
2013 WL 275592

In addition, the § 1983 claims for failure to provide medical treatment brought against Defendants Sheriff John Buncich and Jail Administrator Jeffrey Kumorek in their individual capacities fail because Plaintiff has not met his burden on summary judgment of identifying any genuine issue of material fact that Buncich or Kumorek had any personal involvement with Plaintiff's individual medical treatment or care. An individual cannot be held liable under § 1983 unless he caused or participation in alleged constitutional deprivation. *Jenkins v. Keating,* 147 F.3d 577, 583 (7th Cir.1998). Nor can liability be based on an individual's supervisory role of others. *Zimmerman v. Tribble,* 226 F.3d 568, 574 (7th Cir.2000)."Although direct participation is not necessary, there must at least be a showing that the [individual] acquiesced in some demonstrable way in the alleged constitutional violation."*Palmer v. Marion Cnty.,* 327 F.3d 588, 594 (7th Cir.2003). Plaintiff has not made any showing that either Sheriff Buncich or Jail Administrator Kumorek had knowledge of Plaintiff's medical conditions, of his drug addictions, or of the events of March 13, 2009.

In the alternative, Defendants Buncich and Kumorek argue that they are entitled to summary judgment based on qualified immunity. "[G]overnmental actors performing discretionary functions enjoy qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *In re Escobedo v. Bender,* 600 F.3d 770, 778 (7th Cir.2010) (quoting *Sallenger v. Oakes,* 473 F.3d 731, 739 (7th Cir.2007) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))). To assess whether a governmental actor is shielded from liability by qualified immunity, a court must consider "whether, taking the facts in the light most favorable to the plaintiff, the officers' conduct violated a constitutional right," and "whether the particular constitutional right was 'clearly established,' at the time of the alleged violation." *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). In its discretion, the Court may consider which of the two inquiries to address first. *Id.* (citing *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

Plaintiff has failed to offer any evidence to create a genuine issue of material fact that his federal rights were violated. The evidence of record shows that Plaintiff was provided with medical and mental health care from the outset of his incarceration at the Lake County Jail. When Plaintiff suffered seizures on March 13, 2009, an ambulance was called and he was taken to Methodist Hospital for treatment. The only medical expert in this case, Dr. Farley, found that all jail medical procedures were followed and that Plaintiff was provided proper medical care. Because there is no evidence that Plaintiff's constitutional rights were violated, Defendants Buncich and Kumorek are entitled to qualified immunity on the § 1983 claims against them in their individual capacities.

### 3. Claims Against Lake County Sherif's Department

**\*17** In Count I, Plaintiff brings claims under § 1983 for failure to provide medical treatment in violation of the Eighth and Fourteenth Amendments to the United States Constitution against the Lake County Sheriff's Department and against Sheriff John Buncich and Jail Administrator Jeffrey Kumorek in their official capacities. In Count III, Plaintiff brings claims under § 1983 against the Lake County Sheriff's Department for failure to train and for failure to discipline in violation of the Eighth and Fourteenth Amendments to the United States Constitution. The official capacity claims, which, practically, are claims against the Lake County Sheriff's Department, and the claims against the Lake County Sheriff's Department, are governed by the municipal liability standards set forth in *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)."[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government is responsible under § 1983."*Monell,* 436 U.S. at 694. To establish the liability of a municipality for the constitutional deprivation, a plaintiff must demonstrate:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the final force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir.2007) (quoting *Phelan v. Cook Cnty.,* 463 F.3d 773, 789 (7th Cir.2006)).

In the Motion for Summary Judgment, the Sheriff Defendants argue that Plaintiff has failed to meet his burden of demonstrating a genuine issue of material fact as to any of the three forms of an unconstitutional policy or custom. Plaintiff offers no argument in support of these claims in his response brief. Although there are situations in which "a plaintiff can rely on h[is] own circumstances to establish the existence of a widespread practice, that task is necessarily difficult because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.' " *Diab v. Chi. Bd. of Educ.,* 850 F.Supp.2d 899, 925 (N.D.Ill.2012) (quoting *Grieveson v. Anderson,* 538 F.3d 763, 774 (7th Cir.2008)). In order "to prevail on this type of claim, plaintiffs relying on their specific situations must weave those separate incidents together into a cognizable policy." *Id.* (quoting *Phelan,* 463 F.3d at 790) (quotation marks and other citations omitted). The Court finds that, even if Plaintiff had suffered either of the constitutional violations alleged in Counts I or III, Plaintiff has failed to raise a genuine issue of material fact that he suffered a constitutional deprivation as a result of an express policy, a widespread practice or custom, or a person with final policymaking authority. Thus, summary judgment in favor of Sheriff Buncich and Jail Administrator Kumorek in their official capacities and the Lake County Sheriff's Department on Count I and in favor of the Lake County Sheriff's Department on Count III is granted.

### 4. Conclusion

**\*18** Based on the foregoing, Plaintiff has failed to demonstrate any genuine issue of material fact as to his § 1983 claims against the Sheriff Defendants in Counts I and III, and the Court grants summary judgment in their favor on these claims.

### B. State Law Claims

#### 1. Indiana Constitutional Claims

Plaintiff alleges in Count I that the Sheriff Defendants failed to "provide adequate medical treatment, medical screening, and/or medication to the Plaintiff as required for his injuries and illness, including failure to hospitalize him when informed he required hospitalization ..." and that such a failure "constitutes a violation of the Plaintiff's rights under Article I, Sections 15, 16, and 23 of the Indiana State Constitution."Am. Compl. ¶¶ 5, 10. In Count III, Plaintiff alleges that the Lake County Sheriff's Department failed to follow adequate hiring and training procedures and failed to

reprimand or discipline officers, administrators, and medical personnel in violation of "Plaintiff's rights under Article I, Sections 15, 16, and 23 of the Indiana State Constitution."Am. Compl. ¶ 22.

Article 1, Section 15 of the Indiana Constitution provides that "No person ... confined in jail, shall be treated with unnecessary rigor."Ind. Const. Art. I, § 15.

> Cases recognizing violations of Article 1, Section 15 involve situations where a prisoner was tortured, had a tooth knocked out, was repeatedly beaten, kicked, and struck with a blackjack and beaten with a rubber hose while he was stretched across a table, where a prisoner was beaten with police officer's fists in both eyes, cut on the top of his head, and beaten with a rubber hose on the head and ears, and where a prisoner was severely injured after being shot by police during a protest.

*Ratliff v. Cohn,* 693 N.E.2d 530, 541 (Ind.1998) (internal citations omitted). Although Plaintiff alleges in his Amended Complaint that he was deprived of adequate medical care during his incarceration at the Lake County Jail, Plaintiff has offered no evidence or argument in support of those allegations in response to summary judgment. Thus, Plaintiff has not demonstrated a genuine issue of material fact that he was treated with "unnecessary rigor" under the Indiana Constitution. Summary judgment in favor of the Sheriffs Defendants is granted on Plaintiff's claims brought under Article I, Section 15 of the Indiana Constitution.

Article I, Section 16 of the Indiana Constitution provides, in relevant part, that "[c]ruel and unusual punishments shall not be inflicted" and "all penalties shall be proportionate to the nature of the offense."Ind. Const. Art. I, § 16. Section 16 is, in application, equivalent to the Eighth Amendment to the United States Constitution. *See Naked City, Inc. v. State,* 460 N.E.2d 151, 161 (Ind.Ct.App.1984). Under Section 16, "[p]risoners of the state are entitled to reasonable medical care. However, challenges to the mere adequacy of individual care or claims of medical malpractice are not of constitutional dimension."*Id.* Nevertheless, when "reasonable medical care is denied deliberately, and such denial results in the infliction of unnecessary pain, suffering or disability both the Eighth Amendment of the Constitution

of the United States and Article 1, Section 16 of the Indiana Constitution are implicated."*Id.* For the same reasons set forth above in the context of the alleged Eighth Amendment violation, Plaintiff has failed to demonstrate a genuine issue of material fact that the Sheriff Defendants were deliberately indifferent to his medical care. Summary judgment in favor of the Sheriff Defendants is granted on Plaintiff's claims brought under Article I, Section 16 of the Indiana Constitution.

**\*19** Article I, Section 23 of the Indiana Constitution provides that "the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."Ind. Const. Art. I, § 23 (2012). The Sheriff Defendants argue that it is unclear from the Amended Complaint in what way Plaintiff alleges he was treated differently. Plaintiff offers no argument or explanation in response to support this claim. Plaintiff has not identified any evidence that raises a genuine issue of material fact as to his allegations that the Sheriff Defendants violated Article I, Section 23 of the Indiana Constitution. Accordingly, the Court grants summary judgment in favor of the Sheriff Defendants on Plaintiff's claims brought under Article I, Section 23 of the Indiana Constitution.

Finally, for the same reasons set forth above as to the federal constitutional claims, Defendants Buncich and Kumorek, in their individual capacities, are entitled to qualified immunity on the Indiana constitutional claims brought against them. *See Cantrell v. Morris,* 849 N.E.2d 488, 494 (Ind.2006) ("[T]he qualified immunity applicable to 42 U.S.C. section 1983 claims applies equally to claims against government officials under state law.") (citing *Foster v. Pearcy,* 387 N.E.2d 466, 450 (1979)).

### 2. Indiana Common Law Claim

In the Motion for Summary Judgment, Defendant Lake County Sheriff's Department construes Count III of the Amended Complaint as a claim for negligent hiring and training under Indiana state common law and seeks judgment in its favor on these claims. The Court finds that Plaintiff has not alleged any state common law claims for negligent hiring and training. Rather, Count III alleges a constitutional claim for failure to train under the Indiana Constitution and the United States Constitution, which the Court has addressed above.

### CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** the Sheriff Defendants[sic] Motion to Strike Plaintiff Affidavits Filed in Response to Motion for Summary Judgment [DE 61] and **GRANTS** the Sheriff Defendants[sic] Motion for Summary Judgment [DE 48], granting summary judgment against Plaintiff Kwasi Mitchell in favor of Defendants John Buncich, individually and in his official capacity as Lake County Sheriff, Lake County Sheriff's Department, and Jeffrey Kumorek, individually and in his capacity as Administrator of the Lake County Jail on all claims brought against them in the Amended Complaint.

The Court **REAFFIRMS** the Final Pre–Trial Conference setting of *February 15, 2013,* and the Jury Trial setting of *March 11, 2013,* as to Plaintiff and Defendant Med–Staff, Inc. *only* .

So **ORDERED.**

Footnotes

1    It appears that Plaintiff has cited a prior version of Federal Rule of Evidence 803(4), which was amended, effective Dec. 1, 2011.

2    The Northern District of Indiana Local Rules require a party opposing summary judgment to include in the response brief or appendix a section labeled "Statement of Genuine Disputes" that identifies the material facts that the party contends are genuinely disputed so as to make trial necessary. *See*N.D. Ind. L.R. 56–1(b)(2). Plaintiff has failed to comply with this requirement. This violation, by itself, is not a basis for granting summary judgment as requested by the Sheriff Defendants in their reply brief. The Court has stricken the four Affidavits submitted by Plaintiff in support of his response brief for the reasons set forth above. Therefore, in setting forth the material facts, the Court considers the Statement of Material Facts submitted by the Sheriff Defendants and supported by admissible evidence.

3    The Sheriff Defendants misrepresent this treatment note, stating in their material facts that the nurse noted that Plaintiff was "alert to time and place." Def. Br., p. 3.

4    Plaintiff's claims against Sheriff John Buncich and Jail Administrator Kumorek in their official capacities is the functional equivalent of the claims brought against the Lake County Sheriff's Department and, thus, are treated as one. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1385522
Only the Westlaw citation is currently available.
United States District Court,
N.D. Indiana,
Hammond Division.

Kwasi MITCHELL, Plaintiff,
v.
LAKE COUNTY, Indiana, et al., Defendants.

Cause No. 2:11–CV–91–PRC.   |   April 4, 2013.

**Attorneys and Law Firms**

Mitchell A. Peters, Millerfisher Law LLC, Merrillville, IN, for Plaintiff.

Kenneth B. Elwood, Peter L. Boyles, Rhame & Elwood, Portage, IN, for Defendants.

### OPINION AND ORDER

PAUL R. CHERRY, United States Magistrate Judge.

*1 This matter is before the Court on a Verified Motion for Relief from Judgment [DE 75], filed by Plaintiff on February 1, 2013. For the reasons set forth below, the motion is denied.

### PROCEDURAL BACKGROUND

On February 16, 2011, Plaintiff filed his Complaint in the Lake Superior Court against Lake County, Indiana, John Buncich as Lake County Sheriff, the Lake County Sheriff's Department, Jeffrey Kumorek as Administrator of the Lake County Jail, and Med–Staff, Inc. On March 9, 2011, Defendant Lake County, Indiana removed the case to this Court.

On April 28, 2011, Defendant Lake County, Indiana filed an Answer. On May 9, 2011, the Sheriff Defendants filed a Motion to Dismiss for Failure to State a Claim. On May 27, 2011, Defendant Med–Staff, Inc. filed a Motion to Dismiss for Failure to State a Claim and filed an Answer.

On June 30, 2011, Plaintiff filed a Motion to Amend Complaint. On August 1, 2011, the Court granted the Motion to Amend Complaint and denied the Sheriff Defendants'

Motion to Dismiss as moot. On August 1, 2011, the Court also denied Med–Staff, Inc.'s Motion to Dismiss.

On August 5, 2011, Plaintiff filed an Amended Complaint against the same Defendants. Count I is against John Buncich and Jeffrey Kumorek in both their individual and official capacities for alleged violations of Plaintiff's rights under Article 1, Sections 15, 16, and 23 of the Indiana State Constitution and under the Eighth and Fourteenth Amendments of the United States Constitution, brought under 42 U.S.C. § 1983. Count II of the Amended Complaint is against Defendant Med–Staff, Inc. only. Count III is against Lake County Sheriff's Department for alleged violations of Plaintiff's rights under Article I, Sections 15, 16, and 23 of the Indiana State Constitution and under the Eighth and Fourteenth Amendments of the United States Constitution, brought under 42 U.S.C. § 1983.

The Sheriff Defendants filed an Answer on October 3, 2011, Lake County, Indiana filed an Answer on October 4, 2011, and Med–Staff, Inc. filed an Answer on October 14, 2011. On March 29, 2012, the parties filed a Stipulation of Dismissal as to Defendant Lake County, Indiana.

The Sheriff Defendants filed a Motion for Summary Judgment and memorandum in support on June 15, 2012. On July 11, 2012, Plaintiff filed a Verified Motion for Extension of Time. The Court granted the motion, extending the response deadline to September 17, 2012.

On September 17, 2012, Plaintiff filed his response brief and four Affidavits. All four Affidavits are undated.

On September 26, 2012, the Sheriff Defendants filed a reply in support of the Motion for Summary Judgment. The same date, the Sheriff Defendants filed a Motion to Strike Plaintiff Affidavits filed in Response to Motion for Summary Judgment. Plaintiff filed a response on October 6, 2012, and the Sheriff Defendants filed a reply on October 9, 2012.

On January 24, 2013, the Court granted Defendants' Motion to Strike Plaintiffs Affidavits and granted the Motion for Summary Judgment in favor Defendants John Buncich, individually and in his official capacity as Lake County Sheriff, Lake County Sheriff's Department, and Jeffrey Kumorek, individually and in his capacity as Administrator of the Lake County Jail, on all claims brought against them in the Amended Complaint. On January 13, 2013, Plaintiff and remaining defendant Med–Staff, Inc. filed a Stipulation of

Dismissal, and on February 1, 2013, the claims against Med–Staff, Inc. were dismissed with prejudice.

*2  On February 1, 2013, the instant Motion for Reconsideration was filed. Defendants filed a response on February 14, 2013. Plaintiff has not filed a reply, and the time to do so has passed.

The parties orally agreed on the record to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

### ANALYSIS

In the instant motion, Plaintiff asks the Court to reconsider its ruling granting the Motion to Strike the Affidavits of Plaintiff and of witnesses Sam Mitchell (Plaintiff's father), Brian Loggman, and Ramsey Alexander offered in support of Plaintiff's response in opposition to the Motion for Summary Judgment. In support, Plaintiff cites Federal Rule of Civil Procedure 60(b)(1), which provides: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for ... mistake, inadvertence, surprise, or excusable neglect."Fed.R.Civ.P. 60(b)(1). [1]

In their Motion to Strike, Defendants asked the Court to strike the Affidavits because they are undated and because they contain information that is hearsay, lacks personal knowledge, or is otherwise inadmissible. The Court addressed each basis for the Motion to Strike in the January 24, 2013 Opinion and Order.

The Court first granted the Motion to Strike as to all four Affidavits on the ground that they are undated. The Court explained that a federal statute sets forth the requirements for an unsworn declaration made under penalty of perjury, which includes that the statement be made in a writing, that the person states "as true under penalty of perjury," and that the statement be dated. 28 U.S.C. § 1746. The Court went on to note that Defendants recognized that the absence of a date is not, in and of itself, a reason to discount an affidavit or a declaration but contend that courts typically excuse such an omission *only* when extrinsic evidence demonstrates the approximate date of signing. Brown v. White's Ferry, Inc., 280 F.R.D. 238, 244 (D.Md.2012); see also Peters v. Lincoln Elec.

Co., 285 F.3d 456, 475–76 (6th Cir.2002); Davis v. Wells Fargo Bank, 685 F.Supp.2d 838, 842 (N.D.Ill.2010).

The Court then found that Plaintiff had offered no response to this argument much less any extrinsic evidence demonstrating the approximate date of signing. As a result, the Court granted the Motion to Strike on the basis that the Affidavits are undated, striking the Affidavits of Plaintiff Kwasi Mitchell, his father Sam Mitchell, and fellow inmates Brian Loggman and Ramsey Alexander submitted by Plaintiff in support of his response to the Motion for Summary Judgment. On its own motion, the Court also struck an undated Affidavit offered in support of Defendants' Motion for Summary Judgment.

In addition, the Court went on to consider Defendants' substantive arguments for striking specific paragraphs of each of the four Affidavits, additionally striking several paragraphs of each Affidavit on these alternate grounds. Plaintiff does not discuss, contest, or even acknowledge those rulings in the instant motion.

*3  Rather, Plaintiff now asserts that there is in fact extrinsic evidence to demonstrate the approximate time the Affidavits were signed and posits that the failure to date the Affidavits was a "mistake and oversight on the part of counsel."In support, Plaintiff offers Exhibit A, which is a photocopy of a one-page printout from what appears to be an electronic office calendar for the date August 10, 2012, with an entry for 12:00–12:30 PM with a "description" of "Kwasi Mitchell: 210–[xxxx]." Counsel states in the Verified Motion that, on August 10, 2012, Plaintiff and his father came to counsel's office to read and sign their Affidavits and that they did sign and date the Affidavits that date. Counsel then states that he gave the unsigned Affidavits of Brian Loggman and Ramsey Alexander to Plaintiff on August 10, 2012, and that Plaintiff later returned the signed Affidavits to counsel on September 17, 2012.

The Court finds that Plaintiff has not demonstrated a sufficient basis for reconsideration of the order granting the Motion to Strike the four Affidavits on the basis that they were undated. Although counsel states in the Verified Motion that it was a "mistake and oversight" on his part not to date any of the four Affidavits, as required by law, Plaintiff offers no explanation, or even any argument as to mistake or excusable neglect, for why counsel did not address the issue of the undated Affidavits in response to Defendants' Motion to Strike when he had the opportunity. Plaintiff offers

**Mitchell v. Lake County, Not Reported in F.Supp.2d (2013)**
4:13-cv-04068-SLD · #37-18 · Page 42 of 42
2013 WL 1385522

no explanation for why counsel did not assert "mistake and oversight" in response to Defendants' Motion to Strike or why counsel did not offer any "extrinsic evidence" to demonstrate the approximate date of the Affidavits in response to the Motion to Strike. "Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion."*See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1270 (7th Cir.1996); *see also Rutledge v. United States,* 230 F.3d 1041, 1052 (7th Cir.2000)* ("Rule 60(b) motions cannot be used to present evidence that with due diligence could have been introduced before judgment on the motion from which the party is seeking relief."). Plaintiff should have raised these arguments in response to the Motion to Strike.

Notably, Plaintiff does not seek reconsideration of the Court's alternate ruling on the merits of the Motion to Strike, striking paragraphs from the Affidavits on evidentiary grounds. Moreover, other than a broad statement that "this additional evidence ... [is offered] to suggest a genuine issue of material fact," Plaintiff offers no suggestion of how the remaining paragraphs of the Affidavits would have changed the Court's substantive ruling on summary judgment.

## CONCLUSION

Based on the foregoing, the Court hereby **DENIES** the Verified Motion for Relief from Judgment [DE 75].

**\*4** SO ORDERED.

## Footnotes

1  Although the instant motion was filed within 28 days of the judgment, Plaintiff is not asserting newly discovered evidence or a manifest error of law or fact under Federal Rule of Civil Procedure 59(e).*See Harrington v. City of Chicago,* 433 F.3d 542, 546 (7th Cir.2006) (discussing a case filed within 10 days of the entry of judgment but finding that the district court properly considered the motion under Rule 60(b) because "the only arguable basis for relief presented in the motion is Rule 60(b)'s 'excusable neglect' " and noting that Rule 59(e) " 'does not provide a vehicle for a party to undo its own procedural failures' ").

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.