**2001 WL 1491183**
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Carl MOSS, Plaintiff,
v.
Jason MORMON, et al., Defendant.

No. 99 C 3571.  |  Nov. 26, 2001.

**Opinion**

### MEMORANDUM, OPINION AND ORDER

ANDERSEN, District J.

**\*1** The Plaintiff, currently an inmate at Menard Correctional Center, has brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 against officers and officials at the Joliet Correctional Center where he was previously housed, alleging violations of constitutional rights arising from an incident when another inmate assaulted him, breaking his jaw. He raises claims of failure to protect from harm and failure to provide adequate medical care. He claims that the defendant Dr. Craig violated his constitutional rights by failing to provide him with adequate dental care. This matter is before the Court for consideration of the defendant Dr. Craig's motion for summary judgment. For the reasons stated in this order, the motion is granted.

### STANDARD OF LAW

Summary judgment will be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *O'Connor v. DePaul Univ.,* 123 F.3d 665, 669 (7th Cir.1997). In weighing a motion for summary judgment, the court must take the facts in the light most favorable to the party opposing the motion and draw all reasonable inferences in that party's favor. *Bahl v. Royal Indemnity Co.,* 115 F.3d 1283, 1289 (7th Cir.1997); *Condo v. Sysco Corp.,* 1 F.3d 599, 601 (7th Cir.1993), *cert. denied,* 114 S.Ct. 1051 (1994). The party opposing the motion must present evidence of a triable issue of material fact. *See Vance v. Peters,* 97 F.3d 987, 990 (7th Cir.1996), *cert. denied,* 117 S.Ct. 1822 (1997). The non-moving party is required to go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Bank-Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). A fact is material when it would determine the outcome under the governing law. *Whetstine v. Gate Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990). A material fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### FACTS

The Plaintiff, Carl Moss, is currently an inmate at Menard Correctional Center. In 1998, however, he was an inmate at Joliet Correctional Center. On May 6, 1998, Plaintiff alleges that another inmate assaulted him in the shower, breaking Plaintiff's jaw.

Plaintiff outlines the facts relevant to Dr. Craig in his sworn statement, entitled "History of Broken Jaw," as follows: Dr. Craig installed a bracket on both his upper and lower jaws. These brackets contained numerous razor sharp points that are intended to hold small rubber bands that would lock the top and bottom jaws together. These bands broke on the way back to the prison. His tongue was wired to the floor of his mouth. By placing his finger into his mouth, Plaintiff managed to get his tongue out from under the wire. He states no injury to his tongue from this procedure. Upon return to prison, Plaintiff requested more bands from Joliet Correctional Center personnel. He was told that Dr. Craig sent them to Stateville Prison by mistake.

**\*2** When he next saw Dr. Craig, the doctor gave him dental wax which helped protect his mouth from the sharp metal brackets. (Dep. pp. 100-102, stating that the wax was "very effective"). He complained to Joliet Correctional staff almost daily for more wax. One month after the surgery, he was given 23 bands by Dr. Ward. Plaintiff complains that Dr. Craig tightened the wires holding the brackets to his teeth, inflicting needless pain. He would not give Plaintiff more bands and would not remove the device from his mouth.

Defendant Craig summarizes the facts as follows: On May 11, 1998, Plaintiff was taken to a hospital in Joliet where Dr. Craig installed metal brackets to his upper and

lower jaws to immobilize the broken jaw. The stainless steel wires and the rubber bands were used to lock the brackets together. Plaintiff alleges that the rubber bands he was given broke due to the sharpness of the dental appliance that Dr. Craig installed. For the next two months he was treated almost daily. He sought additional rubber bands from both Dr. Mitchell and Dr. Craig. However, as Plaintiff states in his deposition, Dr. Craig was on vacation from May until early June; further, Dr. Craig sent replacement rubber bands to Stateville Correctional Center instead of to Joliet Correctional Center by mistake. In addition to the rubber bands, Plaintiff received dental wax and pain medication while he was under the care of Dr. Craig. Finally, defendant Craig asserts that Plaintiff received rubber bands on June 11, 17 and July 6, 10, and 13. Craig attaches the medical records from Joliet Correctional Center, including nurses and doctors progress notes, to support these claims.

Plaintiff asserts in his second response to defendant Craig's motion for summary judgment (Plaintiff has filed four separate responses) that all of the medical records and progress notes from the prison are false. He provides no support for this claim. Regarding one important fact, however, he does agree with defendant's statement of facts, # 30, that Dr. Craig sent ligature bands to the wrong prison by mistake. (Dep. p 99-100; 8/30/01 response to motion for summary judgment).

## DISCUSSION

Since this motion is brought only by Dr. Craig, the Court reviews the facts relating to him without commenting on any allegations against any other defendant. There are three different episodes related to Dr. Craig's care of plaintiff: the surgery itself, the month after surgery when rubber bands were allegedly not delivered, and one visit with Dr. Craig when Plaintiff alleges the doctor tightened the brackets on his teeth in a manner that inflicted needless pain. Since the serious nature of Plaintiff's medical needs is not in dispute, the Court will review the applicable law related to deliberate indifference and then examine each of these situations in turn and determine the applicability of the deliberate indifference standard to each instance.

## DELIBERATE INDIFFERENCE

**\*3** The Supreme Court has limited recovery under the Eighth Amendment to those cases in which a prisoner can establish "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 291 (1976). A prison official violates the Eighth Amendment when (1) the deprivation alleged is objectively sufficiently serious and (2) the prison official acts with "deliberate indifference." See *Wilson v. Seiter,* 501 U.S. 294, 297-302 (1991). Deliberate indifference exists when an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In order for this Court to find that Plaintiff's claims of inadequate medical care amount to punishment, he must demonstrate that Dr. Craig exhibited deliberate indifference to his serious medical needs. See *Estelle,* 429 U.S. at 104; *Holmes v. Sheahan,* 930 F.2d 1196, 1199 (7th Cir.1991). Plaintiff must show acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. *Hudson v. McMillian,* 503 U.S. 1, 9 (1992).

A state has an affirmative obligation under the Eighth Amendment to provide persons in its custody with a medical care system that meets minimal standards of adequacy. *Meriwether v. Faulkner,* 821 F.2d 408, 411 (7th Cir.1987). However, not every claim by a prisoner alleging inadequate medical care states a constitutional violation. *Id.* Mere negligence on the part of a physician in diagnosing or treating a medical condition will not state a valid claim of medical mistreatment under the Eighth Amendment. See *Estelle,* 97 S.Ct. at 292; see also *Williams v. Cook County Jail Medical Staff,* 1991 WL 181072, at *1 (N.D.Ill. Sep. 11.1991).

Dental care is one of the most important medical needs of inmates. *Ramos v. Lamm,* 639 F.2d 559, 576 (10th Cir.1980). Plaintiff's allegations are sufficient to demonstrate that he had a serious medical need to restore his broken jaw. The parties agree that Plaintiff has sufficiently stated a serious medical need for treatment for a broken jaw. This treatment includes the operation and the requisite post-operative care.

## WAS DR. CRAIG DELIBERATELY INDIFFERENT TO PLAINTIFF'S MEDICAL NEEDS?

To determine whether Plaintiff has shown that defendant Dr. Craig was deliberately indifferent to his medical needs, it is necessary to evaluate the undisputed facts presented in the summary judgment motion. Inadequate treatment due to negligence, inadvertence or differences

in judgment between an inmate and medical personnel do not rise to the level of a constitutional violation. *Estelle,* 429 U.S. at 106; *Del Raine v. Williford,* 32 F.3d 1024, 1031-32 (7th Cir.1994). Failure to treat a known serious medical need is not alone sufficient to show a constitutional violation; the failure to treat must cause serious injury. *See Langston v. Peters,* 100 F.3d 1235, 1240-41 (7th Cir.1996). The Court reviews all contacts between Plaintiff and Dr. Craig to determine if Plaintiff met the *Farmer* test: namely, Dr. Craig must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference.

*The Surgery*

**\*4** Applying this law to the facts in Plaintiff's case, the only issue related to the surgery is the Plaintiff's claims that his tongue was underneath a wire after the surgery. Although Plaintiff alleges that his tongue was wired to his teeth, he later asserts that he was able to free his tongue with his finger, belying his earlier allegation. He makes no further mention of any wrongdoing regarding the actual surgery. He never complained to Dr. Craig about this tongue problem, and it does not seem to have injured him. He now states in his response that this was a "botched operation." However, he has introduced no evidence of this. To the extent that he claims that the operation was not successful, Plaintiff's claim appears to be one of negligence. As the case law makes clear, negligence, or even gross negligence, does not state a claim for deliberate indifference. Therefore, the Court finds as a matter of law that defendant Craig was not deliberately indifferent to Plaintiff in performing the surgery to repair his broken jaw.

*The Post-Operative Care: Rubber Band Replacement*

The gravamen of Plaintiff's complaint is that the defendant failed to act appropriately following the surgery in that Dr. Craig neglected to provide Plaintiff with post-operative rubber bands and other treatment. The key aspect of the necessary post-operative care was the delivery of rubber bands during the first month after the surgery. It is now undisputed that Dr. Craig mistakenly ordered that the rubber bands be sent to the wrong prison, and that he was on vacation and not available during the first month after the surgery. Nevertheless, there is no circumstance present in the Plaintiff's complaint which rises to the level of deliberate indifference with regard to the bands. Although there was delay in Plaintiff's receipt of dental rubber bands due to Dr. Craig's mistake, the record does not support an assertion that he was either aware of a risk or that he drew the inference that there was any risk to Plaintiff regarding delivery of the rubber bands. Therefore, as a matter of law, Dr. Craig did not deliberately delay Plaintiff's access to medical attention. *See Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992); *Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir.1990) ("In determining deliberate indifference, we scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligent or isolated occurrences of neglect"). While it was unfortunate that Dr. Craig did not send the rubber bands to the correct institution, there is no evidence that he did so deliberately. *See Rapier v. Harris,* 172 F.3d 999, 1006 (7th Cir.1999).

*The Post-Operative Care: Tightening The Brackets*

Plaintiff's affidavit reiterates his allegations in his complaint that the procedure to tighten his brackets caused him needless pain. His bald allegation that this was done intentionally to cause him needless pain, without any supporting evidence, must fail. As the Seventh Circuit has held, a plaintiff cannot overcome a motion for summary judgment by simply restating the allegations contained in his complaint without any additional evidence. *See Bank-Leumi Le-Israel,* 928 F.2d at 236. Plaintiff does not state that the procedure was not medically required, only that it hurt. While we have no doubt that the Plaintiff experienced some discomfort, that is a normal side effect of any surgery. Nevertheless, if Plaintiff's constant complaining is any indication, it appears that some adjustment may have indeed been necessary. However, without any evidence to indicate that this bracket tightening procedure was not medically required, Plaintiff has failed to allege deliberate indifference. Indeed, the medical notes, which Plaintiff asserts are fabricated, show that his jaw was healing, albeit slowly. (Plaintiff disputes the Defendant's statement of facts regarding these notes only by saying that they are "all lies." However, he provides no substantive evidence to support these allegations.) Plaintiff cannot succeed in this case merely by challenging the validity of his medical records. This is so because the Court does not rely on medical records alone, which themselves are hearsay evidence and not supported by affidavits from any defendants, but rather on the undisputed facts regarding this procedure, particularly the statements Plaintiff makes in his own deposition. Plaintiff's assertion that this procedure caused him needless pain, without more, fails to state a claim.

**CONCLUSION**

***5** For the foregoing reasons, the defendant's motion for summary judgment is granted. Judgment is entered on behalf of Dr. Craig and he is dismissed from this suit. All other parties remain. Any other pending motions are denied as moot.

It is so ordered.

End of Document © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2892514
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

[James Snow](), Plaintiff,
v.
Michael Keegan and Dr. Young Kim, Defendants.

Case No. 1:12–cv–2447    |    Signed June 25, 2014

**Attorneys and Law Firms**

[Gregory E. Kulis](), [Joshua S. Patrick](), [Gregory E. Kulis]() and Associates, Ltd., [Ronak P. Maisuria](), Erickson & Oppenheimer, Ltd., Chicago, IL, for Plaintiff.

[Scott George Salemi](), [Jana L. Brady](), [Maura Yusof](), [Stephen Richard Ayres](), Heyl, Royster, Voelker & Allen, Rockford, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

JOHN W. DARRAH, United States District Court Judge

**\*1** Plaintiff James Snow filed a Third Amended Complaint against Defendants Michael Keegan and Dr. Young Kim (collectively, "Defendants"), pursuant to [42 U.S.C. § 1983](), alleging deliberate indifference to serious medical needs. Defendants have filed a Motion for Summary Judgment [78]. For the reasons set forth below, that Motion is granted.

### BACKGROUND

Local Rule 56.1(a) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue" and to cite to the relevant admissible evidence supporting each fact. Local Rule 56.1(b)(3)(B) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. [*Martin v. Gonzalez,* 526 Fed.Appx. 681, 682 (7th Cir.2013)](). Under Local Rule 56.1(b)(3)(C), the nonmoving party may file a statement of additional facts and the moving party may submit a concise reply under Local Rule 56.1(a)(3). To the extent that a purported fact is merely a legal conclusion, it is disregarded. *See[Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec,]()* [529 F.3d 371 (7th Cir.2008)]().

A litigant's failure to respond to a Rule 56.1 statement, or to dispute the statement without "specific references to the affidavits, parts of the record, and other supporting material," results in the court's admitting the uncontroverted statement as true. *[Banks v. Fuentes,]()* [545 Fed.Appx. 518, 520 (7th Cir.2013)](). Similarly, responses containing argumentative denials or extraneous information do not properly dispute a fact. *See[Graziano v. Village of Oak Park,]()* [401 F.Supp.2d 918, 937 (N.D.Ill.2005)]().

Medical records and affidavits may properly be offered to demonstrate adequate care. *[Estelle v. Gamble,]()* [429 U.S. 97, 113 (1976)](). As with all statements of fact, the validity of a proffered medical record may not be disputed without contrary evidence. *See, e.g.,[Richmond v. Dart,]()* [No. 11 C 65, 2012 WL 613 875 1, at \*1 (N.D.Ill.Dec. 11, 2012)](); *[Johnson v. Hart,]()* [No. 10 C 0240, 2011 WL 5509546, at \*2 (N.D.Ill. Nov. 8, 2011)](); *[Moss v. Mormon,]()* [No. 99 C 3571, 2001 WL 1491183, at \*4 (N.D.Ill. Nov. 26, 2001)](). Mere "self-serving statements in affidavits without factual support in the record carry no weight on summary judgment." *[Butts v. Aurora Health Care, Inc.,]()* [387 F.3d 921, 925 (7th Cir.2004)]() (citation and emphasis omitted).

Snow was incarcerated in the Lake County Jail in August 2009 as he awaited trial in two cases and remained incarcerated through his October 2010 transfer to the Illinois Department of Corrections ("IDOC") upon his conviction in both cases. (Defs.' SOF ¶ 2.) [1] Dr. Kim is a licensed physician who, at all times relevant to this action, was the contracted Medical Director of the Lake County Jail. (Defs.' SOF ¶¶ 3–4.) Nurse Keegan is a licensed nurse who, at all times relevant to this action, was the health service administrator ("HSA") of the Lake County Jail. (Defs.' SOF ¶¶ 5,6.) Upon being taken into custody, Snow disclosed a history of asthma, which resulted in his placement in the chronic care clinic. (Defs.' SOF ¶ 18.)

**\*2** Asthma is a chronic lung disease that inflames and narrows the airways, which can cause wheezing, shortness of breath, chest tightness, and coughing. (Defs.' SOF ¶ 11.) Respiratory function in asthmatics is assessed both by listening to the patient's lungs and measuring the patient's oxygen saturation level. (Defs.' SOF ¶ 15.) Oxygen saturation levels are normal between 95 and 100 percent and low under 90 percent. (*Id.*)

Inhalers are devices that deliver medicine to the lungs to treat asthma and its symptoms. (Defs.' SOF ¶ 12.) Albuterol is a fast-acting inhaler to treat sudden symptoms, but should not be used regularly, as persistent use presents a risk of over-dilating the lungs resulting in continual asthma symptoms. (Defs.' SOF ¶ 13.) Conversely, QVAR is a maintenance inhaler, intended for regular use to control and prevent asthma symptoms. (Defs.' SOF ¶ 14.) The Lake County Jail prohibits inmates from keeping Albuterol inhalers and, instead, requires correctional staff determine whether an inmate's complaints of asthma symptoms require a medical emergency call, to which medical staff will respond and administer Albuterol if needed. (Defs.' SOF ¶¶ 16, 17.)

Upon Snow's initial placement in the chronic care clinic, Dr. Kim prescribed Snow Albuterol on a "PRN," or as needed, basis. (Defs.' SOF ¶ 19.) Snow began to request his inhaler more frequently, suggesting his asthma was not well controlled, and Dr. Kim prescribed twice daily use of a QVAR inhaler in response. (Defs.' SOF ¶ 20.)

On November 13, 2009, Dr. Kim examined Snow's lungs and heard no wheezing or rales, measured his oxygen saturation at 99 percent, and noted Snow denied experiencing any shortness of breath, chest pain, or coughing. (Defs.' SOF ¶ 21.) Dr. Kim also instructed Snow to use his QVAR inhaler twice daily, as directed, even if Snow was not experiencing symptoms of asthma attack, and reminded Snow of the proper use of his Albuterol. (Defs.' SOF ¶¶ 22, 23.) On November 28, 2009, Dr. Kim renewed Snow's Albuterol prescription. (Defs.' SOF ¶ 24.)

Dr. Kim visited Snow again on January 6, 2010, in response to Snow's request for a lower bunk permit because he felt chest pain and shortness of breath jumping from the top bunk. (Defs.' SOF ¶ 25.) Snow's evaluation was normal, his oxygen saturation 100 percent, and a lower bunk permit was not medically indicated, but Dr. Kim ordered an electrocardiogram to assess Snow's heart function. (*Id.*) On January 27, 2010, Dr. Kim met with Snow to advise him his electrocardiogram was normal and that he should return to the clinic as needed. (Defs.' SOF ¶¶ 25, 26.) The following day, Snow requested that his QVAR inhaler be discontinued. (Defs.' SOF ¶ 27.)

On February 11, 2010, Dr. Kim responded to Snow's complaints of chest pain from an asthma attack. (Defs.' SOF ¶ 28.) Snow requested a chest x-ray, but Dr. Kim declined to order one as a result of an exam showing Snow's oxygen saturation at 98 percent, no wheezing or rales, and a normal heart rhythm and rate. (*Id.*) Dr. Kim noted after the exam that Snow's sarcastic behavior coupled with his objectively clean exam indicated malingering. (Defs.' SOF ¶ 29.) However, Snow's insistence that he had a problem motivated Dr. Kim to order a chest x-ray and to direct a deputy to have Snow exercise to determine whether Snow's asthma was induced by physical activity. (Defs.' SOF ¶ 30.) After exercise, Snow experienced no trouble breathing and maintained an oxygen saturation of 99 percent. (*Id.*) The results of Snow's chest x-ray came back normal on March 18, 2010. (Defs.' SOF ¶ 31.)

**\*3** On April 19, 2010, Nurse Keegan was called to assess Snow's complaints of trouble breathing. (Defs.' SOF ¶ 41.) Nurse Keegan attempted to listen to Snow's lungs and asked Snow to take deep breaths, but Snow refused. (*Id.*) Nurse Keegan heard no irregularities in Snow's lungs as he took shallow breaths and measured his oxygen saturation level at 98 percent. (*Id.*) Based on Snow's lack of apparent distress or objective symptoms, Nurse Keegan did not administer Snow his Albuterol inhaler. (*Id.*) Snow responded by asking the attendant correctional officer to call a medical emergency. (*Id.*) Nurse Keegan explained to Snow that the correctional officer would call the medical unit if he began to display symptoms. (*Id.*)

On April 29, 2010, Dr. Kim again saw Snow, who complained of headaches, chest pain, shortness of breath, and diminished vision. (Defs.' SOF ¶ 32.) Snow's respiration and heart rate were normal, his pupils were reactive to light, and his visual field was intact. (*Id.*) Dr. Kim referred Snow to an optometrist, continued his PRN prescription for Albuterol, and prescribed an anti-inflammatory for Snow's reported pain. (*Id.*) The optometrist did not believe Snow was in need of corrective lenses. (Defs.' SOF ¶ 33.)

On May 25, 2010, Snow complained to Dr. Kim of migraine headaches, numbness and pain in his right arm, and occasional chest pain. (Defs.' SOF ¶ 34.) Snow's chest x-ray and electrocardiogram were normal, but Dr. Kim prescribed ibuprofen as needed for pain, a decrease in strenuous activities, and instructed Snow to call the health care unit immediately when he felt chest pain so that another electrocardiogram could be performed to compare against his baseline. (*Id.*)

On June 3, 2010, Snow complained of vague pain, but Dr. Kim's exam returned all normal results; he prescribed Snow

a third pain medication (Extra Strength Tylenol) and ordered that Snow's blood pressure and heart rate be measured for three days to rule out high blood pressure as a cause of Snow's headaches. (Defs.' SOF ¶ 36.)

On June 22, 2010, Dr. Kim again saw Snow for complaints of headaches and neck pain. (Defs.' SOF ¶ 38.) Snow stated that the previously prescribed pain medications were not effective and Dr. Kim prescribed Neurontin, a drug used in the treatment of migraines and pain from nerve damage. (*Id.*) Two weeks later, Snow asked Dr. Kim to discontinue all of his medication. (Defs.' SOF ¶ 39.)

Dr. Kim last evaluated Snow on September 14, 2010, at which time Snow complained of right-sided numbness. (Defs.' SOF ¶ 40.) All exams were normal, including a sensory exam that evidenced no objective sensory problems. (*Id.*) Because he could not identify a problem, Dr. Kim referred Snow to an off-site neurologist for further evaluation. (*Id.*)

Throughout his confinement in the Lake County Jail, Snow submitted numerous grievances, all alleging delayed responses from nursing staff, each of which Nurse Keegan reviewed and responded to. (Defs.' SOF ¶¶ 43, 44.) Nurse Keegan determined that all but two of Snow's grievances were unfounded and unsubstantiated. (Defs.' SOF ¶ 45.) The first of Snow's substantiated grievances alleged that medical staff denied him ibuprofen on one occasion; Nurse Keegan addressed this problem after being made aware of it, and it did not recur. (Defs.' SOF ¶ 46.) The second of Snow's substantiated grievances alleged he had not received new medication ordered by Dr. Kim; Nurse Keegan located the new medication, and the problem did not recur. (Defs.' SOF ¶ 47.)

In the time since Snow left the Lake County Jail, Snow has not received a diagnosis that is inconsistent with those rendered by Dr. Kim. (Defs.' SOF ¶¶ 48, 49.) Moreover, Snow never requested to see on-site doctors or specialists once he was transferred to IDOC. (Defs.' SOF ¶ 62.) Snow has experienced no worsening of his alleged right side numbness, and no doctor has prescribed any pain medication other than that prescribed by Dr. Kim. (Defs.' SOF ¶ 50.) However, because his Albuterol inhaler had become ineffective, IDOC prescribed Snow a nebulizer to deliver his asthma medication. (Defs.' SOF ¶ 58.) The IDOC medical staff informed Snow that his Albuterol inhaler may have become ineffective because Snow used all 200 puffs contained within the device in four days, possibly damaging the lining of his lungs. (Defs.' SOF ¶ 59.)

## LEGAL STANDARD

**\*4** Summary judgment is appropriate when there remains "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *See* *Parent v. Home Depot U.S.A., Inc.,* 694 F.3d 919, 922 (7th Cir.2012). The party seeking summary judgment must first identify those portions of the record that establish there is no genuine issue of material fact. *U.S. v. King–Vassel,* 728 F.3d 707, 711 (7th Cir.2013) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). To survive such a showing, the nonmoving party must "present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Tri–Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL–CIO,* 433 F.3d 1024, 1030–31 (7th Cir.2006) (citing *Serfecz v. Jewel Food Stores,* 67 F.3d 591, 596 (7th Cir.1995)). Opposition to summary judgment requires more than a scintilla of evidence or some metaphysical doubt. *Nat'l Inspection Repairs, Inc. v. George S. May Int'l Co.,* 600 F.3d 878, 882 (7th Cir.2010) (citations omitted). The evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Wells v. Coker,* 707 F.3d 756, 760 (7th Cir.2013) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

When considering a motion for summary judgment, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir.2010) (citations omitted). The court does not make credibility determinations or weigh conflicting evidence. *George v. Kraft Foods Global, Inc.,* 641 F.3d 786, 799 (7th Cir.2011) (citations omitted). Therefore, issues of contract interpretation are "particularly amenable to summary judgment." *Automation By Design, Inc. v. Raybestos Prods. Co.,* 463 F.3d 749, 753 (7th Cir.2006).

## ANALYSIS

"The State has a constitutional duty to provide adequate medical treatment to those in its custody ..." *Currie v. Chhabra,* 728 F.3d 626, 630 (7th Cir.2013) (citations omitted). However, an Eighth Amendment violation exists only when a prison official "display[s] deliberate indifference

to serious medical needs of prisoners." *Greeno v. Daley,* 414 F.3d 645, 652–53 (7th Cir.2005) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). A serious medical need is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."*King v. Kramer,* 680 F.3d 1013, 1018 (7th Cir.2012) (citations omitted). Deliberate indifference requires showing that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The same standard is applicable to pretrial detainees bringing claims pursuant to the Fourteenth Amendment. *Board v. Farnham,* 394 F.3d 469, 478 (7th Cir.2005).

To survive summary judgment, Snow must show an "objectively serious medical need" to which Dr. Kim and Nurse Keegan were deliberately indifferent, *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir.2008), but not that he was "literally ignored." *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir.2010) (citation omitted). Delay in treatment alone can establish deliberate indifference if the condition is life threatening or sufficiently serious or painful. *Grieveson,* 538 F.3d at 779. However, "[n]egligence—even gross negligence—is insufficient to meet [the] standard [of deliberate indifference]." *King,* 680 F.3d at 1018.

### Serious Medical Need

**\*5** Prior to determining whether Defendants' actions rise to deliberate indifference to Snow's condition, it must be determined whether that condition represented a serious medical need. The framework for this evaluation is significantly narrowed by the undisputed facts, which demonstrate that asthma, in the absence of attacks, does not represent a serious medical need. Indeed, the Seventh Circuit has held that "asthma can be, and frequently is, a serious medical condition, *depending on the severity of the attacks*." *Board,* 394 F.3d at 484 (emphasis added).

Snow filed numerous grievances asserting that he experienced substantial delays when he requested a nurse bring him his inhaler.[2] Yet, Snow alleges in each instance primarily that he "began experiencing symptoms related to his asthma" and "requested" a nurse. (*See, e.g.,* Pl.'s SOF ¶¶ 4, 5, 6, 7, 8.) There is no evidence that Snow presented to anyone in such a way "that even a lay person would easily recognize the necessity for a doctor's attention." Moreover, there is no evidence that Snow's complaints were "diagnosed by a physician as mandating treatment," with the important exception of Dr. Kim's evaluations and prescriptions which all were followed.

Seventh Circuit law provides that the combination of circumstances surrounding the alleged violation determines whether asthma is a serious medical condition. *Compare**Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir.1999) ( asthma induced breathing problems, chest pain, and headaches were "objectively speaking, relatively minor"), *with**Lee v. Young,* 533 F.3d 505, 510 (7th Cir.2008) (asthma induced shortness of breath, tightening of the chest, and coughing amounted to a serious condition when viewed in light of the record demonstrating "some doctors classified his respiratory issue in this instance as a full-blown asthma attack,""several doctors did diagnose his asthma as 'severe,' " and that "he had gone to the emergency room as a result of it in the past"). Snow cites several cases in which asthma was determined to be a serious medical condition. However, the undisputed facts here do not demonstrate any of the objective factors present in those cited cases. *See, e.g.,**Board,* 394 F.3d at 484–85 (plaintiff was twice taken to the emergency room for his asthma and breathed heavily throughout the night); *Garvin v. Armstrong,* 236 F.3d 896, 898 (7th Cir.2001) (plaintiff was ordered by doctor to be transferred from general population to the infirmary).

The facts must be read in a light most favorable to Snow; however Snow has provided no evidence that he was in fact suffering asthma attacks each time he called for his inhaler. To the contrary, as discussed above, Defendants have provided evidence that Snow was not suffering asthma attacks. Therefore, the objective seriousness of Snow's medical condition has not been established to raise it to the level of a disputed material fact.

### Deliberate Indifference

Even if Snow could demonstrate that his medical need was sufficiently serious, he must also show that Dr. Kim and Nurse Keegan were deliberately indifferent. Furthermore, individual liability under Section 1983 requires Dr. Kim and Nurse Keegan be "personally involved in the alleged constitutional violation [s]." *McKinley v. Harrington,* No. 13–cv–00937–MJR, 2013 WL 5647847, at \*3 (S.D.Ill.

Oct. 15, 2013) (citing *Munson v. Gaetz,* 673 F.3d 630, 637 (7th Cir.2012)). "Although direct participation is not necessary, there must at least be a showing that the [Defendants] acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer v. Marion Cnty.,* 327 F.3d 588, 594 (7th Cir.2003) (citations omitted).

**\*6** Snow effectively alleges two types of deliberate indifference conduct: (1) that the course of treatment provided was not sufficient and (2) that nursing staff were frequently delayed when Snow requested them.

### Dr. Kim [3]

Snow acknowledges that Dr. Kim treated him, but asserts that the treatment was not enough. It is undisputed that Dr. Kim took oxygen levels and listened to Snow's lungs on every visit, prescribed a variety of pain medications, ordered at least one chest x-ray and electrocardiogram, and referred Snow to a neurologist. Yet, Snow argues that Dr. Kim's treatment amounted to a "dogged determination to superficially treat" Snow and he should have been referred to an outside physician.

"Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry,* 604 F.3d at 441 (citing *Estelle,* 429 U.S. at 106). Snow was not entitled to "unqualified access to healthcare," or his preference of treatments, but only what was adequate. *Holloway v. Delaware Cnty. Sheriff,* 700 F.3d 1063, 1073 (7th Cir.2012). Snow argues that Dr. Kim's treatment was not only inadequate but "easier and less efficacious."

In support of this argument, Snow relies heavily on *Berry,* in which an inmate awaiting transfer to the Department of Corrections was denied access to a dentist by jail doctors, despite repeated complaints of worsening pain, and was simply prescribed a variety of painkillers. However, there is an important distinction from the facts here: the plaintiff in *Berry* was seen by a dentist upon his transfer to the Department of Corrections and immediately was given a root canal, alleviating his complaint. That remedial treatment provided immediately by the dentist was effective is highly probative of deliberate indifference by the jail doctors. Snow cannot make a similar showing. Although Dr. Kim referred Snow to an off-site neurologist, there is a complete absence of facts demonstrating that the off-site neurologist even was able to diagnose Snow, let alone treat him for any illness, including asthma. [4]

Snow also attempts to draw parallels between his case and *Berry* by suggesting that Dr. Kim "presumed Mr. Snow could just 'endure' the pain until the [Snow] became IDOC's 'problem.'" (Pl.'s Response at 12.) In *Berry,* the plaintiff was transferred to the jail for ten weeks, due to overcrowding in the Department of Corrections, and the jail medical staff knew he would be transferred back at that time. *Berry,* 604 F.3d at 438. In contrast, Snow was confined in the Lake County Jail as he awaited trial in two separate cases. Snow was not convicted in the later of these until September 29, 2010, two weeks *after* Dr. Kim referred him to a neurologist. There is only Snow's speculation that Dr. Kim attempted somehow to pass off Snow's care when there is no indication Dr. Kim knew when Snow would be transferred.

**\*7** Lastly, Snow argues that, once he was transferred to IDOC, he was prescribed a nebulizer for the first time in his life, and "a jury could certainly conclude ... that his treatment at Lake County Jail ... was the catalyst of his exacerbated conditions." (Pl.'s Response at 7.) However, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir.1996) (emphasis in original). Snow has submitted no such verifying evidence. There simply is no factual basis that proves Dr. Kim's deliberate indifference. Accordingly, his Motion for Summary Judgment is granted.

### Nurse Keegan

Snow admits that Nurse Keegan's involvement with Snow's treatment is limited to the April 19, 2010 exam, during which Snow exhibited no symptoms, and Nurse Keegan's review and response to Snow's multiple grievances. During the April 19, 2010 exam, Nurse Keegan did not administer Snow's Albuterol inhaler because Snow presented no symptoms.

However, Snow's principle complaint is that Nurse Keegan's response to Snow's numerous grievances was deliberate indifference conduct. The facts establish that Nurse Keegan reviewed, investigated, and responded to every grievance, but found all but two of them unsubstantiated or unfounded. In each substantiated instance, Nurse Keegan addressed the problem, and it did not reoccur. Notwithstanding this fact,

Snow argues that Nurse Keegan violated his constitutional rights by not acting on his repeated complaints that his inhaler was not brought to his cell quickly enough. But "the alleged mishandling of [a plaintiff's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley,* 635 F.3d 950, 953–54 (7th Cir.2011). Additionally, as set out above, a claim that delay in providing his inhaler resulted in injury requires the submission of verifying medical evidence, which Snow has not produced.[5] Accordingly, Nurse Keegan's Motion for Summary Judgment is granted.

## CONCLUSION

For the reasons set forth above, Defendants Dr. Young Kim and Michael Keegan's Motion for Summary Judgment [78] is granted.

---

Footnotes

1　Admitted Statements of Fact are designated as either Defendants' ("Defs.' SOF") or Snow's ("Pl.'s SOF"), with the corresponding paragraph referenced.

2　Defendants argue that Snow cites only to copies of his grievances, not sworn or signed under penalty of perjury. However, Snow's deposition was submitted by Defendants and contains the same general allegations.

3　Snow does not argue that Dr. Kim was responsible for delays in nursing staff response, nor does anything in the record reflect that he was. In fact, Snow argues that the nursing staff failed to carry out the assessments Dr. Kim ordered. (Pl.'s Response at 8.)

4　Indeed, Dr. Kim's referral to the neurologist was "protective as opposed to medically necessary." (Defs.' SOF ¶ 69.)

5　In fact, it is undisputed that neither of the two substantiated grievances involved the timely administration of Albuterol. The first was a complaint that a nurse denied Snow ibuprofen, which Nurse Keegan addressed. The second was that Snow had not received a new medication prescribed by Dr. Kim, which Nurse Keegan also corrected.

---

**End of Document**　　© 2014 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22232830
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Ronald MYERS, # N-30973, Plaintiff,
v.
Dr. James McAULEY, et al., Defendants.

No. 02 C 1590.   |   Sept. 16, 2003.

**Attorneys and Law Firms**

Ronald Myers, pro se, Vienna, IL, for plaintiff.

John A. Ouska, John Michael Allegretti, Ashley Caroline Esbrook, Cook County State's Attorney, Chicago, IL, for defendants.

**Opinion**

### MEMORANDUM OPINION AND ORDER

COAR, J.

**\*1** The plaintiff, currently a state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff claims that the defendants, health care providers at the Cook County Jail, violated the plaintiff's constitutional rights by acting with deliberate indifference to his serious medical needs. More specifically, the plaintiff alleges that the defendants refused to provide proper maintenance and medical care for his tracheotomy/breathing tube. This matter is before the court for consideration of the defendants' motion for summary judgment. For the reasons stated in this order, the motion will be granted.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Prime Northgate Plaza Ltd. Partnership v. Lifecare Acquisitions Corp.,* 985 F.Supp. 815, 817 (N.D.Ill.1997). In determining whether factual issues exist, the court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Walker v. Northeast Regional Commuter Railroad Corp.,* 225 F.3d 895, 897 (7th Cir.2000).

However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 393 (7th Cir.1997), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1795, 140 L.Ed.2d 936 (1998).

### FACTS

The defendants have filed a statement of uncontested material facts pursuant to Local Rule 56.1. Together with their motion, the defendants served on the plaintiff the required notice under Local Rule 56.2, advising him what he needed to do to contest the motion, and specifically what he needed to do to dispute their statement of uncontested facts. In addition, the court's Minuto Order of July 10, 2003, struck the plaintiff's original statement of contested facts and instructed him how to respond, reminding him that every assertion of fact he made had to be supported by a citation to the record. Despite this, many of the plaintiff's denials are unsupported by the evidence to which he points. Unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., Johnson v. Spiegel, Inc.,* No. 02 C 0680, 2002 WL 1880137, at \*4 (N.D.Ill. Aug.15, 2002) (Pallmeyer, J.), *citing In the Matter of Morris Paint and Varnish Co.,* 773 F.2d 130, 134 (7th Cir.1985). Furthermore, the plaintiff has failed to provide his own statement of additional facts he wishes the court to consider.

**\*2** The plaintiff's failure to properly respond to the defendants' statements of material facts as directed warrants disregard of any contrary assertions he makes in his briefs. *See Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir.2003). The court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Id., citing Bordelon v. Chicago School Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir.2000). And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. *Edward E. Gillen Co. v. City*

*of Lake Forest,* 3 F.3d 192, 196 (7th Cir.1993).

Nevertheless, because the plaintiff is proceeding *pro se,* the court has considered the factual assertions he makes in his brief and affidavit, but only to the extent that the plaintiff could properly testify about the matters asserted at trial. Affidavits must concern facts about which the affiant is competent to testify, must be based on personal knowledge, and must set forth such facts as would be admissible in evidence. Fed.R.Civ.P. 56(e). A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed.R.Evid. 602. It should additionally be noted that the validity of medical records and entries in the medical records cannot be disputed in the absence of any contrary evidence. *Moss v.. Morman,* No. 99 C 3571, 2001 WL 1491183, at *4 (N.D.Ill. Nov.26, 2001) (Andersen, J.)

The court therefore finds that the following facts are undisputed for purposes of this motion [or there is no genuine issue as to these facts]: The plaintiff, Ronald Myers, is a state prisoner. (Defendants' Exhibit A, Deposition of Plaintiff Ronald Myers, at p. 6.) At the time of the events giving rise to this action, the plaintiff was an inmate at the Cook County Jail. (Amended Complaint, p. 2, Part I, "Plaintiff(s)" section.)

The defendant James McAuley is the jail's Medical Director. (*Id*., Part II, "Defendant(s)" section, pp. 2-2A.) The defendants Andrew Ting and Mohammed Mansour are staff physicians at the jail. (*Id.*) The defendant Carlos Altez is a physician's assistant at the jail. (Defendants' Answer, ¶ 10.)

In September 1999, the plaintiff had a tracheotomy or tracheostomy because of breathing problems and because one of his vocal cords was not working properly. (Plaintiff's Deposition, pp. 10, 13.) The surgery left the plaintiff with a stoma1 in his neck. (*Id.,* p. 10.) A device consisting of a permanent tracheotomy tube attached by "fangs" was placed in the plaintiff's neck during the surgery. (*Id.,* pp. 10-12.) To keep the tracheotomy tube clean and free of fluid and other obstructions, the plaintiff regularly used a suctioning device as well as a "trach kit" (brush, wires, pipe cleaners, cotton swabs, and gauze). (*Id.,* pp. 14-15.)

***3** On July 28, 2001, almost two years after the tracheotomy tube was implanted, the plaintiff was arrested for residential burglary and held at the Cook County Jail pending trial. (Amended Complaint, p. 6; Plaintiff's Deposition, p. 8.) The plaintiff was incarcerated at the jail from July 28, 2001, to May 20, 2002. (*Id.*)

Upon the plaintiff's arrival at the jail, a physician performed an initial medical screening in the receiving unit. (*Id.,* pp. 8-9; Defendants' Exhibit B, Medical Records, pp. 1-4, "Medical Intake Record and assessment forms.") Following the medical screening, the plaintiff was placed in Division 10, the segregation unit, overnight. (Plaintiff's Deposition, p. 16.)

The next day, the plaintiff was seen at Cermak Health Services Emergency room by Dr. Enoch Anaglate (not a defendant). (Plaintiff's Deposition, p. 18; Medical Records, pp. 5-7.) Anaglate noted that the plaintiff had a tracheotomy tube and complained of shortness of breath. (Medical Records, p. 6.) Anaglate prescribed three medications: Compazine [a medication used to control nausea and vomiting, according to the *Physician's Desk Reference,* 57th cd. (2003), at p. 1489], Imodium [a medication aimed at diarrhea and gastro-intestinal problems], and Raitin [which does not appear in the *PDR* ], along with daily stoma care. (*Id.,* pp. 7-8, 53.) Although the doctor's notes are only semi-legible, the court can discern that he wrote, "ø SOB" (no shortness of breath). (*Id.,* p. 5.)

After seeing the doctor, the plaintiff was transferred from Division 10 to the Residential Treatment Unit, or "Medical Dormitory." (Plaintiff's Deposition, pp. 18-19; Medical Records, pp. 6, 7.) On the plaintiff's medical dormitory admission form, Anaglate listed the plaintiff's medications and noted that he needed dressing changes for his tracheotomy tube. (Medical Records, p. 7.) The plaintiff remained in the medical dormitory until May 13, 2002, a week before he left the jail. (Plaintiff's Deposition, p. 18.)

When the plaintiff arrived at the jail, his throat was unclogged and he initially experienced "no problems" with the tracheotomy tube. (Plaintiff's Deposition, p. 21; Medical Records, p. 7.)

Although the plaintiff claims that the jail did not have a functioning mechanical suction pump (Plaintiff's Deposition, pp. 23-25), the health care staff did provide him with tracheotomy care kits like the ones he would obtain from the hospital prior to his incarceration. (*Id.,* pp. 24-26.) The plaintiff's medical records reflect that he received tracheotomy care daily, or nearly daily. (Defendants' Exhibit B, Treatment Dressing Records, pp. 41-47.) However, the plaintiff maintains that on certain occasions, he went up to ten days without a kit. (*Id.,* pp. 22, 24; Plaintiff's Exhibit D, Affidavit of Ronald Myers, ¶ 2.)2 The nursing staff generally watched the plaintiff clean his tracheotomy to make sure that he did it correctly. (Plaintiff's Deposition, pp. 20, 23, 26.)

**\*4** On August 9, 2001, the plaintiff filled out a Detainee Health Service Request form stating that he needed to see a doctor because his tracheotomy tube did not "feel right." (Defendants' Exhibit B, p. 9.) The plaintiff was referred to "sick call" the same day. (*Id.*)

The plaintiff saw Dr. Ting for the first time on August 14, 2001. (Defendants' Exhibit B, Medical Records, p. 10.) At that visit, the plaintiff complained of a weak suction machine. (*Id.,* p. 11.) The plaintiff told Ting that he did not wish to change from his implanted tracheotomy tube to a removable one that was attached as a "cuff with ties" because he feared risk of injury from other inmates. (*Id.*) Ting prescribed the plaintiff Amoxicillin (an antibiotic), Tylenol and Motrin. (*Id.,* p. 53.) Ting also referred the plaintiff to an ENT (ear, nose and throat) specialist. (*Id.,* p. 10.)

The plaintiff saw an ENT specialist ten days later, on August 24, 2001. (Plaintiff's Deposition, p. 27.) At the time of his first visit to the ENT specialist, the plaintiff was not experiencing any throat problems. (*Id.,* p. 28.) Either the ENT doctor or the defendant Ting wrote the plaintiff prescriptions for tracheotomy care (saline irrigation) and a bedside humidifier. (Medical Records, p. 56.) The specialist recommended that the plaintiff return to Cermak in four weeks.

The plaintiff maintains that he began to experience problems swallowing and eating around the end of August 2001. (Plaintiff's Deposition, pp. 28-29.) On August 29, 2001, the plaintiff submitted a Detainee Health Service Request form indicating that he found a small amount of bright red blood when he cleaned out his tracheotomy tube. (Medical Records, p. 12.) The request slip did not mention any problems breathing or eating. (*Id.*) A nurse who spoke to the plaintiff noted that he had no breathing problems, that he was just concerned by the sight of blood. (*Id.*)

On September 17, 2001, the plaintiff was treated in the Cermak Emergency Room for a scalp laceration after he fell in the shower. (Medical Records, pp. 13-14.) The Ambulance Report Sheet attributed the fall to "no lights." (*Id.,* p. 13.) The medical records do not reflect any statement by the plaintiff to health care providers that he fell because he had lost consciousness due to an inability to breathe. (*Id.,* pp. 13-15.) The plaintiff received staples or sutures. (*Id.,* pp. 14-15.) The staples were removed on September 24, 2001, upon the plaintiff's request. (*Id.,* p. 16.)

On October 3, 2001, the plaintiff saw the defendant Altez at Cermak. (*Id.,* p. 17.) Altez wrote a prescription for the plaintiff to continue receiving routine tracheotomy care with suction for six weeks. (*Id.,* pp. 17, 56.) Carlos also referred the plaintiff to an ENT to evaluate the plaintiff's request for closure of his tracheotomy tube. (*Id.,* pp. 17-18.)

On October 21, 2001, the plaintiff filled out a health service request form complaining that he had not yet seen the ENT. (*Id.,* p. 19.) An appointment was scheduled for November 10, 2001. (*Id.,* p. 20.)

**\*5** At the November 10, 2001, appointment, the ENT physician noted that the plaintiff's neck was "clean, no messes," that the tracheotomy tube was capped and in place, and that there were "no ulcers or messes." (*Id.,* p. 20.) The doctor additionally noted that the plaintiff "denied" shortness of breath. (*Id.*). The doctor directed that routine tracheotomy care be continued, and that he return to the ENT in four to six weeks. (*Id.*)

On November 13, 2001, the plaintiff saw the defendants Ting and Altez about his tracheotomy. (*Id.,* p. 21.) At that appointment, the plaintiff denied acute complaints, according to the medical progress notes. (*Id.,*) The plaintiff was directed to continue with the routine tracheotomy care and return to Cermak in two to three weeks. (*Id.*)

Ten days later, on November 23, 2001, the plaintiff saw an ENT doctor again.[3] At that time, the plaintiff reiterated that he wanted his tracheotomy tube removed. The physician recommended Ocean Nasal Spray for the plaintiff, directed him to continue the maintenance plan previously put in place, and scheduled an appointment for twelve weeks later. Ting wrote a prescription for nasal spray on the same day. (*Id.,* p. 57.)

Twelve days later, on December 4, 2001, the plaintiff returned to Cermak for a follow-up visit. (*Id.,* p. 22.) The defendant Mansour examined the plaintiff and charted that his stoma (tracheotomy tube) was clean, that there was no evidence of infection, and that the plaintiff's lungs were clear. (*Id.*) Mansour renewed the nasal spray prescription, recommended that the plaintiff continue with routine tracheotomy care, and scheduled a return appointment on January 29, 2002. (*Id.,* pp. 22, 57.)

On January 4, 2002, the plaintiff saw an ENT specialist again. (*Id.,* p. 25.) At that appointment, the plaintiff requested an appointment at the Cook County Hospital for routine cleaning. (*Id.*) The doctor indicated that he would refer the plaintiff to the hospital and scheduled a return appointment in eight weeks. (*Id.*)

On January 27, 2002, the plaintiff filled out a health service request form insisting that he needed to go to the

hospital. (*Id.,* p. 23.) The plaintiff complained that he could not breathe, that his tracheotomy tube hurt when he cleaned it, and that the tube was blocked. (*Id.*) An appointment was scheduled for two days later. (*Id.*)

Dr. Mansour examined the plaintiff again on January 29, 2002. (*Id.,* p. 24.) Mansour noted the plaintiff's subjective complaints, but his objective observations were that the plaintiff's throat was clear and without lesions, that he demonstrated no shortness of breath, that he said he was not having problems breathing or talking, that the tube was in place, that there was no drainage, that the tube looked clear of mucus, and that there was "very good air exchange." (*Id.*) Mansour scheduled a follow-up appointment the following week and gave the plaintiff another prescription for Ocean Nasal Spray. (*Id.*)

**\*6** At a doctor's visit on February 4, 2002, Mansour noted that the plaintiff had "ø complaints @ present" and that he was scheduled at Cook County Hospital's Fantus Clinic four days later for a possible tube change. (*Id.,* p. 26.) Mansour ordered another prescription for nasal spray. (*Id.*)

On February 10, 2002, the plaintiff submitted another detainee health service request form. (*Id.,* p. 27.) The plaintiff stated, "I need to see the Doctor about my trach tube being cloggy & bleeding." (*Id.*) The defendant Altez noted on the form that an ENT had referred the plaintiff to Fantus Clinic and that the plaintiff was "waiting to go," but that the appointment had been postponed twice. (*Id.*) Altez further noted that the plaintiff nevertheless showed no signs of infection. (*Id.*)

The plaintiff was seen at Cermak's "sick call" on February 14, 2002, four days later. (*Id.,* pp. 28, 29.) Ting referred the plaintiff back to an ENT specialist. (*Id.*)

The next day, February 15, 2002, the plaintiff saw an ENT at the Cook County Hospital. (Plaintiff's Deposition, p. 61.) At that visit, the ENT replaced the plaintiff's tracheotomy tube. (*Id.*) Later that day, the plaintiff returned to Cermak Health Services and saw another ENT. (*Id.,* p. 63; Plaintiff's Medical Records, p. 28 .) The Cermak ENT examined the plaintiff and recommended that he return in sixteen weeks. (Medical Records, p. 28.) Unspecified health care personnel also wrote the plaintiff a prescription for pain medication, although the plaintiff states that he never received it. (Plaintiff's Deposition, p. 63.)

Two or three days after his tube was replaced, the plaintiff saw the defendant Ting. (*Id.,* p. 65.) The plaintiff told the doctor he was still in pain. (*Id.*) Ting prescribed the plaintiff new medication. (*Id.*)

On February 20, 2002, the plaintiff filled out another detainee health service request form asking for pain medication. (Medical Records, p. 30.) A health care provider named Brown noted on the form the next day, "Detainee stated difficult to swallow, swollen, & painful. -A new trach put in [illegible]. B [lood] p[ressure] 132/76. Tylenol Suspension Liq. 30 cc." (*Id.*) A "sick call" appointment was scheduled for March 12, 2002. (*Id.*) In addition, Dr. Ting prescribed Amoxicillin and Motrin to combat pain and infection. (Medical Records, p. 61.)

On February 24, 2002, the plaintiff filled out another detainee health service request form, complaining of persisting pain. (*Id.,* p. 31.) A licensed practical nurse who spoke to the plaintiff noted on the form that the plaintiff was claiming throat and neck pain and insisting that the pain was not relieved by Tylenol. (*Id.*)

On March 4, 2002, the plaintiff filled out another request form asking to see a doctor. (*Id.,* p. 32.) The plaintiff wrote, "You put me on pain medicine and now it stop[ped]. I need to see you doctor about this and the other medicine stop." (*Id.*) The plaintiff was referred to sick call the same day. (*Id.*)

**\*7** On March 12, 2002, the plaintiff had an appointment with the defendant Mansour. (*Id.,* p. 33.) Mansour's notes concerning the examination indicated that the plaintiff "feels much better," that his breathing was better, that his vital signs were "OK," that his tracheotomy bore no evidence of infection, that the tracheotomy tube was in place, and that his lungs were clear. (*Id.*) Mansour prescribed the plaintiff Tylenol and Disalcid [a non-steroid anti-inflammatory drug also used for pain]. (*Id.,* p. 63.)

On March 20, 2002, the plaintiff saw Dr. Ting again. (*Id.,* p. 34.) Ting noted on the plaintiff's medical progress notes that he complained of difficulty swallowing for about a month, but that there were no objective signs of a problem. (*Id.*) The plaintiff had no difficulty talking or breathing, his neck was supple, and the tracheotomy tube was clean and without blockage or obstructions. (*Id.*) Because the plaintiff complained that the Amoxicillin caused gastro-intestinal problems, Ting prescribed three new medications: Motrin, Naprosyn (another non-steroidal anti-inflammatory pain medication), and Taguire. (*Id.,* p. 63.) [Neither party explains what Taguire is used for and the drug is not listed in the *Physician's Desk Reference.*] Ting referred the plaintiff to an ENT two days later and directed that he return to Cermak in four to six weeks. (*Id.,* p. 34.)

On March 22, 2002, an ENT specialist examined the plaintiff. (*Id.,* p. 35.) The ENT noted that the plaintiff's

mouth was pink and moist and without lesions, and that his neck was soft and supple. (*Id.*) The ENT directed that the plaintiff return in two weeks. (*Id.*)

On March 27, 2002, the plaintiff was prescribed Ibuprofen and Prevacid (a medication used to relieve heartburn, acid reflux and ulcers). (*Id.,* p. 62.)

On April 19, 2002, an unnamed physician referred the plaintiff back to an ENT specialist for a follow-up appointment. (*Id.,* p. 36.) The plaintiff saw the ENT the next day, April 20, 2002. (*Id.*) Although the ENT's notes are illegible, the consultation form shows that the plaintiff was to return in six weeks. (*Id.*)

On April 30, 2002, the plaintiff saw the defendant Ting at "sick call." (*Id.,* p. 37.) Among other [mostly illegible] notes, Ting charted that the plaintiff's neck was supple, that he demonstrated no trouble breathing and no shortness of breath, and that the tracheotomy tube looked clean. (*Id.*) At the same appointment, Ting prescribed the plaintiff Motrin, Prevacid, and Elavil (a drug used to treat depression and migraine headaches, as well as to manage chronic pain). (*Id.,* p. 63.) Ting prescribed Elavil because the plaintiff told him that Naprosyn was not casing his pain. (Plaintiff's deposition, pp. 39, 41.) Each time the plaintiff saw Dr. Ting and complained that the current pain medication was not alleviating his pain, Ting would prescribe a different drug. (*Id.,* p. 48.)

**\*8** On May 8, 2002, the plaintiff was evaluated for a transfer to 3 North (a hospital unit). (Medical Records, p. 39.) The doctor noted:

> Patient states doing well, not having problems č tracheostomy tube; getting tracheostomy care when needed; states he's very comfortable and happy č TRACHEOSTOMY care in RU Medical Area. States his tube has been changed and he's [illegible]. Denies shortness of breath, clogging of tube or problems breathing, also denies GERD symptoms. Pt has been seen by ENT doctors = 7x at Cermak being the last visit on 5/3/02. Also seen by ENT doctors at Cook County hospital about 4 or 5 times; and seen in sick call visits several times without any complaints of life threatening situations. Pt stable without any acute complaints and refuses to be transferred to 3 North hospital area. Refusal form signed by patient after patient was clearly explained about refusal implications. Pt also is a worker and has been working for over 4 months in RU Medical Area in the Clothing Department. Continue with tracheostomy care. Follow-up with ENT as advised. RTC as advised by Dr. Ting. (*Id.*)

At a second visit to the health care unit that day, the doctor noted on the plaintiff's medical progress chart:

> No complaints; said he feels fine.... He said he is happy with the tracheotomy care he is [illegible]. He said he is getting suction, [illegible], clean of tracheotomy hole daily. He said the nurse always gives him the cleaning kit and suction. When ever he wants. He said he has no problem with his tracheotomy care [illegible]. ø shortness of breath ø fever ø>>> obstruction. He feel (sic) fine. Alert [illegible], neck supple, [illegible] tracheotomy tube. [Illegible] clean. No obstructions.... (*Id.,* p. 40.)

The plaintiff signed a form confirming that he had refused placement on 3N/3W hospital wing for routine tracheotomy care.4 (*Id.,* p. 41.) Five days later, the plaintiff was transferred to another unit. (Defendants' Exhibit C, Housing History, p. 2.) The plaintiff left the jail on May 20, 2002, a week later. (Plaintiff's Deposition, p. 8.)

## DISCUSSION

Even viewing the record in the light most favorable to the plaintiff, no reasonable person could find that the defendants acted with deliberate to the plaintiff's serious medical needs. The record establishes that the plaintiff received comprehensive medical care, even if he was unsatisfied with it. The plaintiff's evidence, consisting of unsupported statements and contradictory sworn testimony, is insufficient to create a triable issue of fact. The plaintiff has failed to meet his burden under Fed.R.Civ.P. 56 for the case to survive summary judgment.

The court recognizes that, in ruling on a motion for summary judgment, the court cannot weigh the affidavits or the credibility of the parties. *Castillo v. United States,* 34 F.3d 443, 445 (7th Cir.1994). Nevertheless, "there is no issue for trial unless there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). The inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In this case, the evidence almost entirely refutes the plaintiff's allegations.

**\*9** It is well established that the Due Process Clause prohibits deliberate indifference to the serious medical needs of a pretrial detainee. *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir.1999); *Salazar v. City of Chicago,* 940 F.2d 233, 237-38 (7th Cir.1991). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the health care provider must be subjectively aware of and consciously disregard a risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v.. Gamble,* 429 U.S. 97, 103-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Sherrod v. Lingle,* 223 F.3d 605, 610 (7th Cir.2000). In this case, the court will assume for purposes of this motion that tracheotomy maintenance is a "serious" medical need; however, the plaintiff has failed to make a triable showing that the defendants acted with deliberate indifference.

In denying the defendants' motion to dismiss, the court noted that the fact that a prisoner received some medical attention does not necessarily defeat his Section 1983 claim; deliberate indifference to a serious medical need can be manifested by "woefully inadequate action" as well as by no action at all. *Reed v. McBride,* 178 F.3d 849, 854 (7th Cir.1999). But the more fully developed record demonstrates that the plaintiff received constitutionally adequate medical treatment. At best, the plaintiff has greatly exaggerated both his medical complaints and any deficiencies in the care he received; at worst, this is an entirely trumped-up lawsuit.

*No Serious Health Complication*

Even though the plaintiff's tracheotomy or tracheostomy pro-dated his incarceration by almost two years, the court finds that he had a "serious" medical condition. Under the Seventh Circuit's standard,

> A "serious" medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.... [Indications of a serious medical need include] the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.

See *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Even though the plaintiff's medical records repeatedly refer to "routine maintenance," the importance of a breathing tube is obvious; its proper functioning would constitute an objectively serious medical need. In fact, the medical staff deemed monitoring of the plaintiff's condition sufficiently important to house him in the residential treatment unit. The court therefore finds that the plaintiff's medical needs were "serious."

Nevertheless, the record fails to support the plaintiff's claim that he had serious complications during his incarceration at the jail. In his complaint, the plaintiff alleged that he endured agonizing pain, fainting, a great deal of bleeding, a diminished ability to eat and drink, and so much difficulty breathing that fellow inmates literally had to squeeze the air out of him on occasion. The medical records in no way substantiate those claims. To the contrary, the record indicates that the plaintiff suffered from relatively minor, chronic problems one might expect from having a tracheotomy tube in one's throat.

**\*10** Multiple facts lead the court to the inescapable conclusion that the plaintiff's medical problems did not rise to the level of severity contemplated by *Estelle* and its progeny. First, the plaintiff's "Treatment/Dressing Record," taken in the normal course of business, document tracheotomy care performed nearly every single day of the plaintiff's incarceration, from February 10, 2002, through July 31, 2001, through March 11, 2002. See Defendants' Exhibit B, Plaintiff's Medical Records, pp. 42-48. [Presumably, a page is missing from the record covering the plaintiff's last two months at the jail.]

Despite the daily Treatment/Dressing Records, the plaintiff insists that he sometimes went up to ten days without cleanings. But even if there were occasional missed dates, the routine care must have kept the plaintiff's tracheotomy tube reasonably clean, as the nurses' notes reflect no problems. To the contrary, while some of the plaintiff's health request slips described pain and breathing problems, none of the health care providers with whom he came into contact observed any objective

symptoms. Every single medical entry-by the named defendants, by non-defendant jail physicians, and by ENT specialists at both Cermak and the Cook County Hospital-states that the plaintiff's tracheotomy tube was clear and free of obstruction, that the plaintiff evidenced no difficulty breathing, and that there were no lesions or signs of infection.

The notes of both the general practitioners and specialists directed that the plaintiff continue with the "routine" maintenance plan and invariably directed that he return anywhere from four to eight weeks later for follow-up appointments; plainly, no one thought his health situation necessitated close supervision. The plaintiff's medical records make no mention of his ever communicating to the health care staff that he was fainting, unable to eat or drink, or relying on fellow inmates to squeeze the air out of him. The plaintiff's charts reflect no concerns whatsoever about major problems or complications.

The plaintiff did twice complain of bleeding, but occasional, minimal bleeding appears to be completely run-of-the-mill, just as with dental flossing. The first time, the sight of blood only made the plaintiff worry; he was not experiencing pain or other problems. *See* Defendants' Exhibit B, Medical Records, p. 12.) The second time, the defendant Altez examined the plaintiff but found no signs of infection. (*Id.,* p. 27.) The plaintiff has provided no medical evidence that he had any "serious" health problems associated with his tracheotomy tube.

*No Deliberate Indifference*

Even assuming (without finding) that the plaintiff did have any tracheotomy-related problems serious enough to implicate constitutional concerns, the record does not support a finding that the defendants acted with deliberate indifference to his condition. The plaintiff's medical records reflect a comprehensive maintenance plan, which included his placement in the hospital residential unit for closer observation than the plaintiff would have received had he been housed in general population, daily [or nearly] daily cleanings supervised by the nursing staff, numerous visits to the staff physicians, and frequent examinations by on-site and off-site ENT specialists. The plaintiff was provided with kits for tracheotomy care, and multiple medications were prescribed for antibiotic treatment and for pain. The doctors' notes uniformly reflect that care was "routine," and that the plaintiff was doing reasonably well for someone with a breathing tube inserted in his neck.

**\*11** It is not surprising that the plaintiff sometimes experienced pain, particularly after surgery to replace the tracheotomy tube. Certainly, prolonged and severe pain can amount to a serious medical need, *Walker v. Benjamin,* 293 F.3d 1030, 1039-40 (7th Cir.2002), and the subjective element of deliberate indifference encompasses conduct such as the refusal to treat a prisoner's chronic pain. *Jones v. Simek,* 193 F.3d 485 (7th Cir.1999). However, not every "ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters,* 111 F.3d 1364, 1370-72 (7th Cir.1997). In this case, the record establishes that the defendants made reasonable efforts to minimize any pain the plaintiff was experiencing.

The plaintiff has made inconsistent statements concerning the treatment of his pain. During the course of this case, the plaintiff has alternately stated that he received only over-the-counter Tylenol, that he never received prescribed pain medication, and that the pain medication he received was entirely ineffective. But as noted in footnote 2, a party may not create issues of credibility or fact by contradicting his own sworn testimony. *See also Ilhardt v. Sara Lee Corp.,* 118 F.3d 1151, 1152 n. 1 (7th Cir.1997); *Eckert v. Kemper Financial Services, Inc.,* No. 95 C 6831, 1998 WL 699656, *5 (N.D.Ill. September 30, 1998)* (Williams, J.), *inter alia.* If a party is allowed to create a genuine issue of material fact by changing his prior testimony, "the very purpose of the summary judgment motion-to weed out unfounded claims, specious denials, and sham defenses-would be severely undercut." *Babrocky,* 773 F.2d at 861. Contradictory testimony will not defeat summary judgment.

In his deposition, the plaintiff admitted that he did receive pain medication and that Dr. Ting would prescribe a different pain medication every time the plaintiff complained that the current drug was not alleviating his pain. *See* Plaintiff's deposition, p. 48. That fact is substantiated by the plaintiff's voluminous medical records, which reflect orders for various pain medications. The defendants' failure to assuage the pain altogether does not rise to the level of deliberate indifference. Where, as here, a physician provides constitutionally acceptable care, his or her inability to effect a final cure is not proof of deliberate indifference. *Snipes v. DeTella,* 95 F.3d 586, 591 (7th Cir.1996), *cert. denied,* 519 U.S. 1126, 117 S.Ct. 980, 136 L.Ed.2d 863 (1997). The defendants were not deliberately indifferent to any pain the plaintiff endured as a result of having a breathing tube.

The record does not conclusively establish whether the plaintiff generally had access to a properly functioning suction machine while he was incarcerated at the jail. Again, some of the confusion is caused by the plaintiff's own, varying representations: he has alternately claimed

that the suctioning machine had a weak vacuum pull, that it did not work at all, and that it was non-existent. But in any event, the court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *Matter of Wildman,* 859 F.2d 553, 556 (7th Cir.1988); *Nash v. DeTella,* No. 00 C 2784, 2001 WL 1160840, *2 n. 5 (N.D.Ill. Oct.2, 2001) (Zagel, J.) In this case, irrespective of whether the plaintiff had the use of a properly working suction pump, there is no genuine dispute that he had regular use of the cleaning tools of a tracheotomy kit, and that doctors never noted any obstructions or infection whenever they examined his breathing tube. The plaintiff's claim that the tube often became clogged is entirely unsubstantiated by his medical records.

**\*12** The medical staff addressed the plaintiff's concerns whenever he submitted a medical request slip complaining of a medical problem. Moreover, each of the defendants, as well as the ENT specialists at Cermak and at the Cook County Hospital, administered the same basic treatment plan. The fact that all of the plaintiff's treating physicians largely agreed on the care of his tracheotomy tube bolsters the conclusion that the defendants were not deliberately indifferent. *See Steele v. Choi,* 82 F.3d 175, 178-79 (7th Cir.), *cert. denied,* 519 U.S. 897, 117 S.Ct. 244, 136 L.Ed.2d 173 (1996); *see also Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 262 (7th Cir.1996), *cert. denied,* 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997) ( "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment").

In *Steele,* a prison physician diagnosed an inmate as suffering from a drug overdose and treated him accordingly. Doctors at an outside hospital reached the same conclusion; only after the inmate's condition deteriorated did health care professionals realize that the inmate was experiencing a brain hemorrhage. The Court of Appeals affirmed the entry of summary judgment in favor of the prison doctor, finding that "[i]f two sets of outside doctors could draw the same (erroneous) conclusion [about the nature and seriousness of the plaintiff's condition], it is difficult at best to claim that another diagnosis was 'obvious.' " *Steele,* 82 F.3d at 178. Here, as in *Steele,* other physicians made the same assessment, that the plaintiff was doing well; defendants and non-defendants alike also provided essentially the same, standard maintenance plan for the plaintiff's tracheotomy tube, belying any inference that the defendants' approach was blatantly inappropriate.

Although the plaintiff may have been dissatisfied with the caliber and efficacy of his overall care, the defendants' treatment did not violate the Constitution. Mere disagreement with a doctor's prescribed course of treatment does not implicate the Fourteenth Amendment. *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996), *cert. denied,* 519 U.S. 1126, 117 S.Ct. 980, 136 L.Ed.2d 863 (1997). Additionally, evidence that some medical professionals would have chosen a different course of treatment-evidence the plaintiff has not even provided in this case-might establish negligence, but is insufficient to make out a constitutional claim. *Collignon v. Milwaukee County,* 163 F.3d 982, 989 (7th Cir.1998), *relying on Steele,* 82 F.3d at 179. The Constitution is not a vehicle for bringing claims for medical malpractice. *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996).

It is not even entirely clear what better or different treatment the plaintiff wanted. Regardless, the question of whether a certain diagnostic technique or form of treatment should be prescribed "is a classic example of a matter for medical judgment." *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A prisoner does not have a right to a particular type of medical treatment. *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir.1987). A plaintiff can show that the professional disregarded a serious medical need "only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon,* 163 F.3d at 989. The plaintiff has not met his burden of production.

**\*13** Any brief delays in receiving medical attention are not actionable under 42 U.S.C. § 1983 under the facts of this case. Where a plaintiff alleges a constitutional violation based on a delay of medical treatment, "the relevant question is whether the delay in access to treatment was so unreasonable under the circumstances as to suggest deliberate indifference." *Brown v. Briick,* 92 C 2094, 1995 WL 263488, *7 (N.D.Ill. May 3, 1995) (Nordberg, J.) The plaintiff complains that he spent one night in the segregation unit before being transferred to the medical unit, but as discussed above, the plaintiff had no serious condition that warranted hospitalization; his treating physicians placed him in the residential treatment unit only because his tracheotomy tube required regular, ongoing maintenance. In fact, the plaintiff eventually chose not to reside in the treatment unit and was moved to the general population, contrary to the defendants' recommendation.

Furthermore, the replacement of the plaintiff's tracheotomy tube was apparently entirely elective; it is undisputed that the plaintiff himself declined to have the

stoma replaced for some time before he eventually decided he wanted a removable tube. *See* Defendants' Exhibit B, Medical Records, p. 11. Because replacement of the plaintiff's tracheotomy tube was not critical, he is not entitled to damages for having to wait for the procedure. Where, as here, the plaintiff's medical complaints were of a non-emergency nature, the short delays in providing treatment did not amount to deliberate indifference. *See, e.g., Gutierrez v. Peters,* 111 F.3d at 1374; *Lucien v. Godinez,* 814 F.Supp. 754, 755 (N.D.Ill.1993). A plaintiff who complains that a "delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters,* 100 F.3d 1235, 1240 (7th Cir.1996) (emphasis in original), *quoting Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995).

In sum, the medical care provided by the defendants was not so erroneous or so woefully inadequate as to amount to an essential denial of medical care. *Reed v. McBride,* 178 F.3d 849, 854 (7th Cir.1999). Although the plaintiff alleges that he suffered dire problems stemming from his tracheotomy tube, his medical records do not reflect that he communicated most of the worst of his alleged concerns to the medical staff. As to those problems that he did voice, the medical staff found no objective signs of problems or infections to substantiate the plaintiff's concerns. The plaintiff has provided no medical records and no witnesses to support his claims.

*Conclusion*

Even drawing every reasonable inference in favor of the plaintiff, the court finds that the defendants have established that they are entitled to judgment as a matter of law. The record shows that the plaintiff had no serious medical need, apart from routine maintenance of his tracheotomy tube, and that, in any case, the defendants did not act with deliberate indifference. The plaintiff has failed to cite any independent evidence in support of his claims that he had serious health complications, that he did not receive routine stoma care, or that he was otherwise denied needed medical attention. The vast weight of the evidence supports the defendants' position; the court finds that no reasonable person could conclude that the defendants acted with deliberate indifference to the plaintiff's serious medical needs. Consequently, the defendants' motion for summary judgment must be granted.

**\*14** For the foregoing reasons, the case is terminated. If the plaintiff wishes to appeal this final judgment, he must file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R.App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R.App. P. 24(a)(1)(C); *Hyche v. Christensen,* 170 F.3d 769, 771 (7th Cir.1999). If the plaintiff does choose to appeal, he will be liable for the $105 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections,* 150 F.3d 810, 812 (7th Cir.1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a "strike" for purposes of 28 U.S.C. § 1915(g). The plaintiff is warned that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to slate a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (docket # 52) is granted. The clerk of the court is directed to enter judgment in favor of the defendants pursuant to Fed.R.Civ.P. 56. The case is terminated. The parties are to bear their own costs.

Footnotes

1   A stoma is an artificial permanent opening made in surgical procedures, according to *Merriam-Webster's Collegiate Dictionary* (10th ed.), at p. 1158.

2   For purposes of summary judgment, the court will accept as true the factual representations the plaintiff makes in his sworn affidavit (unless in conflict with his deposition testimony). However, the plaintiff cannot now retract the statements he made during his deposition. A party may not create issues of credibility by contradicting his own earlier, sworn testimony. *See, e.g., Bank of Illinois v. Allied Signal Safety Restraint Systems,* 75 F.3d 1162, 1168-69 (7th Cir.1996), *relying on Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985), *inter alia.*

   Furthermore, the court has disregarded the plaintiff's references to medical records he altered. Indeed, although the plaintiff has explained in response to the defendants' motion to strike that he did not intend to mislead the court, his submission of tampered medical records could easily be construed as "fraud" upon the court, which must "lead to immediate termination of the suit." *Sloan v. Lesza,* 181 F.3d 857, 859 (7th Cir.1999).

3   The court finds no medical records for November 21, 2001. However, the plaintiff does not contest the representations made by the defendants in this paragraph.

**Myers v. McAuley, Not Reported in F.Supp.2d (2003)**

| | |
|---|---|
| 4 | The medical progress notes reporting that the plaintiff was completely satisfied with his tracheostomy care just weeks after he filed suit may be taken with a grain of salt. However, the plaintiff cannot deny that he declined placement in the hospital wing since the signed refusal form is in the record. |

**End of Document**  © 2012 Thomson Reuters. No claim to original U.S. Government Works.

